# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | :: | |
| | :: | CRIMINAL CASE NO. |
| v. | :: | 1:21-cr-00328-MLB-RGV |
| | :: | |
| BRIAN SPERBER and | :: | |
| EDMOND NORKUS | :: | |

## <u>MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER</u>

Defendants Brian Sperber ("Sperber") and Edmond Norkus ("Norkus"), jointly referred to as "defendants," are charged in a ten-count superseding indictment with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1957, and 2.  [Doc. 58].[1]  Norkus has filed a motion for bill of particulars, [Doc. 98], which the government opposes, [Doc. 107], and he also has filed a motion to adopt, [Doc. 96], Sperber's motion to dismiss

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

multiplicitous counts, [Doc. 25],[2] and a motion to dismiss Counts Seven through Ten, [Doc. 103], which Sperber has moved to adopt, [Doc. 106].  Defendants also have filed a corrected joint motion to dismiss multiplicitous counts, [Doc. 105],[3] as well as a motion to dismiss the wire fraud counts, [Doc. 115].  The government opposes defendants' multiple motions to dismiss, see [Docs. 108, 109, & 125], and defendants have filed joint replies in support of the motions, [Docs. 113, 114, & 127].  Norkus also has filed a motion to suppress statements, [Doc. 97], and following an evidentiary hearing on this motion on May 10, 2023,[4] the parties filed

---

[2] Sperber filed a motion to dismiss multiplicitous counts on January 13, 2022, [Doc. 25], prior to the return of the superseding indictment, [Doc. 58], but he failed to perfect the motion after being provided an opportunity to do so, see [Doc. 26], and a Report, Recommendation, and Order, issued on June 13, 2022, [Doc. 39], directed the Clerk to terminate the motion, since it was "deemed to have been abandoned," [id. at 2].  Norkus filed a motion to adopt, [Doc. 96], Sperber's motion to dismiss, [Doc. 25], after the Court had already directed the Clerk to terminate it, [Doc. 39]. However, following the return of the superseding indictment, [Doc. 58], the Court provided Sperber an opportunity to perfect his motion to dismiss and Norkus an opportunity to perfect his motion to adopt, see [Doc. 101], and they have now filed perfected motions that are pending before the Court, [Docs. 103, 105, & 115]. Because Norkus' original motion to adopt, [Doc. 96], pertains to a motion that is no longer pending and was directed at the original indictment, see [Doc. 25], and defendants have since perfected their motions to dismiss with respect to the superseding indictment, his motion to adopt, [Doc. 96], is **DENIED AS MOOT**.

[3] Defendants filed an initial joint motion to dismiss, [Doc. 104], but after the Clerk directed them to include information for counsel for both defendants, they filed the corrected joint motion, [Doc. 105].

[4] See [Doc. 139] for a transcript of the evidentiary hearing held on May 10, 2023, which will be referred to as "(Tr. at ___)" and cited according to the page number

post-hearing briefs, see [Docs. 142, 143, & 144]. For the reasons that follow, Sperber's motion to adopt, [Doc. 106], is **GRANTED**, Norkus' motion for bill of particulars, [Doc. 98], is **DENIED** and his motion to adopt, [Doc. 96], is **DENIED AS MOOT**, and it is **RECOMMENDED** that defendants' motions to dismiss, [Docs. 103, 105, & 115], and Norkus' motion to suppress statements, [Doc. 97], be **DENIED**.[5]

## I. INTRODUCTION

On August 25, 2021, a federal grand jury in the Northern District of Georgia returned an indictment against Sperber, [Doc. 1], and on September 20, 2022, a superseding indictment was returned against both defendants, charging them with four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; one count

---

located in the top right corner of the transcript. In addition, the government submitted an exhibit at the evidentiary hearing, see [Docs. 132 & 134], which will be referred to as "(Gov't Ex. 1)."

[5] Sperber also filed a motion to maintain filing ex parte and under seal, [Doc. 52], in which he requests that the affidavit he filed providing information regarding his financial status remain under seal and ex parte, [id. at 1, 3]. The Honorable Michael L. Brown, United States District Judge for the Northern District of Georgia, provided the government an opportunity to respond to this motion, see [Doc. 54], but rather than file a response, the government indicated at an evidentiary hearing before Judge Brown on September 26, 2022, see [Doc. 118], that it had been provided the exhibits that were attached to the affidavit, and the government appeared satisfied with the information provided, [id. at 3]. Accordingly, it is **RECOMMENDED** that Sperber's motion to maintain filing ex parte and under seal, [Doc. 52], be **GRANTED**.

of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); two counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2; and two counts of money laundering, in violation of 18 U.S.C. §§ 1957 and 2, [Doc. 58]. In particular, the superseding indictment alleges that "[b]eginning in or about 2020 and continuing until in or about March 2021," Sperber, who "owned a healthcare distributor located in Florida named Ark GBST [('Ark')] that distributed [personal protective equipment ('PPE')] on behalf of O&M Halyard[, Inc. ('O&M Halyard')]," a subsidiary corporation that maintained its principal place of business in Alpharetta, Georgia, and is a manufacturer and wholesale distributor of PPE, and Norkus, who "owned Champion Resources, a logistics company located in Florida that provided logistical services for Ark" and "also procured PPE for customers largely through its relationship with Sperber's various companies," engaged in a "scheme to defraud a PPE supplier as well as victims who sought to procure PPE for hospital and medical institutions" and that through "a combination of falsified invoices, emails, and other documents," defendants "defrauded prospective PPE purchasers out of more than $12 million, much of which they used for [their] own personal benefit," including  the purchase of Sperber's waterfront mansion and Norkus' condominium.  [Id. ¶¶ 1, 3-4, 8-9 (all caps omitted)].

The superseding indictment charges that "[a]lmost as soon as [Sperber] became an authorized O&M Halyard distributor in September 2019, [he] failed to pay for previously shipped PPE," despite the fact O&M Halyard employees repeatedly told him that he "needed to pay down his outstanding balance in order to remain an authorized distributor." [Id. ¶ 10]. It is alleged that despite owing a substantial amount of money to O&M Halyard, defendants "sent fabricated O&M Halyard emails and invoices to Victim A," a broker located in New York that "sought to procure PPE for [a] Chinese hospital and medical institutions," that "falsely claimed O&M Halyard had an ample supply of N95 masks that was ready to be shipped," enticing Victim A to wire $3,144,960 to Champion Resources for the PPE, with "an expected ship date of February 12, 2020." [Id. ¶¶ 5, 11]. Norkus is alleged to have "used approximately $875,000 of those funds to purchase a condominium" in Florida, and to have wired $1,865,750 to Sperber, "who used those funds to pay down an outstanding balance of over $1 million on previous orders with O&M Halyard." [Id. ¶ 11]. Defendants, however, "led Victim A to believe that the funds were being used to purchase new PPE for Victim A," by, for example, Norkus sending a text message to Victim A on February 10, 2020, "with a fabricated banking statement that falsely claimed Champion Resources had wired nearly $3 million to O&M Halyard." [Id.]. Because Victim A had not received any PPE by February 13, 2020, it asked Norkus for a status update,

leading Norkus to email Sperber, "You need to call me bro I have it set up where we can talk while I'm [i]n front and your [sic] acting as [O&M Halyard.] It's perfect to get us next level," and because Victim A still had not received any PPE by February 27, 2020, Norkus forwarded an email that Sperber "had purportedly received from O&M Halyard, stating, 'I want you to understand your order is confirmed[,]'" and Norkus then forwarded the email he sent to Victim A to Sperber and stated, "What I had to send yesterday FYI." [Id. ¶ 12 (internal marks omitted)].

In addition, the superseding indictment alleges that in early 2020, Sperber negotiated the purchase of PPE by Victim B, a pharmaceutical and medical products wholesaler in Florida that "sought to procure PPE for an international healthcare company," and that defendants "led Victim B to believe that Sperber could acquire a substantial amount of PPE from O&M Halyard and Dukal," a medical supply and medical product manufacturer of PPE located in New York, even though Sperber had been notified by O&M Halyard "that an order of that size was not possible," and Dukal "had never confirmed . . . that they could deliver the quantities of PPE that Victim B needed." [Id. ¶¶ 2, 6, 13 (all caps omitted)]. It is alleged that in order to "convince Victim B into believing they had access to additional quantities of PPE, Norkus displayed pallets of PPE in a warehouse" and that subsequently, Victim B "gave a $2.8 million cashier's check to an individual

6

operating on behalf of Sperber," who then "delivered a portion of the glove order to Victim B and promised that the difference would be made up in subsequent orders."  [Id. ¶ 14 (all caps omitted)].  On March 31, 2020, "Victim B sent an additional $8.25 million to Sperber for the purchase of N95 masks," and on May 1, 2020, "Victim B sent an additional $2.5 million to Sperber for the purchase of N95 masks."  [Id. (all caps omitted)].  Thereafter, defendants "sent a series of false and misleading emails, invoices and messages falsely suggesting that the PPE from O&M Halyard was set to be delivered," and they "also sent fabricated Dukal documents and emails to Victim B purportedly showing that Dukal had an ample supply of N95 masks that was ready to ship."  [Id. ¶¶ 15-16].[6]

---

[6] For example, the superseding indictment details that on April 30, 2020, Sperber emailed Victim B in response to its request for an update that he "expect[ed] this to move asap."  [Doc. 58 ¶ 15 (internal marks omitted)].  On May 1, 2020, Norkus also forwarded an email to Victim B that "had purportedly been sent from O&M Halyard stating, 'as discussed yesterday these 4 orders are now shipping.'"  [Id.].  It is alleged, however, that defendants "knew this email was fabricated and that O&M Halyard had not shipped Victim B's orders."  [Id.].  Norkus is alleged to have also forwarded an email to Victim B on May 1, 2020, "that was purportedly sent by [a] Dukal employee" and then "pressed Victim B on making payments for N95 masks," prompting Victim B to "immediately wire[] $2.5 million to Sperber to pay for the Dukal N95 masks," even though defendants "knew that the forwarded Dukal email was fabricated."  [Id. ¶ 16 (all caps omitted)].  On May 25, 2020, "Victim B emailed Sperber and asked about the status of the Dukal N95 masks," and Sperber "responded by forwarding a fabricated Dukal spreadsheet that falsely listed N95 masks as being available," even though Sperber had confirmed to a Dukal representative on May 4, 2020, that he had been told about "the lack of inventory in existence."  [Id. (all caps and internal marks omitted)].

The superseding indictment also alleges that, at times, Sperber "used the victims' funds to pay down his outstanding balance with O&M Halyard that had been incurred prior to February 2020." [Id. ¶ 17].[7]  It also alleges that defendants "used a substantial portion of the victims' funds for [their] own personal benefit," including that "[f]rom March 26 to May 4, 2020, Sperber used millions of dollars of Victim B's funds to purchase a waterfront mansion," as well as "for a variety of personal and business expenditures," such as "renting a private jet, purchasing jewelry, and purchasing food at restaurants," and that Norkus "used approximately $875,000 of Victim A's funds to purchase a condominium[.]" [Id. ¶ 19 (all caps omitted)].

The superseding indictment specifically charges defendants in Counts One through Four with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, based on

---

[7] For example, the superseding indictment details that on April 13, 2020, Sperber emailed an O&M Halyard employee that $50,000 had been wired as he knew "we had a small invoice coming due," and he was "also trying to expedite as much product as possible to our markets so we are trying to pay down the line so we can continue to work efficiently," but that he "failed to disclose that these funds had actually come from a prospective PPE purchaser who was expecting a shipment of PPE." [Doc. 58 ¶ 17 (internal marks omitted)].  It also alleges that on June 10, 2020, Sperber emailed an O&M Halyard employee that a payment "was debited from our [account] late Monday and you should have seen it yesterday," but that he would "follow up [that day] at noon or so with [them] and if it [was] not in, [he would] head to the bank," even though Sperber knew he had not made the payment.  [Id. ¶ 18 (internal marks omitted)].

certain emails and text messages sent to O&M Halyard employees.  [Id. ¶ 24].

Count Five charges defendants with conspiracy to commit wire fraud, in violation

of 18 U.S.C. § 1349, from about February 2020, and continuing until about March

2021.  [Id. ¶¶ 25-26].  Count Six charges defendants with money laundering

conspiracy, in violation of 18 U.S.C. § 1956(h), alleging that beginning in about

2020, and continuing to about March 2021, defendants knowingly combined,

conspired, and agreed "with each other to commit offenses against the United

States in violation of [18 U.S.C. §§] 1956 and 1957," [Id. ¶¶ 27-28].  This count also

details the manner and means of the conspiracy as defendants using "hundreds of

thousands of dollars from Victim A to pay down Sperber's outstanding balance

with O&M Halyard," instead of using the funds to purchase PPE as had been

promised to Victim A, in order "to remain an O&M Halyard distributor so that

they could commit additional acts of fraud."  [Id. ¶ 29 (all caps omitted)].

Counts Seven and Eight of the superseding indictment charge defendants

with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, while

Counts Nine and Ten charge defendants with money laundering, in violation of

18 U.S.C. §§ 1957 and 2.  See [Id. ¶¶ 30-37].  In particular, Count Seven charges

defendants with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i)

and 2, alleging in relevant part:

> On or about February 12, 2020, . . . the defendants . . ., aided and
> abetted by each other, did knowingly conduct a financial transaction

affecting interstate commerce, to wit: causing a cashier's check in the amount of $350,000 from TD Bank to be deposited into an O&M Halyard bank account, which involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud . . . and wire fraud . . ., with the intent to promote the carrying on of such specified unlawful activity and while conducting and attempting to conduct such financial transactions knew the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

[Id. ¶ 31].  Count Eight similarly charges defendants with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, alleging in relevant part:

On or about February 12, 2020, . . . the defendants . . ., aided and abetted by each other, did knowingly conduct a financial transaction affecting interstate commerce, to wit: causing a cashier's check in the amount of $720,000 from TD Bank to be deposited into an O&M Halyard bank account, which involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud . . . and wire fraud . . ., with the intent to promote the carrying on of such specified unlawful activity and while conducting and attempting to conduct such financial transactions knew the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

[Id. ¶ 33].

Count Nine charges defendants with money laundering, in violation of 18 U.S.C. §§ 1957 and 2, alleging in relevant part:

On or about February 12, 2020, . . . the defendants . . ., aided and abetted by each other, did knowingly engage and attempt to engage in a monetary transaction by, through and to a financial institution, affecting interstate commerce, such transaction knowingly involving criminally derived property of a value greater than $10,000, that is, causing a cashier's check in the amount of $350,000 from TD Bank to be deposited into an O&M Halyard bank account, such property

having been derived from a specified unlawful activity, that is wire
fraud[ and] . . . conspiracy to commit wire fraud. . .

[Id. ¶ 35].  Count Ten similarly charges defendants with money laundering, in

violation of 18 U.S.C. §§ 1957 and 2, alleging in relevant part:

> On or about February 12, 2020, . . . the defendants . . ., aided and
> abetted by each other, did knowingly engage and attempt to engage
> in a monetary transaction by, through and to a financial institution,
> affecting interstate commerce, such transaction knowingly involving
> criminally derived property of a value greater than $10,000, that is,
> causing a cashier's check in the amount of $720,000 from TD Bank to
> be deposited into an O&M Halyard bank account, such property
> having been derived from a specified unlawful activity, that is wire
> fraud[ and] . . . conspiracy to commit wire fraud. . .

[Id. ¶ 37].  Defendants have filed several pretrial motions, [Docs. 97, 98, 103, 105,

& 115], which are now fully briefed and ripe for ruling.

## II.  DISCUSSION

### A.  Norkus' Motion for Bill of Particulars, [Doc. 98]

In his motion for bill of particulars, [Doc. 98], Norkus "acknowledges that

the [superseding] indictment contains more than barebones allegations against

him," but he contends that "it is lacking in critical ways," pointing out that while

"many of the allegations in the [superseding] indictment against [ him] involve e-

mails sent to the companies labeled as Victims A and B," the "remainder of the

allegations involve co-defendant [] Sperber's relationship with O&M Halyard . . .

for whom Sperber and Sperber's company were a distributor," and that the

"substantive counts of wire fraud all related to e-mails that Sperber sent to O&M

11

Halyard, [while] the substantive money laundering counts all involve transfers from a bank account controlled by Sperber to O&M Halyard," but that the superseding "indictment does not contain any allegations that [] Norkus had any stake in Sperber's ongoing relationship with O&M Halyard, that [ he] had any role in sending the e-mails charged in the substantive counts, or that [ he] knew about and/or was involved in sending money from Sperber's bank account to O&M Halyard," such that "[a] bill of particulars is [] necessary to allow [ him] to prepare for trial," [id. at 3-4 (citations omitted)].  Therefore, Norkus moves the Court to order the government to file a bill of particulars, providing the following information:

> (1) Does the government believe that [] Norkus had any direct contact with O&M Halyard, or any O&M Halyard employees?
>
> (2) Does the government believe that [] Norkus knew of the e-mails that Sperber sent to O&M Halyard that are alleged in the substantive wire fraud counts, or took any actions related to those e-mails?
>
> (3) Does the government believe that [] Norkus knew of the wire transfers that Sperber sent to O&M Halyard that are the basis of the substantive money laundering counts, or took any action related to those transactions?
>
> (4) What are the precise actions that [] Norkus took to aid and abet Sperber as it relates to Counts 1-4 and 7-10?
>
> (5) Is the alleged scheme to defraud a scheme to defraud Victims A and B, or a scheme to defraud O&M Halyard?
>
> (6) How was O&M Halyard injured by the e-mails alleged in Counts 1-4?

[Id. at 4-5].[8]

In its response opposing the motion, [Doc. 107], the government argues that the motion should be denied because "[t]he [s]uperseding [i]ndictment more than sufficiently informs [Norkus] of the charges he is facing, and the discovery turned over contains the information [he] is requesting," [id. at 2].  In particular, the government points out that while Norkus "lists six interrogatory-style questions that seek to compel the United States to answer a litany of questions about how it will prove its case at trial," the superseding indictment "and discovery more than adequately inform Norkus of the charges in sufficient detail to enable him to prepare a defense, minimize surprise at trial, and plead double jeopardy, if necessary."  [Id. at 5 (citation omitted)].  It points out that that the speaking superseding indictment, which is "nineteen pages long and includes forty numbered paragraphs," includes twenty-three paragraphs that "are almost exclusively devoted to providing a detailed explanation of how defendants carried out the conspiracy, and include examples of false emails sent to the victims of the

---

[8] In his reply brief, Norkus explains that "[a]lthough [ he] phrased the questions in the form of 'does the government believe,' the questions were intended to elicit whether the government had evidence of and/or intended to present evidence." [Doc. 112 at 2 n.1].  He also "supplements his motion for a bill of particulars with a request for additional details about what act is the 'specified unlawful activity,'" in light of the government's response to his motion to dismiss the money laundering counts.  [Id. at 3-4].

offense," while the "'Manner and Means' section beginning on page three provides a detailed description of how the defendants carried out their scheme to defraud."  [Id. at 5-6].  The government further points out that its "discovery production has been substantial, much of which provides the exact information Norkus is seeking," and that Norkus' attempt to force it to respond to the six interrogatory-type questions is nothing more than "a thinly veiled attempt to force the [ government] to reveal its entire case theory," but that a "bill of particulars cannot be used to ferret out additional overt acts not listed in the indictment, as long as the indictment alleges the required number of overt acts under the statute being charged."  [Id. at 7-9 (footnote, citation, and internal marks omitted)]. Accordingly, the government maintains that Norkus has failed to "carr[y] his burden of showing that the requested information is necessary for trial preparation," and the Court should deny his motion.  [Id. at 2].

In reply, Norkus maintains that as to his "requests 1-3, the indictment does not allege—and the discovery does not reveal—whether the government has evidence that [ he] interacted directly with O&M Halyard or knew the details about [] Sperber's relationship with O&M Halyard," and that it "is unclear to [] Norkus what evidence there is that he knew about a scheme to defraud O&M [Halyard], had any stake in a scheme to defraud O&M, or, perhaps most importantly, had any intent to harm O&M."  [Doc. 112 at 2].  He also maintains

that as to "questions 5 and 6, [ he] has asked about the government's position as to the alleged victims and any alleged injury to O&M Halyard," since "the potential injuries that O&M Halyard suffered or could have suffered . . . is an essential element of the wire fraud charges," and that he "seeks specificity about the scheme to defraud because . . ., although there are allegations about Victims A and B, the substantive counts each relate [] only to fraud directed at O&M Halyard," but the government "must prove an intent to injure," and therefore, he "seeks clarity on who the defendants are alleged to have intended to injure." [Id. at 3].

Rule 7(f) of the Federal Rules of Criminal Procedure provides that the Court "may direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). "The purpose of a true bill of particulars is threefold: 'to inform the defendant[s] of the charge against [them] with sufficient precision to allow [them] to prepare [their] defense, to minimize surprise at trial, and to enable [them] to plead double jeopardy in the event of a later prosecution for the same offense.'" United States v. Reddy, Criminal Action File No. 1:09-CR-0483-ODE/AJB, 2010 WL 3210842, at *5 (N.D. Ga. Apr. 5, 2010) (quoting United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985)), adopted as modified by 2010 WL 3211029, at *7 (N.D. Ga. Aug. 11, 2010); see also United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981) (citations omitted); United States v. Zellner, Criminal Indictment No. 1:09-CR-320-

TCB-GGB, 2011 WL 530718, at *9 (N.D. Ga. Jan. 14, 2011) (citation omitted), adopted sub nom. United States v. Chester, Criminal Action File No. 1:09-cr-320-TCB-GGB, 2011 WL 529952, at *1 (N.D. Ga. Feb. 4, 2011). Generalized discovery is not a valid reason for seeking a bill of particulars, Colson, 662 F.2d at 1391 (citation omitted); United States v. Davis, 582 F.2d 947, 951 (5th Cir. 1978),[9] and "[a] bill of particulars may not be used for the purpose of obtaining detailed disclosure of the government's case or evidence in advance of trial," Zellner, 2011 WL 530718, at *9 (citation omitted). Moreover, defendants are not entitled to a bill of particulars describing information which is already evident from other sources, such as elsewhere in the indictment or in discovery. United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986) (citation omitted), modified on other grounds by, 801 F.2d 378 (11th Cir. 1986); see also Reddy, 2010 WL 3210842, at *5 (citation omitted). Further, "[w]hen a court analyzes the sufficiency of an indictment, it reviews the indictment as a whole and give[s] it a common sense construction." United States v. Mitchell, CRIMINAL CASE NO. 1:17-CR-122-LMM-LTW, 2019 WL 6462838, at *22 (N.D. Ga. June 25, 2019) (last alteration in original) (citation and internal marks omitted), adopted by 2019 WL 3854307, at *3 (N.D. Ga. Aug. 16, 2019). And, the

---

[9] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

"level of detail in the indictment can be a basis for denying the motion for a bill of particulars." United States v. Valdez-Morales, No. 3:15-CR-56, 2016 WL 919029, at *3 (E.D. Tenn. Mar. 4, 2016) (citation omitted).

In this case, the "conspiracy count[s] of the [superseding i]ndictment . . . sufficiently allege[] [those] charge[s] by stating the elements of the offense[s] charged therein and by providing details regarding the manner and means - or the scheme to defraud - by which [d]efendants participated in the charged conspiracy." United States v. Greenhill, CRIMINAL CASE NO. 1:18-CR-00108-MHC-JFK, 2018 WL 5659933, at *2 (N.D. Ga. Sept. 20, 2018) (citation omitted), adopted by 2018 WL 5649898, at *1 (N.D. Ga. Oct. 31, 2018).   Indeed, the superseding indictment provides that defendants engaged in a scheme to defraud a PPE supplier, as well as two specific victims who sought to procure PPE; the time frame of the conspiracy; specific examples of the alleged fraudulent emails sent by defendants; and it sufficiently informs each co-conspirator of his specific offense conduct, as well as the overall object of the conspiracy.  See generally [Doc. 58]. The superseding indictment also tracks the statutory language of the offenses charged, informing Norkus of the essential elements of the offense.  See [id.]. "The Eleventh Circuit has previously found that an indictment alleging such facts is sufficient," Mitchell, 2019 WL 6462838, at *23 (citing United States v. Williams, 181 F. App'x 945, 948-49 (11th Cir. 2006) (per curiam) (unpublished); United States v.

17

Ramos, 666 F.2d 469, 474-75 (11th Cir. 1982)), and the government "need not prove that each defendant had knowledge of all details and phases of the conspiracy when the defendant knows the essential nature of the conspiracy," id. (citation omitted).  Indeed, an "individual cannot escape guilt [of conspiracy] merely because . . . he played a minor role in the total scheme," and the government "does not have to prove that the defendant agreed to commit or facilitate each and every part of the substantive offense."  Id. (alteration in original) (citations and internal marks omitted).  That is, "[a] defendant can be a co-conspirator even if he did not know all aspects or details of the conspiracy or all of the individuals involved, came into the conspiracy after it began and played only a minor role in the conspiracy," and "[i]t is irrelevant that particular conspirators may not have known other conspirators or may not have participated in every stage of the conspiracy," since "all that the government must allege is an agreement or common purpose to violate the law and intentional joining in this goal by conspirators."  Id. (citations and internal marks omitted).

Norkus moves the Court to order the government to file a bill of particulars, outlining whether the government believed that he had any direct contact with O&M Halyard, whether he knew of the emails that his co-conspirator sent to O&M Halyard as alleged in the wire fraud counts, whether the government believed that he knew of the wire transfers his co-conspirator sent to O&M Halyard that are the

basis for the money laundering counts, the precise actions he took to aid and abet his co-conspirator, whether the scheme to defraud was to defraud Victims A and B or O&M Halyard, how O&M Halyard was injured, and that identifies the specified unlawful activity identified in Counts Six through Ten, [Doc. 98 at 5; Doc. 112 at 3-4]; however, Norkus is "not entitled to a bill of particulars with respect to information which is already available through other sources such as the [superseding] indictment and discovery," Mitchell, 2019 WL 6462838, at *19 (citations omitted); see also United States v. Jackson, CRIMINAL ACTION FILE NO. 1:16-CR-427-AT-JKL-8, 2019 WL 7842416, at *3 (N.D. Ga. Aug. 29, 2019) (citation omitted), adopted by 2019 WL 6769233, at *2 (N.D. Ga. Dec. 12, 2019), and Norkus' requests "seek[] evidentiary detail . . . that is not appropriate in a bill of particulars," Greenhill, 2018 WL 5659933, at *3 (citations omitted). That is, "there is a difference between being surprised by the charge and being surprised by the evidence supporting a charge," and "[t]he function of the bill of particulars is to reduce surprise at the charge, that is, to enable the defendant to identify what he is alleged to have done in violation of law," but "[i]t is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant." United States v. Scrushy, Case No. CR-03-BE-530-S, 2004 WL 483264, at *9 n.5 (N.D. Ala. Mar. 3, 2004) (emphasis omitted). In fact, "Rule 7 does not give a defendant the right to insist that he be made aware of all of the evidence

the [g]overnment may use against him so that he literally is not 'surprised' by anything at trial," id., and here, Norkus admits that his "questions were intended to elicit whether the government ha[s] evidence of and/or intended to present evidence," [Doc. 112 at 2 n.1], but "[a] bill of particulars . . . is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial," United States v. Roberts, 174 F. App'x 475, 477 (11th Cir. 2006) (per curiam) (unpublished) (citation and internal marks omitted); see also United States v. Baitcher, Criminal Action File No. 1:11-CR-536-SCJ-AJB, 2013 WL 1501462, at *2 (N.D. Ga. Mar. 22, 2013) (footnote and citations omitted) ("A bill of particulars may be obtained to clarify an indictment, as long as it does not seek to determine in advance the government's proof."), adopted by 2013 WL 1501454, at *1 (N.D. Ga. Apr. 11, 2013); United States v. Wimbley, Criminal No. 11-0019-WS, 2011 WL 3204539, at *2 (S.D. Ala. July 27, 2011) (citations omitted) ("Defendants are not entitled to a bill of particulars as a . . . comprehensive preview of the [g]overnment's trial proof or theories."); United States v. Perez, No. CR 106-029, 2006 WL 1737449, at *3 (S.D. Ga. June 19, 2006) (citation omitted) ("Nor is [a bill of particulars] intended to secure for the defense the government's explanation of its theory of the case."), adopted at *1.   The superseding indictment is "very exhaustive and legally sufficient," United States v. Bickers, CRIMINAL  INDICTMENT. NO. 1:18-CR-98-SCJ-LTW,  2019  WL

7559292, at *8 (N.D. Ga. Sept. 17, 2019), adopted by 2019 WL 5587050, at *7 (N.D. Ga. Oct. 30, 2019), as Norkus acknowledges, see [Doc. 98 at 3; Doc. 112 at 1], and it describes in detail the object and manner and means of the alleged fraudulent scheme, as well as the role of each co-conspirator in the scheme, see [Doc. 58].  In addition, "contrary to [Norkus'] request in this case, [c]ase law is also clear that the [g]overnment is not required to identify . . . specific acts or overt acts done in furtherance of a charged conspiracy by particular defendants."  Greenhill, 2018 WL 5659933, at *3 (second and fourth alterations in original) (citations and internal marks omitted).  Indeed, "[i]n a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant could hardly have been surprised by the government's proof at trial."  Id. (citations and internal marks omitted); see also United States v. Williams, 113 F.R.D. 177, 179 (M.D. Fla. 1986) (footnote and citation omitted) (explaining that when the "[i]nformation about events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence" was sought, the "Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars").  "Quite frankly, [d]efendants should be well aware of which of them . . . interacted with the [PPE supplier and Victims A and B] and engaged in the conduct underlying the scheme to defraud,

including failing to inform the victims that [d]efendants were diverting the funds to their personal benefit." Greenhill, 2018 WL 5659933, at *3.

In sum, the superseding indictment provides "sufficient information about the nature of the charges to enable [Norkus] to prepare for trial, to avoid unfair surprise, and to enable [him] to plead double jeopardy in the event of a later prosecution for the same offense." Bickers, 2019 WL 7559292, at *8 (citations omitted). Norkus "is not entitled to information, beyond the detailed [superseding i]ndictment and extensive discovery produced by the government, describing the specific role [he is alleged to have] played [] in the conspiracy or the particular acts [he] is alleged to have participated in, had knowledge of, or for which he is being held responsible."[10] United States v. Sterritt, 21-CR-193 (KAM), 2023 WL 4140269, at *4 (E.D.N.Y. June 22, 2023) (all but first alteration in original) (citation and

_____

[10] While Norkus asserts that the government "does not fulfill its obligation merely by providing mountains of documents to defense counsel who are left unguided as to which documents are relevant," [Doc. 98 at 3 (alteration and citations omitted)], and it is true that "voluminous discovery cannot cure the defects of an indictment that alone is insufficient to satisfy the [g]overnment's obligation, a bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused," Sterritt, 2023 WL 4140269, at *4 (alterations, citations, and internal marks omitted), which is not the case here where "the detailed factual allegations in the [s]uperseding [i]ndictment provide sufficient notice of the charges against [Norkus] . . ., and the discovery produced by the government, though voluminous, supplements an already sufficient [s]uperseding [i]ndictment," id. (citations omitted).

internal marks omitted).  In short, Norkus "bears the burden of showing that the information requested is necessary and that he will be prejudiced without it so as to justify granting a bill of particulars," Jackson, 2019 WL 7842416, at *3 (citations and internal marks omitted), and he has failed to meet his burden with respect to the particulars sought by his motion.  Accordingly, Norkus' motion for a bill of particulars, [Doc. 98], is **DENIED**.

**B.**   **Defendants' Motions to Dismiss, [Docs. 103, 105, & 115]**

Defendants jointly move to dismiss counts in the superseding indictment as multiplicitous.  [Doc. 105].  Norkus also moves to dismiss Counts Seven through Ten, which are the money laundering counts, for failure to allege a crime,  [Doc. 103], which Sperber has moved to adopt, [Doc. 106].  Finally, defendants jointly move to dismiss the wire fraud counts for failure to properly charge any conduct under the lulling exception.  [Doc. 115].  In response, the government maintains that the superseding indictment is not multiplicitous because each count requires an element of proof that the other count does not require and that the superseding indictment adequately alleges the charged offenses.  [Docs. 108, 109, & 125].  For the reasons that follow, the Court agrees with the government.

**1.**   *Alleged Multiplicitous Counts*

"An indictment is multiplicitous if it charges a single offense in more than one count."  United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008)

(citations omitted).  "A multiplicitous indictment not only subjects the defendant[s] to numerous sentences for one offense, but also prejudice[s] the defendant[s] and confuse[s] the jury by suggesting that not one but several crimes have been committed."  Id. (second and fourth alterations in original) (footnote, citation, and internal marks omitted).  Therefore, "[a] multiplicitous indictment [] violates the principles of double jeopardy because it gives the jury numerous opportunities to convict the defendant[s] for the same offense."  Id.  Thus, "[b]ecause a multiplicitous indictment involves double jeopardy issues, multiplicity and double jeopardy challenges are typically evaluated under the same standards."  United States v. Woods, 730 F. Supp. 2d 1354, 1376 (S.D. Ga. 2010), aff'd, 684 F.3d 1045 (11th Cir. 2012) (per curiam).  "Accordingly, the test enunciated in [Blockburger v. United States, 284 U.S. 299 (1932),] used to evaluate double jeopardy challenges . . . is also used to determine whether an indictment is multiplicitous, verifying that each count requires an element of proof that the other counts do not require."  Id. (citation and internal marks omitted).

"Under Blockburger[,] the test to be applied to determine whether two statutory provisions prohibiting the same conduct violate the Double Jeopardy Clause, or whether each count of the indictment may result in a conviction for the same offense, is whether each provision [or count] requires proof of a fact which the other does not."  Id. (last alteration in original) (citation and internal marks

24

omitted).  Pursuant to this test, "the focus is on the proof necessary to establish the statutory elements of the offense, not the actual evidence presented at trial."  Id. (citation omitted).  However, "multiplicity in an indictment does not require the entire indictment to be dismissed; instead, the appropriate remedy for multiplicity calls for consolidating a multiplicitous charge into one count, or issuing special instructions to the jury."  United States v. Bobo, No. CRA 1:06CR0172-02 TW, 2007 WL 962978, at *4 (N.D. Ga. Feb. 20, 2007) (citation omitted), adopted by 2007 WL 9676896, at *1 (N.D. Ga. Mar. 23, 2007).

Defendants first assert that Counts One through Four, charging defendants "with four substantive counts of wire fraud, with each count being a separate e-mail sent from [] Sperber to O&M Halyard employees" that "promised O&M Halyard that a payment was on the way to pay down [Sperber's] account balance with O&M Halyard," are "multiplicitous because they are not separate executions of the alleged wire fraud scheme," but are instead "part of one single attempt to execute the alleged fraud scheme."  [Doc. 105 at 2, 4 (citation omitted)].  The government responds that "[e]ach substantive wire fraud charge relates to emails that Sperber sent to O&M Halyard representatives to carry out the [] scheme to defraud," and because 18 U.S.C. § 1343 "targets not the defendant[s'] creation of a scheme to defraud, but the defendant[s'] execution of a scheme to defraud," it "punishes each interstate wire transmission that carries out that scheme," and

"[w]here one scheme or artifice to defraud involves multiple wire transmissions, each wire transmission may form the basis for a separate count."  [Doc. 108 at 3-4 (footnote, citations, and internal marks omitted)].  The government also asserts that because the "charged wires were 'lulling' emails," they "were each sent in furtherance of the scheme to defraud," and "[u]nder the lulling exception, a wire transfer subsequent to a defendant obtaining control of fraudulently obtained funds may be considered part of the fraudulent scheme if it was used to lull the scheme's victims into a false sense of security that they are not being defrauded, thereby allowing the scheme to go undetected."  [Id. at 5 (citation and internal marks omitted)].  In their reply, defendants maintain that "[e]ven assuming that the emails properly fill the 'lulling exception' to wire fraud, that does not mean that each of the individual emails is a separate execution of the scheme, as opposed to one execution of the scheme," and that "it is clear that the emails charged in the [superseding] indictment are part of one purported attempt to 'lull' O&M Halyard" and "relate to one single wire that [] Sperber was promising to send." [Doc. 114 at 3-4 (footnote and citation omitted)].

"To prove the crime of wire fraud under 18 U.S.C. § 1343, the government must establish that defendant (1) intentionally participated in a scheme to defraud; and (2) used wire communications to further that scheme."  Skillern v. United States, No. 20-13380-H, 2021 WL 3047004, at *11 (11th Cir. Apr. 16, 2021) (citation

and internal marks omitted).  "In that regard, [t]he relevant question at all times is whether the [wire] is part of the execution of the scheme as conceived by the perpetrator at the time."  Id. (alterations in original) (citation and internal marks omitted).  "The wire transmission itself need not be essential to the success of the scheme to defraud," but rather, "the wire transmission is for the purpose of executing the scheme to defraud if it is incident to an essential part of the scheme or a step in the plot."  Id. (citation and internal marks omitted).

"Where one scheme or artifice to defraud involves multiple wire transmissions, each wire transmission may form the basis for a separate count." Williams, 527 F.3d at 1241.  "A difficult conceptual question arises . . . as to whether particular transactions constitute an execution of a scheme or merely a component of such execution," United States v. Williams, CIVIL ACTION NO. 2:13-CR-21-RWS-JCF, 2015 WL 9999192, at *4 (N.D. Ga. Dec. 18, 2015) (citation and internal marks omitted), adopted by 2016 WL 447844, at *1 (N.D. Ga. Feb. 4, 2016), but "[i]n determining whether each wire transmission is an execution, courts must look to the function of the wire transmission in the context of the defendant[s'] overall scheme and examine how that transmission furthers the scheme," Williams, 527 F.3d at 1241.  Moreover, "[w]ire communications that lull a victim into a false sense of security after the victim's money had already been obtained, or that assist the defendant[s] in avoiding detection may be sufficient to further a scheme," United

States v. Corrigan, Case No. 13-CR-915, 2016 WL 4945013, at *5 (N.D. Ill. Sept. 15, 2016) (citations and internal marks omitted), aff'd, 912 F.3d 422 (7th Cir. 2019), and transmissions "designed to conceal or delay the detection of a scheme may be asserted as separate counts in furtherance of that scheme," United States v. Mosberg, 866 F. Supp. 2d 275, 313 (D.N.J. 2011); see also United States v. Lane, 474 U.S. 438, 453 (1986) (finding each of the mailings satisfied the "in furtherance" requirement because the mailings lulled the victim insurance company into a false sense of security by giving it the impression that defendants' claims were legitimate); United States v. Hill, 643 F.3d 807, 859 (11th Cir. 2011) (citation omitted) ("Under the lulling exception, mailings are sufficiently a part of the execution of a fraudulent scheme if they are used to lull the scheme's victims into a false sense of security that they are not being defrauded, thereby allowing the scheme to go undetected.").

The superseding indictment charges "a scheme to defraud a PPE supplier as well as victims who sought to procure PPE for hospital and medical institutions" through "a combination of falsified invoices, emails, and other documents" via which defendants "defrauded prospective PPE purchasers out of more than $12 million, much of which they used for [their] own personal benefit[.]" [Doc. 58 ¶ 9]. It also alleges that after Sperber failed to pay O&M Halyard for previously shipped PPE and he was advised that unless he paid down

his outstanding balance, he would not be able to remain an authorized distributor and that it would no longer distribute PPE through his company if he did not make timely payments, defendants used funds wired from the victims to pay down the outstanding balance with O&M Halyard, among other things, without disclosing that the funds were from prospective PPE purchasers expecting a shipment of PPE and by representing to O&M Halyard employees that payments had been made that were not.  [Id. ¶¶ 10-11, 14, 17-18].

Under the "Execution of the Wire Fraud Scheme" section of the superseding indictment, defendants are charged with four counts of wire fraud based on emails sent by Sperber to O&M Halyard employees on May 26, May 28, June 2, and June 10, 2020, regarding funds to be wired to O&M Halyard.  [Id. ¶ 24 (emphasis omitted)].  The superseding indictment further alleges that defendants "used hundreds of thousands of dollars from Victim A to pay down Sperber's outstanding balance with O&M Halyard" instead of purchasing PPE so that they could "remain an O&M Halyard distributor" and "could commit additional acts of fraud."  [Id. ¶ 29 (all caps omitted)].

As previously discussed, to "prove wire fraud the government must show [defendants'] participation in a scheme to defraud, [their] intent to defraud, and [their] use of the wires in furtherance of the fraudulent scheme," and "[w]ire communications that lull a victim into a false sense of security after the victim's

money had already been obtained, or that assist the defendant[s] in avoiding detection may be sufficient to further a scheme." Corrigan, 912 F.3d at 428 (emphasis, citation, and internal marks omitted).[11] "[T]he 'in furtherance' cases show that using a wire service need only involve some way, before or after the fraud, of furthering the fraudulent act, including covering it up," and therefore, "each e-mail can, on its own, be deemed a unit of the wire fraud crime" and "can support a few additional counts," with the "bottom line [being] whether the government must prove something different with each e-mail." United States v. Williamson, No. CR409–030, 2009 WL 3208421, at *7 (S.D. Ga. June 25, 2009), report and recommendation rejected as moot based on defendant's plea, 2009 WL 3208396, at *1 (S.D. Ga. Oct. 6, 2009). In the present case, "the government can

---

[11] In support of their motion to dismiss, defendants cite the bank fraud statute, and cases interpreting that statute, [Doc. 105 at 3 (citations omitted)], and argue that because the "wire fraud and bank fraud statutes are structured nearly identically, such that cases involving one crime are relevant to analyzing issues with the other statutes," the fact that the case they cited involved bank fraud "does not render it irrelevant," [Doc. 114 at 1 (citation omitted)]. Defendants, however, overlook that while "the bank fraud statute . . . was modeled on the mail and wire fraud statutes, the mail and wire fraud statutes punish each act in furtherance, or execution, of the scheme; but the bank fraud statute imposes punishment only for each execution of the scheme." Williams, 2015 WL 9999192, at *7 (citations and internal marks omitted). Therefore, "while separate 'lulling' mailings can be charged in separate mail [or wire] fraud counts . . ., that is not the case under the bank fraud statute if those mailings are merely acts in furtherance of the scheme to defraud rather than separate executions or attempted executions of the scheme." Id. Thus, defendants' reliance on the bank fraud statute in this regard is without merit.

prove that each e-mail was sent on a different day and said something different," and quite simply, "[t]hat is enough," and the superseding indictment "is not multiplicitous" in this respect.  Id.; see also Corrigan, 912 F.3d at 428 (finding that three counts of wire fraud based on one email that solicited funds by relying on false statements and material misrepresentations about the need for the funds and two additional emails sent two days apart assuring the victim that the funds were used for its intended purpose and therefore lulled the victim "into a false sense of security," were not multiplicitous).[12]

---

[12] To the extent defendants argue that the charged emails cannot be based on the lulling theory because it was not alleged in the superseding indictment, see [Doc. 114 at 3 n.1]; see also [Doc. 115 at 4 (arguing that the superseding "indictment fails to contain any explanation of how the emails charged in the wire fraud counts could fall under the 'lulling exception[]'"), as will be discussed hereinafter, "[i]n reviewing the sufficiency of an indictment, [the C]ourt should consider each challenged count as a whole and refrain from reading it in a hyper-technical manner; the [superseding] indictment must be read to include facts which are necessarily implied and construed according to common sense," United States v. Braeger, Case No. 21-CR-233, 2023 WL 2136722, at *2 (E.D. Wis. Feb. 21, 2023) (citations omitted).  "Thus, failure to explicitly include all the elements of the offense in an indictment is not fatal so long as the absent elements can be deduced from the language that is actually included in the charging document."  Id. (citation omitted).  Here, the "[s]uperseding indictment [suggests] that the [d]efendants' actions . . . [were] those of conspirators whose actions were furthering the conspiracy," and "[a] mailing can further a charged scheme if it 'lulls' the victim into a false sense of security or otherwise assists the defendant[s] in avoiding detection."  United States v. Villazan, No. 05 CR 792, 2007 WL 541950, at *7 (N.D. Ill. Feb. 15, 2007) (citations omitted).  That is, "[w]ire communications that are designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are communications in

Defendants also assert that Counts Seven and Nine and Counts Eight and Ten are multiplicitous, since Counts Seven and Nine "both relate[] to the same transaction[ of] causing a cashier's check in the amount of $350,000 from TD Bank to be deposited into an O&M Halyard bank account," while Counts Eight and Ten "charge the same transaction[ of] causing a cashier's check in the amount of $720,000 from TD Bank to be deposited into an O&M Halyard bank account." [Doc. 105 at 5 (citations omitted)].   Counts Seven and Eight of the superseding indictment charge defendant with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), see [Doc. 58 ¶¶ 30-33], while Counts Nine and Ten charge defendants with money laundering, in violation of 18 U.S.C. § 1957, see [id. ¶¶ 34-37].

Section 1956(a)(1)(A)(i) provides:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--

(A)(i) with the intent to promote the carrying on of specified unlawful activity. . . .

---

furtherance of the fraudulent scheme," and the superseding indictment alleges a scheme to defraud and the emails in Counts One through Four "furthered that scheme." United States v. Washburn, 862 F. Supp. 2d 871, 886 (N.D. Iowa 2012) (citation and internal marks omitted), aff'd, 728 F.3d 775 (8th Cir. 2013); see also [Doc. 58].   In short, "[r]ead in a common sense fashion," the superseding "indictment sufficiently alleges the requisite elements of a wire fraud charge under the lulling theory." Braeger, 2023 WL 2136722, at *8 (citation omitted).

18 U.S.C. § 1956(a)(1)(A)(i).  Section 1957 provides, in relevant part:

> (a) Whoever, in any of the circumstances set forth in subsection (d),[13], knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

18 U.S.C. § 1957(a).

Thus, § 1956(a)(1)(A)(i), as charged in Counts Seven and Eight of the superseding indictment, requires the government to prove that defendants: "(1) conducted a financial transaction (such as purchasing property) with the proceeds of 'specified unlawful activity' (2) with the knowledge that the proceeds came from 'some form of unlawful activity' and (3) with the intent 'to promote the carrying on of specified unlawful activity,'" United States v. 275 Milton Rahn Rd. Rincon, Ga. 31326, CIVIL ACTION NO.: 4:18-cv-299, 2022 WL 969621, at *6 (S.D. Ga. Mar. 30, 2022) (citations omitted), whereas under § 1957, the government must prove that: "(1) [] defendant[s] 'knowingly engaged or attempted to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000,' and (2) the property 'is derived from specified unlawful activity,'" United

---

[13] "The circumstances referred to in subsection (a)" include "that the offense . . . takes place in the United States or in the special maritime and territorial jurisdiction of the United States[]" or "that the offense . . . takes place outside the United States and such special jurisdiction, but the defendant is a United States person[.]"  18 U.S.C. § 1957(d)(1)-(2).

States v. Forehand, 577 F. App'x 942, 947 (11th Cir. 2014) (per curiam) (unpublished) (alterations and citation omitted).  Thus, "§§ 1956 and 1957 each require proof of additional facts not required by the other."  United States v. Caruso, 948 F. Supp. 382, 390 (D.N.J. 1996).

Defendants acknowledge that "promotional money laundering and transactional money laundering contain slightly different elements," but they nonetheless argue the counts are multiplicitous because "they contain the same unit of prosecution—a single financial transaction" that "is charged in multiple counts[.]"  [Doc. 105 at 6]; see also [Doc. 114 at 4 (citation omitted) (arguing that the superseding "indictment was multiplicitous because one single transaction is charged in Counts [Seven] and [Nine], and one single transaction is charged in Counts [Eight] and [Ten]").  However, for the reasons that follow, defendants' argument fails.

As previously noted, "[a]n indictment is multiplicitous if it charges a single offense in more than one count," but "[c]ourts which have addressed this issue have found that violations of § 1956 and § 1957, while likely based on the same conduct, represent two distinct offenses, each with different elements."  United States v. Huber, No. CR. C3–00–76, 2002 WL 257851, at *4 (D.N.D. Jan. 3, 2002) (citing United States v. Hill, 167 F.3d 1055, 1069-70 (6th Cir. 1999); Caruso, 948 F. Supp. at 390-91; United States v. Ferrouillet, No. CriM.A. 96-198, 1996 WL 684461,

at *1-2 (E.D. La. Nov. 26, 1996)); see also Hill, 167 F.3d at 1070 (citations omitted) (explaining that "§ 1957 offenses are not lesser-included offenses of § 1956").[14] "The Court fully adopts the reasoning articulated in these cases, since it has found no cases that support a contrary finding," and concludes "that the [superseding] indictment with respect to these counts [is] not multiplicitous." Huber, 2002 WL 257851, at *4; see also Caruso, 948 F. Supp. at 390 (finding that because "§§ 1956

---

[14] Although the evidence may be the same to prove the violations asserted in the counts at issue, in applying the Blockburger test, the focus is on the statutory elements of the offense, not the specific facts presented by the government to prove the offenses. See Albernaz v. United States, 450 U.S. 333, 338 (1981); United States v. Buckingham, Case No.: 4:18-cr-00376-RDP-JEO-2, 2018 WL 6570874, at *4 (N.D. Ala. Dec. 13, 2018) (emphasis and citation omitted) (explaining that "there is nothing improper about reciting the same factual allegations in different counts of an indictment where those facts show the defendant committed two or more distinct statutory offenses" as the "multiplicity doctrine guards against charging a single offense in more than one count of the indictment," but it "does not prohibit restating similar factual allegations in more than one count of the indictment, a practice explicitly contemplated by the Federal Rules of Criminal Procedure"). Here, each statutory provision requires proof of an additional fact not required by the other. See Hill, 167 F.3d at 1069-70 (citation omitted) (explaining that the "$10,000 threshold is not an element of proof for the §1956(a)(1)[] money laundering charges"; that "money laundering offenses under §§ 1956(a)(1)[] and 1957 have different scienter requirements; [and that] § 1957 does not require that the defendant[s] know that the transaction was designed to conceal or disguise the nature, location, source, ownership or control of the subject proceeds . . ."); Ferrouillet, 1996 WL 684461, at *1 (finding the counts at issue charging violations of §§ 1956 and 1957 were "not multiplicitous based on the different elements in each offense, the legislative history, and the treatment of multiplicitous claims on other § 1956 contexts").

and 1957 each require proof of an element which is not required by the other," the "two statutes constitute different offenses, and it is not multiplicitous to charge the offenses in different counts").  Accordingly, defendants' joint motion to dismiss multiplicitous counts, [Doc. 105], is due to be denied.[15]

### 2.  *Failure to Allege a Crime*

Defendants also move to dismiss the wire fraud counts, [Doc. 115], for failure "to properly charge any conduct under the lulling exception," [id. at 1]. Norkus also moves to dismiss the money laundering counts from the superseding indictment, [Doc. 103], for failure to "charge the crime of money laundering," [id.

---

[15] While the Court finds that the challenged counts are not multiplicitous for the reasons discussed, even if "[a]n indictment . . . charging the same offense in more than one count is multiplicitous," it is "not fatal and does not require dismissal of the indictment," United States v. Siegelman, 2:05 CR 119 MEF, 2006 WL 752951, at *3 (M.D. Ala. Mar. 22, 2006) (alterations in original) (footnote, citation, and internal marks omitted).  Indeed, "there are less severe remedies available to alleviate potential prejudice," including "by offering appropriate instructions to the jury." Id. (citation omitted); see also United States v. Pefanis, Criminal Action No. 1:10–CR–0513–RWS–CCH, 2011 WL 1134310, at *3 (N.D. Ga. Mar. 1, 2011) (citation omitted), adopted by 2011 WL 1113954, at *1 (N.D. Ga. Mar. 25, 2011).  In fact, "should the evidence at trial demonstrate that the charges were improperly multiplied, the trial court can still remedy any violation by consolidating the counts or requiring dismissal," and, "even after a verdict, any error may be remedied by vacating multiplicitous convictions and any concurrent convictions based upon those convictions."  United States v. Ford, Criminal Action No. 1:12–CR–297–TWT–ECS–1, 2013 WL 1337130, at *2 n.3 (N.D. Ga. Mar. 5, 2013) (citations omitted), adopted by 2013 WL 1320739, at *1 (N.D. Ga. Mar. 29, 2013), aff'd, 784 F.3d 1386 (11th Cir. 2015); see also Bobo, 2007 WL 962978, at *4.

at 5], and Sperber has moved to adopt this motion, [Doc. 106].  The government opposes both motions, [Docs. 109 & 125], and defendants have filed replies in support of the motions, [Docs. 113 & 127].

"'An indictment is valid if it contains the elements of the offense intended to be charged.'" United States v. Honeycutt, Criminal Action No. 2:12–CR–00022–RWS, 2014 WL 2003029, at *4 (N.D. Ga. May 14, 2014) (quoting Williams, 181 F. App'x at 949), adopted at *1.  "An indictment is sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense."[16]  United States v. Aydin, Criminal Case No. 1:12–CR–221–2–ODE–AJB, 2015 WL 927666, at *7 (N.D. Ga. Mar. 3, 2015) (citations and internal marks omitted), adopted at *5; see also Fed. R. Crim. P. 7(c)(1) ("The indictment . .

---

[16] "[I]f the indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." United States v. Slawson, Criminal Case No. 1:14–CR–00186–RWS–JFK, 2014 WL 5804191, at *5 (N.D. Ga. Nov. 7, 2014) (citations and internal marks omitted), adopted by 2014 WL 6990307, at *1 (N.D. Ga. Dec. 10, 2014).  And, "[i]n judging the sufficiency of an indictment, courts are cautioned to use a broad and enlightened standpoint of common sense and right reason rather than [a] narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding." Id. (second alteration in original) (citations and internal marks omitted).

. must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"). "'In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment, and more specifically, the language used to charge the crimes.'" Honeycutt, 2014 WL 2003029, at *4 (emphasis omitted) (quoting United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006)); see also United States v. Kopp, Criminal Action No. 1:12–CR–0269–RWS, 2014 WL 2154199, at *4 (N.D. Ga. May 21, 2014) (alteration in original) (citation and internal marks omitted) ("It is well-settled that a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial"), adopted at *1, aff'd, 778 F.3d 986 (11th Cir. 2015).

### a.    Wire Fraud Counts

Defendants "move to dismiss the wire fraud counts because they fail to properly charge any conduct under the lulling exception."  [Doc. 115 at 1].  In particular, defendants contend that "there is no indication in the [superseding] indictment that people who had been defrauded—Victims A and B—had any knowledge of the emails sent to O&M Halyard, or that any communication with O&M Halyard would have any effect on whether Victims A and B discovered the fraudulent scheme" and that it "is unclear how emails promising to pay O&M Halyard could prevent either Victims A and B or O&M Halyard from discovering any alleged fraud."  [Id. at 4 (emphasis omitted)].  Defendants therefore assert that

because the superseding "indictment fails to contain any explanation of how the emails charged in the wire fraud counts could fall under the 'lulling exception,' the indictment should be dismissed as to those counts." [Id.].[17]

In response, the government contends that defendants have "fail[ed] to point to any authority for the proposition that lulling emails must be sent directly to the victim of the offense," but rather, "if the wiring was used to lull the scheme's victims, then the lulling exception has been met." [Doc. 125 at 5 (internal marks omitted)]. The government also points out that defendants "wrongfully assume that O&M Halyard was not an intended victim of this offense," explaining that their "fraud scheme had multiple stages," including that Sperber failed to pay O&M Halyard money for previously shipped PPE; that defendants fabricated emails to Victim A, inducing that victim to send money for PPE; that defendants then induced Victim B to send money by falsely claiming they would deliver PPE from O&M Halyard and Dukal; and that Sperber used a portion of the funds received from the victims to pay down the debt owed to O&M Halyard and while doing so, sent a series of false and misleading emails to O&M Halyard employees

---

[17] Defendants also maintain that because they filed this motion "within two weeks of the government's disclosure that it is proceeding under the lulling exception," the motion is timely filed even though it was filed after the pretrial motions deadline. [Doc. 115 at 1 n.1].

in order to lull O&M Halyard into thinking that the debt had been or would be paid.  [Id. at 7-9 (citations omitted)].

Defendants have filed a reply in support of their motion, [Doc. 127], in which they clarify that their position is not that to be properly charged under the lulling exception, the wires must have been directed toward the victims of the scheme, but instead, they argue "that the [superseding] indictment, as written, does not charge or explain how the wire fraud counts could fall under the 'lulling exception,'" [id. at 1 (citation omitted)].  Specifically, defendants assert that the superseding "indictment [does] not contain any allegations that the emails in question were used to delay detection of the fraud," and they simply maintain "that there had to be some allegation that the e-mails somehow 'lulled' the victims into not discovering the fraud."  [Id. at 2 (citation omitted)].  Defendants explain that "[i]f O&M Halyard is the victim, it is unclear how the lulling exception applies because there was no separate fraud toward O&M Halyard other than the promise to pay for materials received," but that if "the e-mails to O&M Halyard were somehow supposed to 'lull' Victims A and B from discovering the fraud," there "is no allegation that the e-mails in question had any effect on delaying the discovery of the alleged fraud as to Victims A and B," and "they are not properly charged under the 'lulling exception' either."  [Id. at 3-4].

Despite defendants' arguments to the contrary, "[r]ead in a common sense fashion, the [superseding] indictment describes an overarching scheme in which defendant[s] sought to defraud [O&M Halyard and Victims A and B]." Braeger, 2023 WL 2136722, at *8. Indeed, the superseding incitement alleges that defendants "engaged in a scheme to defraud a PPE supplier [(O&M Halyard)] as well as victims [(Victims A and B)] who sought to procure PPE for hospital and medical institutions"; that Sperber failed to pay O&M Halyard for previously shipped PPE at which time O&M Halyard employees advised him that in order to remain an authorized dealer, he had to pay down his balance; that defendants sent false O&M Halyard emails and invoices to Victim A regarding the availability of PPE supplies, causing Victim A to wire funds to Norkus' company, a portion of which Norkus used to purchase a condominium and Sperber used to pay down his balance with O&M Halyard in order to remain an authorized dealer to enable defendants to be in a position to commit additional acts of fraud, although the funds were to be used to purchase PPE; that defendants led Victim B to believe that they could acquire a substantial amount of PPE from O&M Halyard and Dukal, causing Victim B to wire over $13 million for the purchase of PPE supplies, despite having been informed by O&M Halyard representatives that the quantity requested was not possible; that throughout the relevant period, defendants misappropriated Victims A and B's funds, including Sperber using portions of the

funds to pay down his outstanding balance with O&M Halyard that had been incurred prior to February 2020 and involved sending O&M Halyard employees emails representing that Sperber was wiring funds to O&M Halyard for previous shipments without disclosing that the funds were from prospective PPE purchases who were expecting to receive PPE; and that once the fraud scheme began to unravel in mid-2020, Sperber threatened O&M Halyard with a false press release and then initiated a lawsuit against O&M Halyard. [Doc. 58 ¶¶ 9-11, 13-18, 20-21, 23, 29]. In the paragraph charging the wire fraud counts, the superseding indictment further alleges that defendants, "for the purpose of executing and attempting to execute the [] scheme and artifice to defraud," continued their deception by sending a series of emails to O&M Halyard employees regarding the transfer of funds in order to cause them to believe that the outstanding debt has been or would be paid so that they would remain authorized distributors for O&M Halyard and conceal their alleged fraudulent activities to reduce the likelihood of jeopardizing their scheme and in order to be in a position to commit further fraudulent acts. [Id. ¶ 24]; see also [id. ¶ 29].

"[A] single fraud scheme may be multi-faceted and have more than one victim or object, and, indeed, may violate more than one criminal statute," and "a lulling email sent after the money has been obtained can give rise to liability for wire fraud[.]" Braeger, 2023 WL 2136722, at *8-9 (citations omitted). Quite simply,

the superseding indictment "allege[s] that the scheme, . . . as [] carried out, included fraudulent activities both before and after the victims had [] given over their money to the defendants," and that "[i]t was further a part of the scheme . . . . by false and fraudulent statements to make the victims believe that the defendants had faithfully performed and would continue to perform the promised services." United States v. Sampson, 371 U.S. 75, 78 (1962).  That is, the emails were "sent directly by [Sperber] in furtherance of the scheme because [they were] specifically intended to assuage and lull [O&M Halyard] regarding the allegations of fraud and to evade detection," and the superseding indictment here, "sufficiently tracks the elements of the statute and notifies [d]efendants of the nature of the charge and the wire transmission[s] at issue." United States v. Alfortish, Criminal No. 10–328, 2011 WL 2293136, at *4 (E.D. La. June 8, 2011). "Defendants may argue at trial that the . . . email[s were] not sent in furtherance of the fraud and move for acquittal if the evidence is insufficient, but that argument does not warrant dismissal of the [wire fraud counts] at this stage[.]" Id.

While defendants argue that the superseding indictment does not "explain how the wire fraud counts could fall under the 'lulling exception,'" [Doc. 127 at 1], the "substance behind [defendants'] argument . . . has nothing to do with the adequacy of the [g]overnment's accusations as set forth in the [superseding]

indictment," <u>United States v. Wrobel</u>, 12-CR-125W, 2017 WL 3097611, at *6 (W.D.N.Y. July 21, 2017), and defendants' "view of the [superseding] indictment . . . asks the Court to ignore the allegations . . . [and] the [] statute-tracking allegations that the case law indicates is sufficient," <u>United States v. Rhame</u>, CRIMINAL ACTION NO. 1:16-CR-67-SCJ-CMS, 2017 WL 9474217, at *5 (N.D. Ga. Jan. 31, 2017) (citation omitted), adopted by 2017 WL 5591273, at *8 (N.D. Ga. Nov. 20, 2017).   "Although, the [superseding i]ndictment does not specify that [d]efendant[s] sent the email[s] to lull [O&M Halyard, or any other victims,] or avoid detection, it does state that [d]efendant[s] sent the email[s]" for the purpose of executing the scheme to defraud by paying down the outstanding balance, or leading O&M Halyard to believe they would do so, to pacify O&M Halyard so that Sperber could remain an authorized distributor, and the Court "finds that [the] allegation[s are] sufficient to establish that the wire message[s were] in furtherance of the scheme for purposes of indicting [d]efendant[s]." <u>United States v. Martin Wynn</u>, Cr. No. 8:10–cr–1026–GRA, 2011 WL 1748424, at *5 (D.S.C. May 2, 2011); <u>see also</u> [Doc. 58 ¶¶ 10, 17-18, 24, 29].  Thus, the superseding "indictment sufficiently alleges a fraud scheme directed at [O&M Halyard, as well as others], so the lulling caselaw is applicable to the wire transmission charged in [C]ount[s One through F]our," <u>Braeger</u>, 2023 WL 2136722, at *9, and defendants' motion to dismiss these counts, [Doc. 115], is due to be denied.

### b.   Money Laundering Counts

Defendants next contend that the Court "should dismiss the money laundering counts because they fail to charge the crime of money laundering." [Doc. 103 at 5].  In particular, defendants argue that because these counts "plainly involve transactions that predate the completion of the alleged fraudulent scheme—and well before any of the substantive wire fraud counts," the "underlying predicate acts did not predate—and were certainly not complete— prior to the transactions that form the basis for the money laundering counts." [Id.].[18]

The government responds that while defendants "claim that the money laundering counts must fail because the substantive wire fraud offenses post-date the alleged money laundering transactions," they "incorrectly assume[] that because the dates of the charged wire fraud offenses occurred after the charged money laundering offenses, there could be no completed specified unlawful activity (and, therefore, no 'proceeds' to launder)," but because the "substantive

---

[18] Defendants also maintain that the motion to dismiss the money laundering counts is timely since they were given until the date of the filing to perfect the motion to dismiss multiplicitous counts and they "did not recognize the need to file the motion until [they were] researching the perfected multiplicitous motion[.]"  [Doc. 103 at 6-7].  The government "has no objection to the Court reaching the merits of the defendants' motion and does not take the position that it should be denied as untimely."  [Doc. 109 at 2 n.1].  Therefore, the Court will consider the motion timely filed and address the merits.

wire fraud charges in the [superseding] indictment relate to lulling emails sent by Sperber to O&M Halyard employees in furtherance of the overall wire fraud scheme" and, as previously discussed, pursuant to the lulling exception, "a wire transfer subsequent to a defendant obtaining control of fraudulently obtained funds may be considered part of the fraudulent scheme if it was used to lull the scheme's victims into a false sense of security that they are not being defrauded, thereby allowing the scheme to go undetected," defendants' motion "should be denied." [Doc. 109 at 4-5, 8 (emphasis, citations, and internal marks omitted)]. The government also asserts that while defendants "incorrectly assume that the proceeds alleged in the money laundering counts were derived from the[] 'lulling' emails," the "plain language of the [s]uperseding [i]ndictment is clear: each money laundering transaction involved the proceeds of wire fraud conspiracy and wire fraud," including that the superseding indictment alleges "that the money laundering transactions involved the funds that the defendants had previously obtained unlawfully from Victim A." [Id. at 5-6 (citing [Doc. 58 ¶¶ 11, 31])]. The government further contends that "there is no requirement that the specified unlawful activity even be separately charged in the indictment," but nonetheless, the "[s]uperseding [i]ndictment alleges that the money laundering transactions each involved the proceeds of specified unlawful activity" and satisfy the test for

"constitutional sufficiency . . . and that is all that is required at this pre-trial stage." [Id. at 7-8 (emphasis and citations omitted)].

In their joint reply, defendants contend that "the issue presented here" is "whether the substantive crime was completed prior to the charged money laundering," and because the "government relies on the 'lulling' emails allegedly sent," the "alleged fraud was ongoing—and certainly extended past the date of the February 12, 2020 transactions charged as money laundering," and since "the fraud was not complete at the time of the transactions alleged in the money laundering transactions, the money laundering charges cannot stand." [Doc. 113 at 4-6 (citation omitted)]. Defendants also contend that the "government has alleged the same transactions as both part of the fraud and as money laundering," but the "money laundering charges cannot be premised on the same transactions that constitute the alleged fraud," and the "money laundering counts must be dismissed." [Id. at 6-7 (citation omitted)].[19]

As previously discussed, § 1956 makes it unlawful to conduct a financial transaction involving the proceeds of unlawful activity "with the intent to promote

---

[19] In their joint reply, defendants also clarified that they "mistakenly only referenced Counts [Seven through Ten], and not the conspiracy to commit money laundering count charged in Count [Six]," and they "request that the Court consider [their] arguments and the initial motion as to all money laundering counts[.]" [Doc. 113 at 1 n.1].

the carrying on of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(A)(i), while § 1957 makes it unlawful to conduct a financial transaction "of a value greater than $10,000," involving the proceeds of unlawful activity, 18 U.S.C. § 1957(a). "[P]roceeds are derived from an already completed offense, or a complete[d] phase of an ongoing offense, before they can be laundered." United States v. Grasso, 173 F. Supp. 2d 353, 362 (E.D. Pa. 2001) (first alteration in original) (citation and internal marks omitted).[20] "The main issue in a money laundering charge . . . is determining when the predicate crime becomes a completed offense after which money laundering can occur." United States v. Brown, Case No. 3:18-cr-89-J-34JRK, 2019 WL 1471029, at *3 n.9 (M.D. Fla. Apr. 3, 2019) (citation and internal marks omitted).  Defendants argue that "[b]ecause the fraud was not complete at the time of the transactions alleged in the money laundering transactions, the money laundering charges cannot stand."  [Doc. 113 at 4-5 (citation omitted)]. However, for the reasons that follow, defendants' arguments are unpersuasive and fail.

---

[20] Additionally, "[t]o prove a conspiracy to commit money laundering, the government must show that two or more persons agreed to commit a substantive money laundering violation, and the defendant[s] knowingly and voluntarily joined the conspiracy." United States v. Hirmer, Case No. 3:08cr79/MCR, 2009 WL 10726280, at *4 (N.D. Fla. July 14, 2009) (citation omitted).

"Wire fraud is a specified unlawful activity,"[21] but the government "need not prove the defendant[s] committed the specified unlawful activity," and it is also "not required to allege any details about the specified unlawful activity[.]" Hirmer, 2009 WL 10726280, at *4 (citations omitted).  Defendants' argument fails because they incorrectly identify the specified unlawful activities upon which the money laundering charges are predicated.  Defendants point to the substantive wire fraud counts charged in Counts One through Four, see [Doc. 103 at 5], but the money laundering conspiracy count of the superseding indictment ranges from 2020 to about March 2021, while the money laundering counts charge transactions that occurred on February 12, 2020, see [Doc. 58 ¶¶ 28, 31, 33, 35, 37].  The superseding indictment alleges wire fraud as the specified unlawful activity, see [id.]; however, it also details that defendants sent fabricated emails, text messages,

---

[21] Although the superseding indictment alleges that the specified unlawful activity includes conspiracy to commit wire fraud and wire fraud, see [Doc. 58 ¶¶ 28, 31, 33, 35, 37], including conspiracy to commit wire fraud "is an incorrect statement of law because specified unlawful activity . . . does not include wire fraud conspiracy," but "this error relates to an ancillary issue and not an essential element of the [money laundering] conspiracy [or money laundering charges themselves]" and, "after removing [the] erroneous language, the [superseding i]ndictment still states an offense." United States v. Shea, 20 Cr. 412-4 (AT), 2023 WL 4551635, at *3 (S.D.N.Y. July 14, 2023) (citations and internal marks omitted); see also United States v. Liersch, No. 04CR02521, 2005 WL 6414047, at *11 (S.D. Cal. May 2, 2005) ("It is undisputed that a conspiracy to commit [mail fraud, among other offenses,] does not meet the definition of 'specified unlawful activity.'").

and invoices to Victim A that led to Victim A wiring over $3 million to Norkus'
company for the purchase of PPE with an expected ship date of February 12, 2020,
and that on February 10, 2020, Norkus sent Victim A fabricated bank statement
that falsely claimed Norkus' company had wired nearly $3 million to O&M
Halyard for the purchase of PPE, but that Norkus actually used a portion of the
funds to purchase a condominium and Sperber used a portion to pay down his
balance with O&M Halyard for previous shipments he still owed, [id. ¶¶ 10-11].
Thus, "the money laundering [counts] alleged in Count[s] [Six through Ten are]
not predicated on the laundering of proceeds of the wire fraud scheme [as
specified] in Count[s One through Four]."  United States v. Alabed, CRIMINAL
ACTION FILE NO. 1:19-CR-089-MHC-JSA, 2020 WL 114415, at *2 (N.D. Ga. Jan. 9,
2020) (citation omitted).  That is, "where wire fraud and money laundering are
alleged in the same indictment, and wire fraud is the specified unlawful activity
referenced in the money laundering counts, money laundering convictions can
rest on communications other than those that comprise the wire fraud counts."
United States v. Nickolas, No. CR–12–01927–PHX–NVW, 2014 WL 5811127, at *2
(D. Ariz. Nov. 10, 2014).  In fact, defendants do "not have to be charged with the
specified unlawful activity."  United States v. Howard, 271 F. Supp. 2d 79, 83
(D.D.C. 2002) (emphasis and citations omitted); see also United States v. Loe, 248
F.3d 449, 468 (5th Cir. 2001) (explaining that "specified unlawful activity" did not

50

"imply that the indictment must list a specific unlawful act that [was] the source of the money"); <u>United States v. Smith</u>, 44 F.3d 1259, 1265 (4th Cir. 1995) (emphasis and internal marks omitted) (discussing that "[j]ust because the statute requires that funds be obtained from specified unlawful activity does not mean that the government is required to detail the circumstances of the unlawful activity," but rather, "the term 'specified unlawful activity' is a defined term referring to a list of offenses which qualify as unlawful activity for purposes of stating a money laundering offense," of which wire fraud is included). And, here, the specified unlawful activity as alleged in the superseding indictment occurred prior to the charged acts of money laundering, which as the government points out, "involved the funds that the defendants had previously obtained unlawfully from Victim A." [Doc. 109 at 6].

"If one engages in ongoing criminal activity that includes completed instances of specified unlawful activity, then that completed specified unlawful activity may be the basis for a money laundering charge even if it is part of a larger ongoing conspiracy or criminal scheme that continues after the act of money laundering is committed." <u>Liersch</u>, 2005 WL 6414047, at *10 (citation omitted). In fact, while "it is true that the defendant[s] must have control of the proceeds of a fraudulent transaction before [they] can engage in money laundering with those proceeds, there is no requirement that the entire fraudulent scheme be complete

before the defendant[s] start[] laundering the proceeds from early portions of the scheme," as "money laundering can be a critical element in a complex fraud scheme because it helps keep the scheme afloat and helps disguise the source of the fraud proceeds." United States v. Seward, 272 F.3d 831, 837 (7th Cir. 2001) (citations omitted); see also Howard, 271 F. Supp. 2d at 89 (citation omitted) (explaining that the "underlying criminal conduct from which the laundered funds were derived need not have been a completed offense when the money laundering occurred" as "[a]ll the government needs to establish is that the defendant had possession or control of the funds that were laundered"). Indeed, "Congress did not intend to allow criminals to lawfully cleanse their ill-gotten gains simply by engaging in an ongoing conspiracy," and "[t]o hold otherwise would be to essentially gut the heart of the statute." Liersch, 2005 WL 6414047, at *10; see also United States v. Quan, No. CR 04-0323 VRW, 2006 WL 2619191, at *1 (N.D. Cal. Sept. 12, 2006) (rejecting defendants' argument "which would prohibit prosecution for money laundering for transactions which involve the proceeds from separate, completed acts in an ongoing criminal scheme" because "[s]uch an interpretation of completed criminal activity would have the court create immunity from money laundering charges for any transaction that predates the completion of an ongoing criminal offense or scheme"). Therefore, "[t]here is no reason why the government [cannot] view the activity charged as money

laundering as the defendant[s'] attempt to launder the proceeds of the early, already completed phases of [their] fraudulent scheme and as part of [their] ongoing effort to defraud . . . and to conceal [their] fraud." Howard, 271 F. Supp. 2d at 89-90 (citation and internal marks omitted).

"In any event, the incorporated paragraphs of the [superseding] indictment detail alleged facts that the defendant[s, [prior to February 12, 2020], fraudulently transferred [ Victim A's] funds to accounts [they] had under [their] control [prior to transferring a portion of those funds to O&M Halyard]," and there "being no requirement that the entire fraudulent scheme be complete before the defendant[s] start[] laundering the proceeds from early portions of the scheme, the defendant[s] can properly be charged with money laundering for the earlier actions that helped comprise [the] fraudulent scheme." Id. at 90 (alteration, footnote, citation, and internal marks omitted).[22]   In sum, the superseding indictment "alleges that

---

[22] Furthermore, "even if details about [the] underlying unlawful conduct were not set forth in the [superseding] indictment, this would not be grounds for dismissal . . . because whether the criminally derived proceeds existed before the laundering transaction is a question of proof, not a question of the adequacy of the indictment." Howard, 271 F. Supp. 2d at 90 (citation and internal marks omitted). "Thus, as long as the indictment contains a plain, concise and definite written statement of the essential facts constituting the offense charged, [such as is the case here,] it should not be dismissed for failure to plead in detail the facts establishing the specified unlawful activity underlying the money laundering charge[s]." Id. at 84 (alteration, citations, and internal marks omitted).

[d]efendant[s] reinvested the proceeds of [their] alleged . . . fraud in furtherance of a continuing scheme," and it "therefore adequately charges the money laundering offenses." Grasso, 173 F. Supp. 2d at 363; see also United States v. Davis, 53 F.4th 833, 844 n.4 (5th Cir. 2022) (alteration, citations, and internal marks omitted) (explaining that the "statute does not require the indictment to specify which unlawful activity generated the funds in question," but instead, "nothing more need be alleged than that the laundered money was the proceeds of wire fraud" and that the government "was thus free to pursue seven specific wire-fraud charges, while nevertheless insisting on the existence of a broader fraudulent scheme, involving a plethora of fraudulent wires, from which funds were derived for the four money-laundering charges"); Smith, 44 F.3d at 1265 (finding that even if the indictment's wire fraud counts were incorporated by reference into the money laundering counts, the money laundering counts "would still pass muster[,]" since a sufficient portion of the wire fraud scheme had been completed and the fact that the wire fraud scheme "as alleged . . . included further transactions" did not detract from the fact that once received, the funds "constituted proceeds derived from an unlawful activity for purposes of a money laundering offense"); United States v. Sidoo, 468 F. Supp. 3d 428, 435, 445-46 (D. Mass. 2020) (citation and internal marks omitted) (finding the superseding indictment sufficiently alleged a money laundering conspiracy where the facts

54

alleged that "the scheme operated in stages," with the defendants allegedly making payments to two entities used by a co-conspirator who would then in turn made payments to other alleged corrupt insiders as part of a college admissions scheme, as there was "no requirement that the underlying crime be completed before money laundering [could] take place . . . ., so long as the underlying offense ha[d] progressed to the point of creating proceeds the money bec[a]me[] proceeds of illegal activities and it [could] be laundered," meaning, "so long as a phase of the ongoing offense ha[d] been completed (and ha[d] generated proceeds) a defendant may be liable for money laundering"), aff'd sub nom. United States v. McGlashan, No. 21-1421, 2023 WL 5199864 (1st Cir. Aug. 14, 2023); Harned v. United States, Nos. 7:00-CR-12 WLS, 7:08-CV-90033 WLS, 2010 WL 3198857, at *3 (M.D. Ga. Mar. 19, 2010) (citations and internal marks omitted) (rejecting defendant's contention "that the underlying offense, in this case mail and wire fraud, must have produced proceeds before those proceeds could be laundered" and that because "the mail and wire fraud had not occurred at the time the funds were placed into the accounts," the "placement of the funds could not have been money laundering because the predicate offenses had not yet occurred," explaining that the government "established that prior to obtaining money from the victims, at least one mailing or wiring to execute the scheme to defraud that

victim would have occurred"), adopted by 2010 WL 3198853, at *1 (M.D. Ga. Aug. 11, 2010).

Defendants also argue that "[b]ecause money laundering charges cannot be premised on the same transactions that constitute the alleged fraud, the money laundering counts must be dismissed."  [Doc. 113 at 6-7 (citing United States v. Christo, 129 F.3d 578, 580 (11th Cir. 1997) (per curiam))].  Despite defendants' arguments to the contrary, [Doc. 103 at 5; Doc. 113 at 6-7], the superseding "indictment . . . is not guilty of a Christo problem," as the "money laundering count[s] properly charge[] that [d]efendants engaged in financial transactions that were separate from and in addition to the underlying criminal activity."  Alabed, 2020 WL 114415, at *2 (citation and internal marks omitted).  That is, the superseding indictment "charges that the activity that dirtied the money is distinct from the laundering activity."  United States v. Vila, Criminal No. 3:08–cr–297–PJB, 2009 WL 79189, at *6 (D.P.R. Jan. 9, 2009).  The Seventh Circuit's decision in Seward, 272 F.3d 831, is illustrative of this point.

In Seward, the Seventh Circuit rejected defendant's argument "that the government failed to allege that he engaged in any money-laundering transactions that were distinct from the bank, mail, and wire fraud scheme," explaining that the "transactions [at issue] demonstrate[d] both unlawful activity and distinct transactions in the criminally derived proceeds," since "[w]hen the defendant

impersonated the decedent and defrauded the Bank into transferring the decedent's CD proceeds to the joint account, the defendant committed bank and wire fraud," and "[t]hat act of fraud was complete and the defendant had control over the proceeds of the fraud, once the money was placed in the joint account," and the "checks the defendant then wrote on the account were, therefore, transactions in the proceeds of the bank fraud." Howard, 271 F. Supp. 2d at 86-87 (alterations and citations omitted). "Although the activity alleged in the [superseding] indictment as constituting the money laundering activity is also alleged in the [wire fraud] counts . . ., as long as there is separate underlying unlawful activity that gave rise to the proceeds charged . . .," defendants do "not suffer prejudice for the indictment's failure to specify conduct separate from the underlying criminal activity." Id. at 87 (citation and internal marks omitted). In short, the "wire transaction[s] that serve[] as the basis for [defendants'] wire-fraud charge[s] . . . [are] separate and apart from the monetary transactions supporting the money-laundering charges[.]" United States v. Huff, 641 F.3d 1228, 1233 (10th Cir. 2011); see also United States v. Nolan, 223 F.3d 1311, 1316 (11th Cir. 2000) (per curiam); United States v. Booth, 583 F. Supp. 3d 545, 549 (S.D.N.Y. 2022); United States v. Happ, No. CR2-06-129(8), 2008 WL 5101227, at *5 (S.D. Ohio Nov. 25, 2008).

"A motion to dismiss challenges the sufficiency of the pleadings, not proof at trial." Medina-Rodrìguez v. $3,072,266.59 in U.S. Currency, 471 F. Supp. 3d 465, 481 (D.P.R. 2020) (citation and internal marks omitted). "On its face, the [superseding i]ndictment contains all necessary elements of the money laundering [] charge[s], fairly informs [d]efendant[s] of the charge[s] against which [they] must defend, and enables [defendants] to plead an acquittal or conviction in bar of future prosecutions for the same offense," which "is enough to satisfy the requirements of Rule 7(c)(1)," Shea, 2023 WL 4551635, at *3 (citation and internal marks omitted), and the pending motion to dismiss the money laundering counts for failure to allege a crime, [Doc. 103], is due to be denied.  Accordingly, it is **RECOMMENDED** that defendants' motions to dismiss, [Docs. 103, 105, & 115], be **DENIED**.

## C.   Norkus' Motion to Suppress Statements, [Doc. 97]

Norkus contends that the statements he made in a social room in his condominium building on March 10, 2021, should be suppressed because the interview occurred in violation of Georgia's Rules of Professional Conduct and encroached on his attorney-client relationship.  [Doc. 142 at 18-22].  He also contends that the Court erred in prohibiting him from questioning the witness at the evidentiary hearing about knowledge of Norkus' representation by counsel at the time of the March 2021 interview and requests that the Court reopen the

evidentiary hearing and allow him to address the issue.  [Id. at 16-18].  Finally, Norkus contends that his statements were not voluntary and therefore should be suppressed.  [Id. at 22-25].[23]

In response, the government argues that Norkus' motion is due to be denied because "the evidence at the suppression hearing demonstrates that the interview was voluntary"; Norkus "fails to show that the [government] violated Georgia Rule of Professional Responsibility 4.2 and ignores binding Eleventh Circuit precedent, which states suppression is not permitted if the ethical rules are in fact violated"; and Norkus' request to reopen the evidentiary hearing should be denied and "he should not be permitted to present additional evidence."  [Doc. 143 at 2-3, 9]; see also [id. at 6-20].  Norkus has filed a reply in support of his motion to suppress statements, [Doc. 144], and the Court will address the parties' arguments in turn.

---

[23] In his initial motion to suppress, [Doc. 97], Norkus referenced Miranda v Arizona, 384 U.S. 436 (1966), [id. at 2].  "[O]ut of an abundance of caution," the government addressed whether Norkus' Miranda rights were violated and argued that Norkus was not in custody at the time of his interview on March 10, 2021. [Doc. 143 at 2 n.2, 3-6]; however, in his reply, Norkus concedes that he was not in custody at the time of his interview on March 10, 2021, see [Doc. 144 at 1].  Thus, the Court need not address this argument.

1.  *Statement of Facts*

On the morning of March 10, 2021, Atlanta-based Federal Bureau of Investigation ("FBI") Special Agents Bradley Rhoden ("Agent Rhoden") and Stephen Ryskoski ("Agent Ryskoski") arrived at Norkus' condominium building in Hillsboro Beach, Florida, and pressed the call button on the intercom system at the front of the building and spoke with Norkus' wife, who relayed that Norkus was in the sauna. (Tr. at 3-7, 9, 26). The agents, who identified themselves to Norkus' wife, informed her that they wanted to speak with Norkus, provided her with Agent Rhoden's contact number, and then returned to their vehicle to wait for Norkus' call. (Tr. at 10, 18). About fifteen minutes later, Norkus contacted the agents, and they informed him that they wanted to speak to him regarding financial transactions that took place between Craig Curry ("Curry"), a victim of the alleged scheme, and Sperber. (Tr. at 10, 19, 26). Norkus agreed to speak with them and suggested that they meet in the foyer of his condominium building, and after the agents introduced themselves, Norkus led them to a "social room or club room" located on the first floor of the building. (Tr. at 10-11, 19).[24]

---

[24] Agent Rhoden described the "social room" as a "medium-sized room" that "was large enough to have multiple tables" and had windows from which the ocean was visible. (Tr. at 11-12). The agents and Norkus sat down at a table in the room, with Norkus' back to the exit of the room. (Tr. at 12). At this time, the agents placed a recording device in plain view on the table and began recording the interview. (Tr. at 5-6, 13, 19; Gov't Ex. 1).

At the beginning of the interview, Norkus informed the agents that he knew Sperber, that it had been a couple of weeks since he had spoken with him, that he was a "little" upset because he had found out "some stuff," and he was meeting with his lawyer later that day as he was involved in two civil lawsuits because of Sperber.  (Gov't Ex. 1 at 00:08-00:35).  Norkus described his relationship with Sperber, including that Sperber had a distribution business and would set up the deals with the manufacturers, and explained that his role was also to bring the customers and handle logistics at the warehouse, but that he was not involved in the "financials."  (Gov't. Ex. 1 at 00:43-01:14).  He also discussed the deal with Curry, his relationship with Curry from his "younger days," and Sperber's inability to get PPE products out of the country after a stop order was put into place.  (Gov't. Ex. 1 at 01:25-02:00, 02:15-14:00).  About fourteen minutes into the interview, Norkus referenced Sperber's attorney, at which time Agent Rhoden stated, "Yeah, if he told you, I don't want to hear what his attorney told him or anything."  (Gov't Ex. 1 at 14:05-14:16).  Agent Ryskoski asked Norkus about the civil lawsuits, and Norkus explained that his attorney was "working on that because [Sperber] owes money on that to [his] company because that company wired [him] and [he] took care of it with [Sperber], and that goods never came in, but [Sperber] did wire money back, but not all of it."  (Gov't Ex. 1 at 16:55-17:14).  Norkus further explained that he had entered into a settlement agreement on one

of the civil lawsuits, and that despite Sperber agreeing to pay him back, he had not yet done so.  (Gov't Ex. 1 at 17:15-17:25).  Norkus also indicated that he believed the agents were there to discuss the Curry deal, and he then provided further details about his knowledge of that deal.  (Gov't Ex. 1 at 17:34-18:35).  Norkus also stated that he had not spoken to Sperber in a while because he was "upset" and that he had spoken to his attorney and had a meeting with him later that day with regard to the civil lawsuit as he was "trying to get things worked out," but that Sperber "got himself in a pickle here."  (Gov't Ex. 1 at 21:00-21:41).

During the interview, Norkus asked the agents whether they had spoken to Sperber, and they explained that they wanted to talk with him first.  (Gov't Ex. 1 at 25:37-25:50).  Agent Rhoden also inquired as to whether Norkus had any information from O&M Halyard and showed him a bank statement regarding a wire transaction, and Norkus explained what happened and responded, "Yeah, okay, this is one of the things that I had a problem with . . . . I just found this out from my attorney."  (Gov't Ex. 1 at 26:55-29:08).  Norkus continued by stating, "Let me tell you something why I'm upset, one of the reasons I'm upset about it.  I just had a conversation with my attorney," at which time Agent Rhoden interrupted and said that they did not want to hear anything he had told his attorney.  (Gov't Ex. 1 at 29:21-29:30).  Norkus continued speaking with the agents and thereafter explained the process of receiving orders with Sperber and others and when he

subsequently discovered that a document was "bogus."  (Gov't Ex. 1 at 29:31-32:08).

At approximately thirty-three minutes into the interview, Agent Ryskoski reminded Norkus that they were federal agents and that lying to them could be a crime.  (Gov't Ex. 1 at 32:59-33:05).  He also informed Norkus that there was a "grand jury investigation going on right now up in Atlanta related to this whole case."  (Gov't Ex. 1 at 33:06-33:11).  Norkus responded by asking, "What case?," and Agent Ryskoski replied, "This whole thing that we're talking about here." (Gov't Ex. 1 at 33:11-33:17).  Norkus followed up by asking, "With [Sperber] and everything?," and Agent Ryskoski replied, "Right."  (Gov't Ex. 1 at 33:17-33:20). Agent Rhoden also responded, "[Sperber] and everything."  (Gov't Ex. 1 at 33:16-33:18).

Norkus continued to provide the agents details about certain documents he admitted were "not accurate," at which time Norkus asked whether the agents would be speaking with Sperber next, but the agents reiterated that they were speaking with him first.  (Gov't Ex. 1 at 34:00-34:26).  At about forty-one minutes into the interview, Norkus confirmed that he and Sperber held a conference call in which Sperber pretended to be a representative from O&M Halyard in order to pacify the customer, and Agent Rhoden stated, "But, you know this is wrong and it's fraud," and he continued by again telling Norkus that they were speaking with

him first and that they were looking for his cooperation and that "this [did] not look good." (Gov't Ex. 1 at 41:17-43:33). Later in the interview, Agent Rhoden stated that they wanted to know what Sperber knew and thought Norkus could help them and that it seemed like Norkus was doing the hard work at the warehouse while Sperber was flying around on private jets. (Gov't Ex. 1 at 48:08-48:44). Agent Rhoden also stated, "I mean, to me that sounds like somebody that's using you for this, but you do have to own up to some of these things. This [] looks really bad." (Gov't Ex. 1 at 48:55-49:10). Agent Ryskoski also reiterated that they were looking for his cooperation and that part of it was Norkus owning up and telling them about the conversations he had with Sperber. (Gov't Ex. 1 at 51:45-51:53).

The agents also questioned Norkus about using funds from a deal to purchase his condominium and about customers not receiving their products, at which time Norkus said that he was working on getting that taken care of and that his "attorney says," but Agent Ryskoski interrupted him and said that he did not want to hear about that, and then Norkus continued by explaining that he was working on a settlement agreement and that he was going to cover it but that Sperber was supposed to "cover him." (Gov't Ex. 1 at 56:00-56:30). Agent Ryskoski asked Norkus if he had anything to say about various fake documents, and Norkus responded that he did not because Sperber did not tell him the truth,

and then he started to say what his attorney said, at which time Agent Ryskoski again interrupted him.   (Gov't Ex. 1 at 1:00:19-1:01:08).   Agent Ryskoski commented that there was a "lot of fraudulent stuff here," and Agent Rhoden then indicated that they wanted to know which documents were doctored by him and which were doctored by Sperber because what was going to happen was that Sperber would point his finger at Norkus "all day" and that Norkus needed to tell them "more about [Sperber]."   (Gov't Ex. 1 at 1:08:11-1:10:15).   The interview, which lasted about an hour and twenty minutes, concluded with Agent Rhoden advising Norkus that it would be in his best interest to continue to cooperate because it was important for him to realize that "a lot of this [was] flowing downhill." (Gov't Ex. 1 at 1:16:35-1:16:54).   The agents then served Norkus with a grand jury subpoena for documents from his company, Champion Resources, and he was not arrested or otherwise placed in custody on that day.  (Tr. at 15, 17; Gov't Ex. 1 at 1:17:09-1:19:28).[25]

At the time of the interview, both agents, who were dressed in "slacks and pullovers," were armed with their standard-issue handguns, which remained holstered on their hips and were never displayed.  (Tr. at 7-8).  The tone of the

---

[25] During the interview, Norkus agreed to show the agents his telephone upon their request so they could confirm Sperber's contact number, and while the agents took a picture of his phone screen with Sperber's contact information on it, they never seized Norkus' phone.  (Tr. at 16; Gov't Ex. 1 at 37:22-40:53).

interview was cordial and polite, with Norkus displaying a friendly demeanor throughout the interview, and the agents never physically touched or threatened Norkus or patted him down, and he was not restrained in any way.  (Tr. at 14-15, 17, 21, 30); see generally (Gov't Ex. 1).  During the interview, Norkus seemed to understand everything that was being asked of him and did not appear to be under the influence of drugs or alcohol, nor did he request that the agents cease interviewing him or express a desire to leave.[26]  (Tr. at 16-17); see generally (Gov't Ex. 1).  Agent Rhoden testified that Norkus was never promised immunity or leniency if he agreed to speak with them, and he never advised Norkus that he would face more serious charges or a longer prison sentence if he did not speak with them.  (Tr. at 14, 27); see also (Gov't Ex. 1).  The agents never advised Norkus at any time during the interview that he was a target of a criminal investigation, and they also never advised him that he was free to leave, that he did not have to speak with them, or that his statements could be used against him, though Norkus also never asked to speak to an attorney or invoked his right to silence.[27]  (Tr. at

---

[26] The agents never blocked the door to the room during the interview, and in fact, twice during the course of the interview individuals entered the "social room," but they immediately left the room on their own accord.  (Tr. at 12-13, 15; Gov't Ex. 1 at 29:11-29:18, 49:20-49:22).

[27] Norkus concedes that he "never invoked his right to counsel" during the interview.  [Doc. 142 at 4 (citing (Tr. at 29))].  At the evidentiary hearing, Norkus' counsel attempted to ask Agent Rhoden about Norkus' legal representation in

15, 18-20, 25, 27, 29-30); <u>see also</u> (Gov't Ex. 1).  The agents, however, did advise Norkus that they were speaking to him first rather than to Sperber and that he had the opportunity to cooperate and should do so, though they never promised him a reduced sentence.  (Tr. at 27, 29; Gov't Ex. 1).

### 2.    *Analysis*

Norkus moves to suppress statements he made during the interview on March 10, 2021.  [Doc. 97]; <u>see also</u> [Doc. 142].  Norkus first argues that his statements on March 10, 2021, should be suppressed because Agents Rhoden and Ryskoski encroached on his attorney-client relationship, in violation of Georgia Rule of Professional Conduct 4.2.  [Doc. 142 at 18-22].  Relatedly, he also argues that he should have been able to question Agent Rhoden at the evidentiary hearing about Norkus' legal representation at the time of the interview and asks the Court

---

related civil lawsuits at the time of the March 10, 2021, interview, and the government objected to this line of questioning based on relevance, which the Court sustained as to the question posed.  (Tr. at 21-23).  Norkus' counsel then argued that Norkus' "representation was definitely a part of the issues that [she] wanted to raise about the voluntariness of his statement" and the Court advised her that if she wanted to "try to pose something more narrow," she was "welcome to do so[.]"  (Tr. at 22-23).  Norkus' counsel then asked Agent Rhoden whether he was aware that Norkus had an attorney representing him in the civil lawsuits at the time he interviewed him, and Agent Rhoden responded affirmatively, confirmed that Norkus had referenced his attorney during the interview, and explained that "when an attorney was even mentioned," he and Agent Ryskoski advised Norkus that they did not "want to hear about anything that [he] may have spoken with [his] attorney."  (Tr. at 24-25); <u>see also</u> (Gov't Ex. 1.).

to reopen the evidentiary hearing to allow him to present evidence to address the issue.   [Id. at 16-18].   Finally, Norkus argues that his statements were not voluntarily made because he was misled into believing the agents were investigating Sperber and not him and that after encroaching on his attorney-client relationship, they told him he needed to cooperate, rendering his statements involuntary.   [Id. at 22-25].   The Court will address each of these arguments.

### a.   Violation of the Georgia Rules of Professional Responsibility

Norkus contends that the agents encroached on his attorney-client relationship, in violation of Georgia Rule of Professional Conduct 4.2, when they questioned him on March 10, 2021.   [Doc. 142 at 18-22].   In particular, Norkus asserts that because Rule 4.2 provides that a "lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or court order," and the "Comment to Rule 4.2 [only] allows contact about matters not related to the subject matter," Norkus' "statement should be suppressed because the agents plainly knew that he was represented by counsel but continued to ask him questions, including about the lawsuits on which they knew he was represented," and that the agents therefore "directly asked [ him] about the subject matter of representation," without telling him "not to repeat attorney-client

communications between him and his lawyer until nearly half an hour into the conversation." [Id. at 18-19 (citation and internal marks omitted)].

In response, the government maintains that Norkus was not represented for purposes of the criminal investigation at the time of the March 10, 2021 interview; even if he had been represented, and Rule 4.2 applied, the agents' contact with him fell under the "authorized by law" exception to the rule; and, even if it had "violated a Rule of Professional Responsibility . . ., suppression is not an appropriate remedy." [Doc. 143 at 8 (internal marks omitted)]. Norkus replies that while the "government spends the bulk of its response arguing that it is allowed to contact represented parties," he "does not dispute this general proposition," but rather, he argues that the "agents encroached on his attorney-client relationship, such that his statement should be suppressed." [Doc. 144 at 2 (citations omitted)]. Specifically, Norkus contends that the "agents repeatedly sought or invited information about the content of attorney-client communications[]" and that it was "because of this—not just because the agents contacted a represented party— that [ his] statement should be suppressed." [Id. at 2-3 (citation omitted)].

"[F]ederal prosecutors are subject to the Georgia Rules of Professional Conduct and Local Rules of this Court." United States v. Evans Concrete, LLC, CR 420-081, 2023 WL 3019058, at *9 (S.D. Ga. Apr. 20, 2023), adopted by 2023 WL

4704010, at *2 (S.D. Ga. July 24, 2023). "The Georgia no-contact rule, set forth in Georgia Rule of Professional Conduct 4.2," id., which has been incorporated by this Court's Local Rule 83.1, see LR 83.1(C), NDGa., provides, in relevant part:

> RULE 4.2 COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL
>
> (a) A lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or court order.
>
> (b) Attorneys for the State and Federal Government shall be subject to this Rule in the same manner as other attorneys in this State.

Evans Concrete, LLC, 2023 WL 3019058, at *9.

Despite Norkus' arguments to the contrary, [Doc. 142 at 18-19; Doc. 144 at 2-5], this Court "need not-and indeed, does not—determine whether the contacts with [ Norkus] . . . violated Rule 4.2," since "[e]ven if the contact[] did constitute an ethical breach, the Eleventh Circuit law is clear that an ethical breach cannot be the basis for exclusion of evidence," United States v. Scrushy, 366 F. Supp. 2d 1134, 1141 (N.D. Ala. 2005) (citing United States v. Lowery, 166 F.3d 1119, 1125 (11th Cir. 1999)). In Lowery, the Eleventh Circuit held that "a state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible." 166 F.3d at 1124. In reaching this conclusion, the Eleventh Circuit explained, in pertinent part:

Federal law, not state law, determines the admissibility of evidence in federal court.  "Although there is an important state interest in the regulation of attorneys practicing within its borders, there is a competing federal interest in the enforcement of federal criminal law."  The same principle applies to civil law as well.

When it comes to the admissibility of evidence in federal court, the federal interest in enforcement of federal law, including federal evidentiary rules, is paramount.  State rules of professional conduct, or state rules on any subject, cannot trump the Federal Rules of Evidence. . . . Federal Rule of Evidence 402 provides:

> All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority.

That is an exclusive list of the sources of authority for exclusion of evidence in federal court.  State rules of professional conduct are not included in the list.

Local rules of federal courts are not listed in Rule 402, either.  As a result, otherwise admissible evidence cannot be excluded based upon local rules.  For that reason, the Southern District of Florida's adoption of the State of Florida's professional conduct rules does not affect our analysis or the result. . . .

Id. at 1124-25 (footnotes and citations omitted).

While Norkus acknowledges the Lowery decision, he contends that his statements should be suppressed because the agents "encroached on his attorney-client relationship" under the holding in United States v. Sander, 615 F.2d 215, 219 (5th Cir. 1980) (per curiam), which he asserts was "not tied to the violation of any specific bar rule, but applies to the violation of a defendant's attorney-client

relationship more generally." [Doc. 144 at 2, 5 (citations omitted)]. However, Norkus' reliance on <u>Sander</u> is misplaced.

In <u>Sander</u>, the attorney initially retained by the defendant to represent him on his extortion charge was murdered shortly thereafter, and the defendant was named as a possible suspect in the murder. 615 F.2d at 219. During the investigation of the murder, the local police procured the defendant's file from the attorney's office and "glanced through it." <u>Id.</u> The defendant moved to dismiss his indictment, alleging "his Sixth Amendment right to counsel was violated[.]" <u>Id.</u> The district court conducted an in camera hearing, during which the police officer who examined the file testified that he did not see the document defendant had concerns about, that he did not discuss the file with any federal agents, and that he provided no evidence to the government, nor was any information from defendant's file used by the government in the case. <u>Id.</u> Under these facts, the Fifth Circuit found that defendant had "made no showing of injury or prejudice because of the fact that his file at his attorney's office was viewed by the [ local] police" and "denied his motion to dismiss." <u>Id.</u> However, the Fifth Circuit noted that "[w]here there is an intrusion on the attorney-client relationship the remedy for such a violation is not dismissal but the suppression of any evidence so obtained." <u>Id.</u> (citations omitted).

In relying on <u>Sander</u>, Norkus would have this Court ignore the fact that the general proposition articulated by the Fifth Circuit was in the context of a Sixth Amendment violation, which Norkus acknowledges does not apply in this case. <u>See</u> [Doc. 144 at 2].[28]  This case is clearly distinguishable from the circumstances in <u>Sander</u>, and this Court "is bound to follow controlling precedent of this circuit."

---

[28] In <u>United States v. Tapp</u>, No. CR107-108, 2008 WL 2371422, at *17-18 (S.D. Ga. June 4, 2008), the district court concluded that the no-contact rule "should be interpreted by courts as a guide for professionalism among attorneys, not as a vehicle for conferring substantive criminal rights not provided by the Constitution," and further explained that "the scope of the [n]o-[c]ontact [r]ule and the scope of the Sixth Amendment [were] not identical," since "[w]here there is a constitutional violation, the court has the uncontroverted power to uphold the Constitution and to suppress evidence or reverse a conviction," but "[a]bsent the implication of a defendant's substantive rights, violation of Rule 4.2 [was] akin to 'harmless error' and should not be enough for a court to grant a substantive remedy affecting a defendant's case."  Norkus "cites no authority, and the Court has found none, holding that the mere use of a covert [operation] to speak with him during the investigative phase—even if the [g]overnment knew he was represented—is the kind of technique that is so outrageous that it is fundamentally unfair and shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment."  <u>United States v. Jafari</u>, CRIMINAL CASE NO. 1:19-CR-0078-SCJ-LTW, 2020 WL 7090698, at *11 (N.D. Ga. Feb. 25, 2020) (emphasis, citation, and internal marks omitted), adopted by 2020 WL 6281703, at *1 (N.D. Ga. Oct. 27, 2020).  In sum, the "ethical rules do not state anywhere therein that they create substantive rights, and courts should not read substantive rights into the rules of legal ethics," <u>Tapp</u>, 2008 WL 2371422, at *18 (citation omitted), and "there are other remedies available to deter ethical violations by federal attorneys, including disciplinary sanctions within the Justice Department and by the bar associations of which they are members, [so] the need for the exclusionary rule as a remedy for ethical violations is far outweighed by the costs the rule inflicts on the truth-finding process," <u>Scrushy</u>, 2004 WL 483264, at *6 (emphasis omitted).

Scrushy, 366 F. Supp. 2d at 1141.  In fact, the Eleventh Circuit recently reaffirmed its holding in Lowery, and concluded that it "need not reach whether the [g]overnment violated Georgia's no-contact rule because [it had] held that a state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible," and that it was "bound to follow a prior binding precedent unless and until it [was] overruled by [the Eleventh Circuit] en banc or by the Supreme Court."  United States v. Beck, No. 21-13582, 2023 WL 5016614, at *5 (11th Cir. Aug. 7, 2023) (citations and internal marks omitted).   In Beck, the Eleventh Circuit explained that because the defendant had "presented no other basis for suppressing the recordings other than an alleged violation of Rule 4.2. . . ., the district court did not err in denying the motion to suppress [the defendant's] statements made to an undercover informant pre-indictment."   Id.   Indeed, the holding in Lowery, 166 F.3d at 1124-25, "forecloses [Norkus'] argument that the [g]overnment's alleged violation of Georgia's Rules of Professional Conduct provides an adequate basis to suppress evidence in this case."  Jafari, 2020 WL 6281703, at *1 n.1 (citation omitted).  Thus, pursuant to the binding precedent set forth under Lowery, "[s]uppression is not an available remedy for a violation of the no-contact rule even assuming the federal prosecutor knowingly violated Rule 4.2," especially in the absence of a violation of a substantive right, Evans Concrete, LLC, 2023 WL 3019058, at *9-10;

see also Adams v. Austal, U.S.A., L.L.C., 569 F. App'x 732, 736 (11th Cir. 2014) (per curiam) (unpublished) (alteration, citation, and internal marks omitted) (explaining that in "the Eleventh Circuit, a state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible"); Bane by & through Bane v. Se. Corr. Med. Grp., Inc., CASE NO.: 1:19-CV-179 (LAG), 2022 WL 993017, at *4 (M.D. Ga. Mar. 31, 2022) (citation and internal marks omitted) (explaining that state rules of professional conduct "can have no role in determining whether evidence is admissible in federal court proceedings"), and the Court therefore "need not reach whether the [g]overnment violated Georgia's no-contact rule," Beck, 2023 WL 5016614, at *5; see also United States v. Esformes, Case No. 16-20549-Cr-Scola/Otazo-Reyes, 2018 WL 5919517, at *17 (S.D. Fla. Nov. 13, 2018) (citation and internal marks omitted) (explaining that "even if the state ethics rules apply to a federal prosecutor in the pre-indictment, pre-arrest stage of an investigation, the Eleventh Circuit has held that a state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible"), since Norkus' argument in this respect does not provide a basis to suppress his statements made on March 10, 2021.[29]

---

[29] Norkus maintains that he "should have been able ask [Agent Rhoden] about [ his legal] representation at the time of the interview, and he objects to the Court's

### b.     Voluntariness

Although Norkus does not contend that his statements were taken in

violation of <u>Miranda</u>, "the [C]ourt still must determine that any confessions or

---

decision to prohibit this line of questioning," and he asks "the Court to re-open the
evidentiary hearing and allow him to present evidence[.]"  [Doc. 142 at 16-17].
Relatedly, Norkus points to discovery he was provided following the evidentiary
hearing that shows the government obtained an order, authorizing covert, pre-
indictment contact between Sperber and a victim, since both Sperber and the
victim were represented by counsel in private, civil lawsuits, and indicated that
the government would take certain precautions to protect attorney-client
discussions on the recorded calls, in an effort to bolster his argument for
suppression of his statements by arguing that the "agents did not take any of the
cautionary measures described by the government in the motion in which it
sought approval to record conversations with Sperber" and to support his request
to reopen the evidentiary hearing.  [Doc. 142 at 14-15, 22; Doc. 144 at 7-8].
However, as the government points out, the victim, Currie, "agreed to make
consensually monitored telephone calls with Sperber and Sperber's counsel," and
it therefore obtained the order "[o]ut of an abundance of caution," since "Currie
could conceivably engage in discussions with Sperber and Sperber's counsel about
their respective civil litigation strategies," which has no bearing "on the March
2021 interview[.]"  [Doc. 143 at 16-18].  Putting aside the parties arguments in this
regard, "[b]ecause suppression of [Norkus' statements during the March 10, 2021,
interview] is not a remedy available in these circumstances, there is [simply] no
need for an evidentiary hearing," as "[w]hatever might be found about violations
of Rule 4.2 would not lead to the suppression of the [statement], so a hearing on
the issue appears useless."  <u>Scrushy</u>, 2004 WL 483264, at *6.  Furthermore, as noted
earlier, the Court sustained an objection by the government to a question posed by
Norkus' counsel, but invited her to rephrase it, and she proceeded to ask the
witness several questions consistent with the topics she said she intended to cover
on the issue of representation and therefore had an adequate opportunity to
question the witness on those topics.  (Tr. at 21-25).  Thus, it is not necessary to
reopen the evidentiary hearing in this case.

incriminatory statements made by [Norkus] were voluntary in order to admit them at trial." United States v. Lazarus, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing United States v. Bernal–Benitez, 594 F.3d 1303, 1317–18 (11th Cir. 2010)); see also United States v. Badiki, CRIMINAL ACTION NO. 1:17-CR-342-ELR-AJB, 2018 WL 7283636, at *9 (N.D. Ga. Dec. 31, 2018) (citations omitted) ("Regardless of whether [d]efendant was in custody or not, the [g]overnment must prove that [his] statements were voluntary."), adopted by 2019 WL 397991, at *2 (N.D. Ga. Jan. 31, 2019). Whether a statement was voluntarily given must be examined in light of the totality of the circumstances. United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011). "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'" United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010) (citation omitted), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011). "Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises

or inducements by police." Villaverde-Leyva, 2010 WL 5579825, at *11 (citations omitted); see also United States v. Moran-Can, No. CR-22-01661-001-TUC-SHR (LCK), 2023 WL 2727824, at *5 (D. Ariz. Mar. 31, 2023) (citations omitted).

The focus of the voluntariness inquiry is whether Norkus was coerced by the government into making the statement, so "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986); see also Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (citation omitted); Collazo v. Estelle, 940 F.2d 411, 415 (9th Cir. 1991) (citation omitted); United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011) (citation omitted), adopted at 1345. Thus, "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007) (quoting Colorado v. Connelly, 479 U.S. 157, 164 (1986)), adopted at *1; see also Connelly, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'"); United States v. Preston, 751 F.3d 1008, 1019 (9th Cir. 2014) (citation omitted); Demarest v. Sec'y, Dep't of Corr., Case No. 8:13-cv-75-T-36TBM, 2016 WL 951913, at *6 (M.D. Fla. Mar. 14, 2016) (citation omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long

interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation omitted); see also Preston, 751 F.3d at 1016; Trethewey v. Farmon, 39 F. App'x 591, 593 (9th Cir. 2002) (unpublished) (citation omitted); Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985) (alteration in original) (citation and internal marks omitted) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired"), modified in unrelated part by, 781 F.2d 185 (11th Cir. 1986) (per curiam).

Norkus contends that the "misleading nature of the interview—that the agents indicated that they were investigating [] Sperber, not [ him], and that they told [ him] that he needed to 'own[] up' to his involvement and that they 'need[ed] him to cooperate with [them],'" rendered his statements involuntary because "he felt compelled to answer their questions."  [Doc. 144 at 9 (citation omitted)]; see also [Doc. 142 at 22-24].  The government responds that "it is difficult to imagine a situation where two dedicated law enforcement agents conducted a more professional interview of a suspect," and that Norkus' "motion points to no facts and no legal authority suggesting that suppression is warranted."  [Doc. 143 at 8

(emphasis omitted)].  For the reasons that follow, Norkus' motion to suppress his statements is due to be denied.

"A confession is involuntary if the suspect's 'will was overborne in such a way as to render his confession the product of coercion.'"  Demarest, 2016 WL 951913, at *6 (quoting Arizona v. Fulminante, 499 U.S. 279, 288 (1991)); see also Doody v. Ryan, 649 F.3d 986, 1008 (9th Cir. 2011) (citation omitted); United States v. Pinder, CRIMINAL ACTION FILE NO. 1:08-CR-421-03-MHS/AJB, 2009 WL 10670633, at *30 (N.D. Ga. Dec. 23, 2009) (citation and internal marks omitted) ("Determining if a confession is voluntary requires examining whether a defendant's will was overborne by the circumstances surrounding the giving of a confession."), adopted by 2010 WL 11507903, at *14 (N.D. Ga. Mar. 5, 2010), aff'd, 437 F. App'x 816 (11th Cir. 2011) (per curiam) (unpublished).  As previously noted, the Court must consider the totality of the circumstances to determine whether Norkus' statements were voluntary.  Pinder, 2009 WL 10670633, at *30 (citations omitted); see also Preston, 751 F.3d at 1016 (citations omitted); Bernal-Benitez, 594 F.3d at 1319 (citation omitted) ("[The Court] consider[s] the totality of the circumstances, including the details of the interrogation and the defendant's characteristics, when deciding whether a confession was voluntary.").

"Considering the totality of the circumstances as established by the evidence adduced at the evidentiary hearing, the Court finds that the government has

demonstrated by a preponderance of the evidence that [Norkus'] statements were entirely voluntary." United States v. Lynn, 547 F. Supp. 2d 1307, 1311 (S.D. Ga. 2008) (citations omitted), adopted at 1308.  The interview with the FBI agents on March 10, 2021, which was conducted in a "social room" located on the first floor of Norkus' condominium building and lasted no more than an hour and twenty minutes, was not unreasonably long, see Shriner v. Wainwright, 715 F.2d 1452, 1455 (11th Cir. 1983) (concluding that statements made during a five-hour interrogation were not involuntary).   Additionally, the agents generally maintained a calm and cordial tone during the interview, did not brandish their weapons, and did not use any physical force against Norkus or threaten him in any way, nor did they make any promises to him, see (Tr. at 8, 14-17, 21, 25, 27, 29-30; Gov. Ex. 1); see also Moran, 475 U.S. at 421 (citation omitted) ("[T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."); Miller v. Dugger, 838 F.2d 1530, 1537 (11th Cir. 1988) (finding that "there was no official overreaching that could have rendered [defendant's] statement involuntary" under the totality of the circumstances, including that "[t]he transcript [did] not suggest, nor d[id] [defendant] allege, that the police either applied physical force or threatened to do so").

Although Norkus asserts that he was misled or deceived because the agents encouraged him to talk by implying that cooperation and being truthful were in

his best interest, after indicating that they were investigating only Sperber in an apparent attempt to downplay the significance of his statements, which led him to believe that he had to respond to their questions, [Doc. 142 at 24; Doc. 144 at 9], the evidence of record belies Norkus' assertions, see generally (Gov. Ex. 1).  First, any suggestion that cooperation was in Norkus' best interest and that he should tell the truth does not constitute sufficient police overreaching or coercion to render a statement involuntary.  United States v. Hipp, 644 F. App'x 943, 945, 947-48 (11th Cir. 2016) (per curiam) (unpublished) (alteration, citations, and internal marks omitted) (finding statements to defendant that they were FBI agents investigating fraudulent activities of a corporation and that defendant should tell the truth and that cooperating with the government may be beneficial or in his best interest did not render a statement involuntary but amounted to "no more than affording [the defendant] the chance to make an informed decision with respect to his cooperation with the government," even though the agents knew at the time of questioning, which lasted an hour and a half, defendant could face criminal charges for his involvement with the corporation); see also United States v. Rutledge, 900 F.2d 1127, 1128, 1130-31 (7th Cir. 1990) (holding a defendant's statement to be voluntary even though police told him that "all cooperation is helpful"); United States v. Chaidez-Reyes, 996 F. Supp. 2d 1321, 1352 (N.D. Ga. 2014) (finding that the agents advising defendant that they did not believe his

denials of criminal activity "did not render his statements involuntary"). Indeed, "[a] mere admonition to the accused to tell the truth does not render a statement involuntary," and similarly, "a general statement that cooperation may be beneficial to an accused, with no promise of leniency, does not amount to an illegal inducement." Hipp, 644 F. App'x at 947 (citations omitted); see also United States v. Varnell, Criminal Indictment No. 1:13–CR–394., 2014 WL 5517923, at *10 (N.D. Ga. Oct. 28, 2014) (explaining that "[w]hile the agents did make vague statements indicating that cooperation could help [d]efendant, the agents' conduct in raising the possibility of [d]efendant cooperating [did] not render [d]efendant's subsequent statements involuntary").

To the extent the agents' attempts to downplay the significance of Norkus' statements amounted to trickery or deception, "it is clear, that the police's use of a trick alone will not render a confession involuntary." United States v. Castandeda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984) (citations omitted). Indeed, "trickery or deceit is only prohibited to the extent it deprives the suspect of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." Soffar v. Cockrell, 300 F.3d 588, 596 (5th Cir. 2002) (citation and internal marks omitted); see also United States v. Lall, 607 F.3d 1277, 1285-86 (11th Cir. 2010) (citations omitted) (noting that police misrepresentations of fact are not enough to render a confession involuntary, but

misrepresentations of law are more likely to do so).  Accordingly, "[t]he kinds of deception that are generally deemed to trigger suppression are lies about a defendant's legal rights (*i.e.*, you must answer our questions), false promises (*i.e.*, whatever you say will be just between us) or threats (*i.e.*, if you don't talk, you won't see your family for a very long time)."  United States v. La Forgia, Criminal No. 12-0057-WS-C, 2012 WL 1869035, at *4 (S.D. Ala. May 22, 2012) (footnote and internal marks omitted) (citing United States v. Degaule, 797 F. Supp. 2d 1332, 1380 (N.D. Ga. 2011)).

Moreover, cases where police trickery has caused a statement to be involuntary involve "other aggravating circumstances."  Castaneda-Castaneda, 729 F.2d at 1363; see also United States v. Graham, Criminal Action File No. 3:13–cr–11–TCB, 2014 WL 2922388, at *10 (N.D. Ga. June 27, 2014).  Since "[c]oercive police activity is a necessary predicate to the finding that a [statement] is not 'voluntary,'" see Connelly, 479 U.S. at 167, the aggravating circumstances generally must show that the police exerted such pressure on a defendant that his "will [is] overborne and his capacity for self-determination critically impaired," Martin, 770 F.2d at 926 (citation and internal marks omitted); see also United States v. Anthony, Criminal Case No. 1:11-CR-0326-SCJ-JFK, 2012 WL 684844, at *6 (N.D. Ga. Jan. 20, 2012) (finding statement voluntary despite the fact that the agents were not truthful with defendant about the reason for the interview where the

atmosphere was cordial, the agents did not use any force or draw their weapons, the agents did not make defendant any promises or threaten him, and defendant never asked for a lawyer or told the agents he did not want to speak to them), adopted by 2012 WL 684802, at *1 (N.D. Ga. Mar. 2, 2012).

Norkus asserts that the agents misled him "into believing that he was participating in an investigation into [] Sperber," [Doc. 144 at 10 n.3], but to the extent this contention is accurate, it was a simple misrepresentation of fact that, without more, does not render Norkus' statements involuntary, see Lall, 607 F.3d at 1285-86 (citations omitted); see also United States v. Farley, 607 F.3d 1294, 1328 (11th Cir. 2010) (citation and internal marks omitted) (finding "[k]nowledge of what the agents really suspected [defendant] of doing would no doubt have been useful, possibly even decisive, to [him] in calculating the wisdom of answering their questions," but "their deception on that point was not constitutionally significant"); United States v. Kidd, CRIMINAL CASE NO. 1:16-CR-00172-AT-JFK, 2016 WL 10704429, at *8 (N.D. Ga. Dec. 7, 2016) (footnote and citation omitted) (explaining that "agents were not required to provide [d]efendant with details about the nature of their investigation inquiry or that he was the focus of that inquiry"), adopted by 2017 WL 6520539, at *1 (N.D. Ga. Dec. 19, 2017). Furthermore, no other aggravating circumstances are present that render the environment in which Norkus spoke with the agents coercive, see Hipp, 644 F.

App'x at 947; <u>Anthony</u>, 2012 WL 684844, at *6.[30]  As previously set forth, the agents

never drew their weapons or threatened Norkus; Norkus was not handcuffed or

restrained in any way at any point during the interview, which took only about an

---

[30] Norkus also "maintains that his statement was involuntary because—despite [ his] repeated statements that he had an attorney, including that he had a meeting with his attorney that afternoon, and statements about what he and his attorney had discussed—the agents never informed [ him] that he was not required to talk to them or that he could invoke his right to counsel."  [Doc. 144 at 10 (citation omitted)].  While "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning," <u>Davis v. United States</u>, 512 U.S. 452, 457-58 (1994), and "if a suspect requests counsel at any time during [an] interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation," <u>id.</u> at 458 (citation omitted) (citing <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981)), "<i>Miranda</i> rights cannot be asserted outside the context of custodial interrogation," and, an "individual cannot, therefore, assert his . . . <i>Miranda</i> right to counsel before he . . . is in custody," <u>United States v. Clark</u>, 600 F. Supp. 3d 251, 272 (W.D.N.Y. 2022) (citation and internal marks omitted); <u>see also</u> <u>United States v. Sater</u>, 477 F. Supp. 3d 372, 383 (M.D. Pa. 2020) (citation omitted) (explaining that the "right to remain silent and the right to counsel pursuant to <i>Miranda</i> can only be involved during a custodial interrogation[]"); <u>Kidd</u>, 2016 WL 10704429, at *8 (rejecting defendant's argument "that his statement [was] involuntary because he was not advised of his right to remain silent" as "a non-starter," since "the interview was non-custodial"), and Norkus acknowledges that he was not in custody at the time of the interview, <u>see</u> [Doc. 144 at 1].  Moreover, Norkus concedes that he "never invoked his right to counsel," [Doc. 142 at 4 (citing (Tr. at 29))], and despite his assertion that he was pressured to cooperate without the assistance of counsel, [Doc. 144 at 10], the credible evidence of record simply does not support this assertion, and in fact, demonstrates that no promises or threats were made in exchange for his statements and that the agents repeatedly advised him during the course of the interview that they did not want to hear about any conversations held with counsel, <u>see</u> (Gov. Ex. 1).

hour and twenty minutes and occurred in an open "social room" on the first floor of Norkus' condominium building; and, while Norkus was advised that the agents were speaking to him first and that it was in his best interest to cooperate and be truthful with them, he was never threatened or promised anything in return for his statement.  (Tr. at 8, 14-17, 21, 25, 27, 29-30; Gov. Ex. 1).  In short, Norkus has not identified, nor does the record reveal, any aggravating circumstances creating a coercive environment which would cause the agents' use of any trickery to render Norkus' statement involuntary.  See Kidd, 2016 WL 10704429, at *8-9 (citations and internal marks omitted) (finding "[n]othing about the circumstances of the interview . . . evidence[d] any attempt by the agents to coerce [d]efendant to speak to them, and . . . no aggravating facts suggest[ed] that [d]efendant answered questions unwillingly" where "the interview occurred in a location selected by [d]efendant" and once the interview started, defendant "was not restrained, threatened physically or verbally or misled," but that even if he "was misled about the nature of the interview, there were no other aggravating circumstances beyond the mere use of deceptive tactics that render[ed his] confession involuntary"); see also Anthony, 2012 WL 684844, at *6.  In sum, "the totality of the circumstances demonstrates that [Norkus] made his statements voluntarily."  United States v. Nettleton, Case No. 3:19-cr-1-J-32PDB, 2019 WL 5102803, at *6 (M.D. Fla. Oct. 11, 2019); see also United States v. Grant, Criminal Action No. 1:09–CR–482–TWT–

LTW, 2011 WL 2580867, at *7 (N.D. Ga. May 4, 2011), adopted by 2011 WL 2580779 (N.D. Ga. June 29, 2011), aff'd, 521 F. App'x 841 (11th Cir. 2013) (unpublished). Accordingly, Norkus' arguments regarding the voluntariness of his statements on March 10, 2021, are without merit, and because he has not identified any legitimate basis for suppression, it is **RECOMMENDED** that his motion to suppress statements, [Doc. 97], be **DENIED**.

## III.  CONCLUSION

For the foregoing reasons, Sperber's motion to adopt, [Doc. 106], is **GRANTED**, Norkus' motion for bill of particulars, [Doc. 98], is **DENIED** and his motion to adopt, [Doc. 96], is **DENIED AS MOOT**, and it is **RECOMMENDED** that Sperber's motion to maintain filing ex parte and under seal, [Doc. 52], be **GRANTED** and that defendants' motions to dismiss, [Docs. 103, 105, & 115], and Norkus' motion to suppress statements, [Doc. 97], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case, but notes that Sperber recently retained new counsel.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 23rd day of August, 2023.


RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE