## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

United States of America,

v.                                                    Case No. 1:21-cr-328-MLB

Brian Sperber and Edmond
Norkus,

                              Defendants.

_____/

## <u>ORDER</u>

Magistrate Judge Russell G. Vineyard issued a Report, Recommendation, and Order (R&R): (1) denying Defendant Edmond Norkus's motion for a bill of particulars (Dkt. 98); (2) recommending the Court deny both Defendants' motions to dismiss the indictment (Dkts. 103, 105, 115); and (3) recommending the Court deny Norkus's motion to suppress statements he made to FBI agents (Dkt. 97).  (Dkt. 153.) Defendants object.  (Dkts. 161, 162.)

### I.    Background

The United States obtained a superseding indictment against Defendants Brian Sperber and Edmond Norkus, charging them with wire

fraud, conspiracy to commit wire fraud, money laundering, and conspiracy to commit money laundering. (Dkt. 58.) The indictment alleges that "[b]eginning in or about 2020 and continuing until in or about March 2021," Defendants—distributors of personal protective equipment ("PPE")—engaged in a "scheme to defraud a PPE supplier as well as victims who sought to procure PPE for hospital and medical institutions." (Dkt. 58 ¶¶ 1, 3–4, 8–9.) Defendants allegedly "defrauded prospective PPE purchasers out of more than $12 million, much of which they used for [their] own personal benefit." (Dkt. 58 ¶¶ 1, 3–4, 8–9.)

## A.   Wire Fraud Counts

Counts One through Four charge Defendants with wire fraud. (Dkt. 58 ¶¶ 7–24.) The superseding indictment includes factual allegations that contextualize those charges. It explains that Sperber was an authorized distributor for victim O&M Halyard—a "manufacturer and wholesale distributor of" PPE. (Dkt. 58 ¶¶ 1, 10.) According to the superseding indictment, "[a]lmost as soon as he became an authorized O&M Halyard distributor in September 2019," Sperber "failed to pay for previously shipped PPE." (Dkt. 58 ¶ 10.) O&M Halyard repeatedly told Sperber he had to pay the outstanding invoices and, by

February 2020, threatened to stop doing business with him if he did not. (*Id.*)

The superseding indictment says Defendants' scheme began when they "sent fabricated O&M Halyard emails and invoices to" Victim A—a broker trying to buy PPE. (Dkt. 58 ¶¶ 5, 11.) These emails "falsely claimed O&M Halyard had an ample supply of N95 masks that was ready to be shipped to" Sperber. (Dkt. 58 ¶ 11.) "As a result of these misrepresentations, Victim A wired \$3,144,960 to [Norkus's company] for the purchase of N95 masks with an expected ship date of February 12, 2020." (*Id.*) Norkus allegedly used approximately \$875,000 of those funds to buy a condo and wired the rest to Sperber, "who used those funds to pay down an outstanding balance of over \$1 million on previous orders with O&M Halyard." (*Id.*) On February 10, 2020, Norkus allegedly "sent a text message to Victim A with a fabricated banking statement that falsely claimed [his company] had wired nearly \$3 million to O&M Halyard" for the purchase of new PPE for Victim A. (*Id.*)

Around the same time, Victim B (a medical products wholesaler) negotiated with Sperber to purchase N95 masks and other PPE. (Dkt. 58 ¶¶ 6, 13.) Defendants caused Victim B to believe falsely that Sperber

could "acquire a substantial amount of PPE from O&M Halyard" (and another company), even though O&M Halyard had already told Sperber it could not supply the order and even though Sperber never confirmed the other company could do so. (Dkt. 58 ¶ 13.) To convince Victim B that Defendants had access to additional quantities of PPE, Norkus "displayed pallets of PPE in a warehouse," after which Victim B gave Sperber a cashier's check for $2.8 million. (Dkt. 58 ¶ 14.) Victim B later sent two more payments to Sperber: $8.25 million on March 31, 2020, and $2.5 million on May 1, 2020—both for the purchase of N95 masks. (*Id.*) Over the next several weeks, Defendants sent Victim B a series of false, misleading, and sometimes fabricated emails, invoices, and messages falsely suggesting O&M Halyard was shipping the masks. (Dkt. 58 ¶¶ 15, 16.)

The superseding indictment also explains (again) that Norkus used $875,000 from Victim A's money to buy a condo and that Sperber used "millions of dollars of Victim B's funds to purchase a waterfront mansion in Boca Raton, Florida" and "for a variety of personal and business expenditures." (Dkt. 58 ¶ 19.) Finally, the superseding indictment points to four emails Sperber (aided and abetted by Norkus) allegedly sent O&M

Halyard to mislead O&M Halyard into believing Sperber was preparing to pay the outstanding invoices. (Dkt. 58 ¶ 24.) These four emails constitute the substantive wire fraud charges in Counts One through Four. (*Id.*)

### B.    Money Laundering Counts

Counts Seven through Ten charge Defendants with money laundering for deposits Sperber made to O&M Halyard using illegally obtained funds. (Dkt. 58 ¶¶ 31, 33, 35, 37.) Specifically, they identify two different transactions: (1) Defendants' depositing a $350,000 cashier's check from TD Bank into an O&M Halyard bank account (Dkt. 58 ¶¶ 31, 35), and (2) Defendants' depositing a $720,000 cashier's check from TD Bank into an O&M Halyard bank account (Dkt. 58 ¶ 33, 37).

Counts Seven and Eight charge Defendants with promotional money laundering. Those counts each say Defendants—with regard to the $350,000 check and the $720,000 check, respectively—"[o]n or about February 12, 2020, . . . did knowingly conduct a financial transaction affecting interstate commerce, . . . which involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud, . . . and wire fraud, . . . with the intention to promote the carrying on of such

specified unlawful activity and while conducting and attempting to conduct financial transactions," while knowing "the property involved in the financial transaction represented the proceeds of some form of unlawful activity." (Dkt. 58 ¶¶ 31, 33.)

Counts Nine and Ten charge Defendants with transactional money laundering. They say Defendants—again, each with respect to the two different checks—"[o]n or about February 12, 2020, . . . did knowingly engage and attempt to engage in a monetary transaction by, through and to a financial institution, affecting interstate commerce, such transaction knowingly involving criminally derived property of a value greater than $10,000, . . . such property having been derived from a specified unlawful activity, that is wire fraud, [and] conspiracy to commit wire fraud[.]" (Dkt. 58 ¶¶ 35, 37.)

C.   **Pertinent Procedural History**

Norkus moved—on his own—for a bill of particulars and to suppress statements he made to FBI agents during law enforcement's investigation of this matter. (Dkts. 97; 98.) Both Defendants—in three separate motions—moved to dismiss the indictment. (Dkts. 103; 105; 115.) The Magistrate Judge issued an R&R. (Dkt. 153.) In it, he denied

the motion for a bill of particulars, and recommended the Court deny the motion to suppress and all three motions to dismiss.  (*Id.*)  Defendants separately object.  (Dkts. 161; 162.)

## II.   Legal Standard

28 U.S.C. § 636(b)(1) requires district courts to "make a de novo determination of those portions of [an R&R] to which objection is made." Any such objection "must specifically identify the portions of the [R&R] to which objection is made and the specific basis for objection." *McCullars v. Comm'r, Soc. Sec. Admin.*, 825 F. App'x 685, 694 (11th Cir. 2020)[1]; *see United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009) ("[A] party that wishes to preserve its objection must clearly advise the district court and pinpoint the specific findings that the party disagrees with.").   "Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).

"It does not appear that Congress intended to require district court

---

[1] The Court recognizes *McCullars* and other cases cited herein are unpublished and not binding.  The Court cites them nevertheless as instructive. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). And, in most cases, "[a] party failing to object to [an R&R] waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *McGriff v. Comm'r, Soc. Sec. Admin.*, 654 F. App'x 469, 472 (11th Cir. 2016). Ultimately, whether or not objections are filed, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

### III.   Motion for Bill of Particulars[2]

Norkus moves for a bill of particulars. (Dkt. 98.) While he "acknowledges that the indictment contains more than barebones allegations against him," he contends "it is lacking in critical ways," specifically regarding his conduct and knowledge related to Sperber's relationship with O&M Halyard. (Dkt. 98 at 3–4.) He also requests a bill of particulars regarding certain aspects of the money laundering

---

[2] Although the Magistrate Judge denied Norkus's motion for a bill of particulars (Dkt. 98), Norkus challenges the denial in his objections to the R&R (Dkt. 162 at 1–9). So, the Court addresses his arguments and treats the Magistrate Judge's denial as a recommendation.

charges and of O&M Halyard's purported injuries.  (Dkt. 162 at 6–7.)

Rule 7(f) of the Federal Rules of Criminal Procedure allows a court to "direct the government to file a bill of particulars."  Fed. R. Crim. P. 7(f).  "The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985).  "A request for a bill of particulars is, inter alia, befitting in those instances where the defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense."  *Id.*  "[G]eneralized discovery," however, "is not the proper function of a bill of particulars." *Id.*  A defendant is not entitled to a bill of particulars "with respect to information which is already available through other sources such as the indictment or discovery and inspection."  *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986).  Nor can a bill of particulars "be used as a weapon to force the government into divulging its prosecution strategy."  *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980).

## A.    Substantive Counts

With respect to the substantive wire fraud and money laundering counts (*i.e.*, all but the conspiracy counts) involving O&M Halyard, Norkus says the facts underlying those allegations involve only Sperber's relationship with that company.  (Dkt. 98 at 3–4.)  He argues that, because the superseding indictment does not allege *he* had any role in or knowledge about that relationship, he is entitled to a bill of particulars describing what the United States believes about his involvement.  (Dkt. 98 at 4–5.)  The Magistrate Judge disagreed, concluding (1) the superseding indictment contains sufficient language to inform Norkus about his specific offense conduct and how it relates to the overall object of the fraud conspiracy and (2) that he can get the specific information he seeks through discovery.  (Dkt. 153 at 17–23.)  Norkus objects, saying the Magistrate Judge improperly analyzed his request under conspiracy law even though the indictment also charges him with substantive counts of wire fraud and money laundering for Sperber's emails and deposits to O&M Halyard.  (Dkt. 162 at 4–6.)  As to *those* charges, Norkus says, the language of the indictment is insufficient.  (*Id.*)

As an initial matter, the Court agrees with Norkus that the

framework for analyzing conspiracy charges is useless in determining whether the superseding indictment properly notifies Norkus about the substantive crimes of wire fraud and money laundering. The Magistrate Judge, however, correctly noted the indictment need not allege Norkus knew about all details and phases of the conspiracy to charge him with that crime. But this says nothing about whether the indictment properly notifies him of the substantive crimes with which he is charged. Even though the United States brought those charges against both Defendants, the allegations underlying those counts say only that Sperber—not Norkus—sent false or fabricated emails and wires to O&M Halyard. (Dkt. 58 ¶¶ 7, 10–11, 14–16.) So, for Norkus to be guilty of those crimes, the United States must prove he aided and abetted Sperber in committing them. (Dkt. 58 ¶ 24 (alleging Sperber and Norkus, "aided and abetted by each other," committed wire fraud in part by sending the subject emails; ¶¶ 31, 33, 35, 37 (alleging Sperber and Norkus, "aided and abetted by each other," committed money laundering by depositing illegally obtained funds to O&M Halyard); *see Steiner v. United States*, 940 F.3d 1282, 1289 (11th Cir. 2019) ("The federal aiding-and-abetting statute provides that a person who aids or abets the commission of an

11

offense is liable as a principal.").

Norkus wants to know exactly what evidence the United States believes it can use to prove Norkus aided and abetted Sperber in defrauding O&M Halyard. Specifically, he wants the United States to tell him: (1) whether it believes he had contact with O&M Halyard or knew about Sperber's emails and wires to the company; (2) whether the alleged scheme was "to defraud Victims A and B, or a scheme to defraud O&M Halyard"; and (3) the "precise actions" Norkus took "to aid and abet Sperber as it relates" to the substantive counts. (Dkt. 98 at 5.)

Norkus's request fails for two reasons. First, the superseding indictment lays out in significant detail the entire fraudulent scheme—including that Norkus forwarded fabricated emails from O&M Halyard to Victims A and B knowing they were fake to make those victims believe the transactions were legitimate. (Dkt. 58 ¶ 15.) Second, the United States represents it turned over "substantial" discovery that it says "provides the information Norkus is seeking," including warrant affidavits, records from O&M Halyard and other relevant third parties, and witness interviews. That is enough. *See United States v. Beverly*, 2010 WL 11474387, at *2 (M.D. Ga. Oct. 15, 2020) (denying motion for

bill of particulars where indictment and discovery gave defendant the information he wanted).

Norkus counters that the United States "has provided no discovery indicating that [] Norkus either knew of or benefitted from either the emails sent to O&M Halyard . . . or the wires sent to O&M Halyard." (Dkt. 162 at 4–5.)  He says he "does not necessarily seek the specific evidence at issue, . . . but instead, he seeks to know what position the [United States] is going to take as to his knowledge, given that his knowledge is an essential element of the offense."  (Dkt. 162 at 6.)  But a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial."  *United States v. Roberts*, 174 F. App'x 475, 477 (11th Cir. 2010) (quoting *Burgin*, 621 F.2d at 1359).  The law simply does not permit a criminal defendant to posit to the United States specific interrogatories requiring it to answer pointed questions as to its theory of the case, such as whether it "believes" certain things.  The superseding indictment and discovery provide Norkus with the information to which he is entitled at this point.  The United States will be held to that evidence at trial, and Norkus is not entitled to know its legal strategy.

## B.   "Specified Unlawful Activity"

Norkus also says he needs to know more about what "specified unlawful activity" predicates the money laundering counts. (Dkt. 112 at 3–4.) He claims he assumed that activity "was the charged counts," but because the United States said he "could not assume that the charged counts of wire fraud were the" subject activity underlying the money laundering charges, he finds it "necessary and appropriate" for the United States to provide a bill of particulars identifying the specified unlawful activity. (*Id.*) It appears the Magistrate Judge did not address this argument—at least in regard to the motion for a bill of particulars. Regardless, it fails.

Norkus argues allowing the United States to rely on a different specified unlawful activity than the conduct charged in the superseding indictment would effectively allow it to improperly amend that indictment ex post facto. (*Id.*) That is not true. All the superseding indictment says is that the specified unlawful activity underlying the money laundering counts is wire fraud. (Dkt. 58 ¶¶ 31, 33, 35, 37.)[3] It

---

[3] The superseding indictment also charges conspiracy to commit wire fraud as a specified unlawful activity. (Dkt. 58 ¶¶ 31, 33, 35, 37.) As discussed in detail below, the Magistrate Judge correctly concluded

does not specify that the predicate wire fraud is the conduct charged in the superseding indictment.  So there is no risk of a constructive amendment.

This does not seem to be a real dispute.  A common-sense reading of the superseding indictment suggests paragraph 11 describes the wire fraud underlying the money laundering charges.  That paragraph alleges Defendants sent "fabricated" emails and invoices to Victim A—plus one text message on February 10, 2020—causing Victim A to wire over $3 million to Norkus's company for the purchase of PPE with an expected shipment date of February 12, 2020. (Dkt. 58 ¶ 11.)  The United States's use of the term "fabricated" suggests it contends the emails and invoices were "false."  Paragraph 11 then alleges Norkus and Sperber used some of the money obtained by the "fabricated" emails and invoices to pay down their outstanding balance with O&M Halyard.  (*Id.*)  The money laundering counts point to two checks Defendants purportedly deposited into an O&M Halyard bank account "[o]n or about February 12, 2020."

conspiracy to commit wire fraud cannot serve as a specified unlawful activity supporting a money laundering charge.  (Dkt. 153 at 49 n.21.) So, the Court addresses only the wire fraud allegations in dealing with Norkus's motion for a bill of particulars.

(Dkt. 58 ¶¶ 31, 33, 35, 37.)  It thus seems obvious to the Court—given that the money laundering charges describe transactions that took place on the same day as or shortly after Defendants' "fabricated" communications to Victim A and involved payments to O&M Halyard— that those counts charge Defendants with using some portion of Victim A's fraudulently obtained money to pay down outstanding O&M Halyard invoices.  In other words, Defendants' use of "fabricated" emails and invoices to get money from Victim A (as alleged in paragraph 11) is the predicate for the money laundering charges alleged in Counts 7 through 10.  The United States's response to Norkus's motion buttresses this conclusion.  The United States explained that the indictment alleges "Sperber used victims' funds to pay down his debt to O&M Halyard." (Dkt. 107 at 6.)  While the United States does not specifically say the referenced "victims' funds" are from Victim A obtained through the conduct described in paragraph 11 of the superseding indictment, that is the only possibility given that Victim A is the only alleged victim that wired Defendants money prior to February 12, 2020.  In an abundance of caution, if this common-sense interpretation of the superseding indictment is wrong and the United States intends to rely on some other

wire fraud conduct in the money laundering counts, it should clearly say so and provide a bill of particulars to describe this other conduct. Otherwise, the Court will hold the United States to this evidence at trial.[4]

### C.   O&M Halyard's Injuries

Finally, Norkus requests information "about whether or how O&M Halyard was or would have been injured by the wire fraud," given that the United States must prove he had an intent to harm the company. (Dkt. 162 at 7–8.)  Specifically, he says "he is entitled to know what the [United States] intends to allege is the harm intended to O&M Halyard as a result of the emails charged in" the wire fraud counts.  (Dkt. 162 at 8.)  He notes that the superseding indictment alleges Sperber sent the fraudulent emails and wires so he could remain an O&M Halyard distributor and commit additional acts of fraud, but says "this does not establish an injury to O&M Halyard."  (*Id.*)  The Magistrate Judge did not address this argument, either.  But it fails for the same reasons as

---

[4] To the extent Norkus suggests the United States could still use different wire fraud conduct to support the money laundering counts at trial, the Court can address that issue—if it arises—at the close of trial.  *See United States v. Holt*, 777 F.3d 1234, 1261 (11th Cir. 2015) (improper "variance occurs when the facts proved at trial deviate from the facts contained in the indictment").

before—namely, that the superseding indictment and discovery provide Norkus with sufficient information about what the United States accuses him of doing and how that conduct constitutes a crime.

Like before, a common-sense reading of the superseding indictment gives Norkus the information he wants. It says the fraud Defendants committed upon O&M Halyard allowed them to continue to defraud it going forward. (Dkt. 58 ¶ 29.) The United States made clear in its opposition to Defendants' motion to dismiss the wire fraud counts that it considers the charged emails to have "lull[ed] O&M Halyard into thinking that its debt had been (or would be) paid with legitimate funds," and that had O&M Halyard known Defendants made the payments using fraudulently obtained funds, it "could have sought legal remedies or reported [Defendants'] unlawful conduct to law enforcement." (Dkt. 125 at 8–9.) So, it seems obvious that the United States contends Defendants injured O&M Halyard by "lulling" it into a false sense of security that prevented it from taking actions to protect itself and stop Defendants' misconduct. Once again, if the Court is wrong, the United States should say so and tell Defendants what injuries it claims O&M Halyard suffered.

At bottom, Norkus is not entitled to a bill of particulars to give him

granular detail about what "the intended injury was," because, at least according to the Court's reading of the superseding indictment, he already knows (or should know) that allegation.  (Dkt. 162 at 8.)  Norkus can argue at trial that the evidence is insufficient to establish an injury. But for now, he is not entitled to a bill of particulars.

## IV.   Motions to Dismiss

In three separate motions, Defendants jointly move to dismiss the money laundering counts as multiplicitous and for failure to allege a crime, and to dismiss the wire fraud counts for failure to allege a crime. (Dkts. 103; 105, 115.)  The Court, however, need only address in this order the two motions dealing with the money laundering charges.  (Dkts. 103; 105.)[5]  The Magistrate Judge recommended denying both motions.

_____

[5] This is because, while the Magistrate Judge recommended denying Defendants' motion to dismiss the wire fraud counts for various reasons (Dkt. 153 at 29–31), Defendants objected raising an argument they had not initially brought before the Magistrate Judge.  Specifically, they say the indictment really alleges two, separate schemes—one against Victims A and B and a later one against O&M Halyard. (Dkts. 161 at 1– 6; 162 at 16–19.)  They argue that because the emails charged in the wire fraud counts could have "lulled" only O&M Halyard into a false sense of security (since Victims A and B never saw those emails), they cannot render Defendants criminally liable for the scheme against Victims A and B.  (*Id.*)  At a hearing on Sperber's motion to decertify this case as ready for trial, the Court explained it would allow Defendants to raise this new argument for the first time in front of the Magistrate Judge to better

(Dkt. 153.)  Defendants object.  (Dkt. 161; 162.)

## A.    Multiplicity

Defendants say the money laundering charges—Counts 7 through 10—are multiplicitous.  (Dkt. 105 at 5.)  Basically, they say those counts improperly charge them with both transactional money laundering and promotional money laundering—which they argue "contain the same unit of prosecution"—over the same two transactions.  (Dkt. 105 at 6.)[6] The Magistrate Judge disagreed, concluding those two crimes contain different elements, such that they can be charged in separate counts. (Dkt. 153 at 34–36.)  Sperber does not object on multiplicity grounds. Norkus does object, however, essentially raising the same arguments he made to the Magistrate Judge.  (Dkt. 162 at 9–10.)

"An indictment is multiplicitous if it charges a single offense in more than one count."  *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008).  "A multiplicitous indictment not only subjects the

---

develop the issue. (Dkt. 165.) So, Defendants' motion to dismiss the wire fraud counts (Dkt. 115)—and the Magistrate Judge's recommendation to deny that motion—are moot.

[6] More specifically, with Count 7 being multiplicitous of Count 9 and Count 8 being the same in regard to Count 10.

defendant to numerous sentences for one offense, but also 'prejudice[s] the defendant and confuse[s] the jury by suggesting that not one but several crimes have been committed.'" *Id.* (citation omitted). "Because a multiplicitous indictment involves double jeopardy issues, multiplicity and double jeopardy challenges are typically evaluated under the same standards." *United States v. Woods*, 730 F. Supp. 2d 1354, 1376 (S.D. Ga. 2010). "Accordingly, the test enunciated in [*Blockburger v. United States*, 284 U.S. 299 (1932)], used to evaluate double jeopardy challenges . . . is also used to determine whether an indictment is multiplicitous." *Id.* Under *Blockburger*, courts examine "whether each [count] requires proof of a fact which the other does not." *Id.* (citations and internal quotation marks omitted). Courts "focus . . . on the proof necessary to establish the statutory elements of the offense, not the actual evidence presented at trial." *Id.* (citation omitted).

On one hand, the transactional money laundering statute requires the United States to prove that Defendants: "(1) conducted a financial transaction (such as purchasing property) with the proceeds of 'specified unlawful activity' (2) with the knowledge that the proceeds came from 'some form of unlawful activity' and (3) with the intent 'to promote the

carrying on of specified unlawful activity.'" *United States v. 275 Milton Rahn Road Rincon, Ga. 31326*, 2022 WL 969621, at \*6 (S.D. Ga. Mar. 30, 2022) (citations omitted); *see also* 18 U.S.C. § 1956(a)(1)(A)(i).  On the other hand, the promotional money laundering statute requires the United States to prove Defendants (1) "'knowingly engage[d] or attempt[ed] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000,' and (2) the property 'is derived from specified unlawful activity.'" *United States v. Forehand*, 577 F. App'x 942, 947 (11th Cir. 2014); *see also* 18 U.S.C. § 1957.  So, not only do the statutes differ in what the United States must prove, each statute includes an additional element the other does not (*i.e.*, for promotional money laundering, that Defendants made the transaction with the intent to promote the carrying on of illegal activity, and for transactional money laundering, that the transaction is of a value greater than $10,000).  In other words, each statute "require[s] proof of additional facts not required by the other." *United States v. Caruso*, 948 F. Supp. 382, 390 (D.N.J. 1996).  The buck stops there—the counts are not multiplicitous for that reason alone.

   In arguing to the contrary, Norkus cites several cases, claiming

they "hold that relying on one action to convict a defendant on multiple crimes is multiplicitous." (Dkt. 162 at 9–10.) But those cases involved either (1) multiple convictions for gun crimes under the same statute setting the unit of prosecution as one firearm, *see United States v. Zapala*, 509 F.3d 1060, 1062 (9th Cir. 2007) (separate convictions under same statute for possessing one firearm was multiplicitous because unit of prosecution was single firearm); *United States v. Hollis*, 506 F.3d 415, 421 (5th Cir. 2007) (convictions as felon-in-possession and fugitive-in-possession under same subsection of statute is prohibited because only difference in elements was offender's status); *United States v. Phipps*, 319 F.3d 177, 184–85 (5th Cir. 2003) (separate convictions under same statute for single use of firearm based on multiple predicate offenses was multiplicitous) or (2) a single false statement that violated two subsections of the same statute, *see United States v. McIntosh*, 124 F.3d 1330, 1336–37 (10th Cir. 1997) (separate convictions for bankruptcy fraud under same statute were multiplicitous where they were based on same false statement and Congress did not show "clear intention" to allow punishment for the same act under separate subsections of the statute).

The situation here is different.  For one thing, Defendants' alleged conduct violated two separate statutes.  Even as one of Norkus's cases recognizes, "Congress undoubtedly may subject a defendant to multiple convictions and punishments for the same act."  *McIntosh*, 124 F.3d at 1337.  For another thing, and as the Court already explained, a successful challenge on multiplicity grounds requires the defendant to show the *legal* elements of the challenged charges are the same.  *United States v. Woods*, 684 F.3d 1045, 1060 (11th Cir. 2012) ("[C]harges in an indictment are not multiplicitous if the charges differ by even a single element or alleged fact.").  Regardless of whether the result of both offenses was the same (*i.e.*, Defendants' using the proceeds of the alleged wire fraud for their own ill-gotten gains), the superseding indictment still alleges Defendants committed more than one laundering offense.  To rule otherwise would require the United States to decide before indictment whether it wants to limit its prosecutorial discretion and trial evidence to proving Norkus entered into the alleged transaction with the intent "to promote the carrying on of specified unlawful activity" as required by the first statute or whether, instead, to seek to prove he knowingly engaged in the type of transaction at issue in the second statute.  The

24

United States is not required to make that election and can seek to prosecute Norkus for both alleged crimes.    Norkus's multiplicity challenge fails.

## B.    Failure to Allege a Crime

Defendants also move to dismiss the money laundering counts on the ground they fail to "charge the crime of money laundering."  (Dkts. 103 at 5; 105.)  They say the charges "plainly involve transactions that predate the completion of the alleged fraudulent scheme—and well before any of the substantive wire fraud counts," so the "specified unlawful activity" underlying the money laundering counts could not have occurred.  (Dkt. 103 at 5.)  The Magistrate Judge disagreed, concluding (1) the non-charged emails, text messages, and invoices that caused Victim A to wire money to Defendants in February 2020 could serve as the specified unlawful activity supporting the money laundering counts, and (2) even if that conduct had not predated the money laundering acts, there is no legal requirement that the entire fraudulent scheme be completed before a defendant starts laundering illegal proceeds; rather, a defendant "can properly be charged with money laundering for the earlier actions that helped comprise the fraudulent scheme."  (Dkt. 153

at 49–53 (citation omitted).)  Defendants object, saying (1) because the money laundering counts allege the illegal proceeds were derived in part from wire fraud conspiracy (and because wire fraud conspiracy cannot be a specified unlawful activity to support that charge), they are deficient; (2) the charged wire fraud cannot support the money laundering counts because the fraud was not complete prior to the transactions that form the basis of the money laundering counts; (3) if non-charged conduct supports the laundering counts, the indictment does not sufficiently put Defendants on notice of the charges against them; and (4) the money laundering charges must be dismissed because they are based on the same transactions that support the fraud charges.  (Dkts. 161 at 6–14; 162 at 10.)

The Court agrees that wire fraud conspiracy cannot support the money laundering charges.  So did the Magistrate Judge.  (Dkt. 153 at 49 n.21 (citing *United States v. Shea*, 2023 WL 4551635, at *3 (S.D.N.Y. July 14, 2023) ("'specified unlawful activity,' . . . does not include wire fraud conspiracy") (citation omitted).)  As the R&R correctly explains, however, "this error relates to an ancillary issue and not an essential element of the" crime, and "after removing [the] erroneous language, the

[superseding] [i]ndictment still states an offense." (Dkt. 153 at 49 n.21 (quoting *Shea*, 2023 WL 4551635, at *3).) Each of the money laundering counts includes the substantive offense of wire fraud as a specified unlawful activity, and that is enough. *See United States v. Hirmer*, 2009 WL 10726280, at *4 (N.D. Fla. July 14, 2009) ("Wire fraud is a specified unlawful activity.") (citing 18 U.S.C. §§ 1956(c)(7)(a), 1961(1)).

It does not matter that the entire fraudulent scheme was not complete or that the conduct underlying the substantive wire fraud counts occurred after the alleged date of the money laundering for two reasons. First, as the Magistrate Judge correctly held, the United States can rely on non-charged conduct to support the money laundering counts. (Dkt. 153 at 49.) Indeed, the United States does not "have to prove the defendant committed the specified unlawful activity." *Hirmer*, 2009 WL 10726280, at *4; *see also United States v. Martinelli*, 454 F.3d 1300, 1309 (11th Cir. 2006) (affirming defendant's conviction for conspiracy to launder proceeds of mail fraud even though defendant was not charged with mail fraud). It doesn't even have to "allege *any* details about the specified unlawful activity." *Hirmer*, 2009 WL 10726280, at *4 (emphasis added) (citing *United States v. Smith*, 44 F.3d 1259, 1265 (4th Cir. 1995)).

27

Second, even though it didn't have to, the United States *did* allege plenty of details about the wire fraud conduct that serves as the predicate for the money laundering charges. The money laundering counts allege that the violative transactions took place "[o]n or about February 12, 2020." (Dkt. 58 ¶¶ 31, 33, 35, 37.) As already explained, the superseding indictment says Defendants sent fabricated communications to Victim A to trick it into wiring over $3 million for N95 masks expected to ship on February 12, 2020. (Dkt. 58 ¶ 11.) But Defendants never shipped that PPE. (*Id.*) Rather, according to the superseding indictment, Sperber (with Norkus's help) used the funds from that wire fraud to pay down an outstanding balance on previous orders with O&M Halyard— transactions charged in the money laundering counts. (*Id.*) So, the unlawful communications that led Victim A to wire that money occurred prior to the charged acts of money laundering, and can clearly serve as the specified unlawful activity on which those counts are predicated. *See United States v. Nickolas*, 2014 WL 5811127, at *2 (D. Ariz. Nov. 10, 2014) ("where wire fraud and money laundering are alleged in the same indictment, and wire fraud is the specified unlawful activity referenced in the money laundering counts, money laundering convictions can rest

on communications other than those that comprise the wire fraud counts"). And contrary to Defendants' argument, they did not have to complete the entire fraudulent scheme before they used proceeds from Victim A for that use to constitute money laundering. *See United States v. Seward*, 272 F.3d 831, 837 (7th Cir. 2001) ("Although it is true that the defendant must have control of the proceeds of a fraudulent transaction before he can engage in money laundering with those proceeds, there is no requirement that the entire fraudulent scheme be complete before the defendant starts laundering the proceeds from early portions of the scheme.").

Given the superseding indictment's level of detail, the Court does not buy Defendants' argument that it does not put them on sufficient notice of what non-charged conduct constitutes the specified unlawful activity in the money laundering counts. Again, however, if the Court is wrong, the United States must promptly say so.

Defendants counter that regardless of the timing, the money laundering counts must be dismissed because they are premised on the same transactions that constitute the charged wire fraud. (Dkts. 161 at 11–14; 162 at 11–13 (citing *United States v. Christo*, 129 F.3d 578, 579

29

(11th Cir. 1997).) As the Magistrate Judge correctly concluded, however, the superseding indictment alleges Defendants engaged in illegal financial transactions that were "separate from and in addition to the underlying criminal activity." *Christo*, 129 F.3d at 580. First, when Defendants sent fabricated communications to Victim A to defraud it into wiring the $3.1 million payment, "[t]hat act of fraud was complete and [Defendants] had control over the proceeds of the fraud" once they received the money. *United States v. Howard*, 271 F. Supp. 2d 79, 86 (D.D.C. 2002); *see also Belt v. United States*, 868 F.3d 1208, 1211 (11th Cir. 1989) ("The elements of an offense under the wire fraud statute are 1) a scheme to defraud, and 2) the use of wire communications in furtherance of the scheme."). Then, when Defendants used that money, they engaged in "transactions in the proceeds of the [wire] fraud." *Howard*, 271 F. Supp. 2d at 86–87. It does not matter that "the activity alleged in the [superseding] indictment as constituting the money laundering is also alleged in the [wire fraud] counts" because "there is separate underlying unlawful activity that gave rise to the proceeds charged." *Id.* at 87. That separate underlying activity is Sperber's sending the four emails charged in the wire fraud counts—but that

30

activity has nothing to do with the money laundering charges. (Dkt. 58 ¶ 24.) In other words, the "wire transaction[s] that serve[] as the basis for [Defendants'] wire fraud charge[s] . . . [are] separate and apart from the monetary transactions supporting the money-laundering charges." *United States v. Huff*, 641 F.3d 1228, 1233 (10th Cir. 2011).

## V.   Motion to Suppress

Norkus moves to suppress an interview he gave FBI agents during their investigation into the alleged crimes, saying agents violated the Georgia Rules of Professional Conduct ("GRPC"), agents encroached on his attorney-client relationship, and his statement was not voluntary. (Dkts. 97; 142 at 18–25.) The Magistrate Judge held a hearing to elicit testimony from one of the agents who interviewed Norkus and recommends this Court deny Norkus's motion to suppress. (Dkts. 139; 153 at 68–88.) Norkus objects. (Dkt. 162.)

### A.   GRPC Violation and "Encroachment" on Attorney-Client Relationship

In March 2021, FBI agents interviewed Norkus about financial transactions between Sperber and an alleged victim. (Dkt. 139 at 5:7–13, 10:8-22.) At that time, Norkus was represented by counsel in two related civil cases. (Dkts. 134-1; 139 at 24:2–13.) He told the agents he

knew Sperber, was upset with Sperber because the lawsuits were Sperber's fault, and planned to meet with his lawyer later that day regarding the litigation. (Dkt. 134-1.)  One of the agents asked Norkus about the civil suits, and Norkus told him he had entered into a settlement agreement and was trying to get Sperber to reimburse him for that expense. (Dkt. 134-1.)  Norkus talked about a conversation he had with an attorney, but one of the agents interrupted, telling him they did not want to know about conversations with lawyers. (Dkts. 134-1; 139 at 24:23–25:5.)  Norkus never asked to speak with his attorney during the interview.

Norkus says the agents violated the GRPC and "encroached" on his attorney-client relationship by continuing to question him despite knowing he had retained counsel. (Dkt. 142 at 18–22.)  The Magistrate Judge concluded Norkus's statement should not be suppressed because (1) even if the agents violated the GRPC, the appropriate remedy is not suppression, and (2) intrusion of the attorney-client relationship sufficient to warrant suppression arises under the Sixth Amendment right to counsel, which is not implicated here. (Dkt. 153 at 68–75.) Norkus objects, raising basically the same arguments he made to the

Magistrate Judge.  (Dkt. 162.)

Federal prosecutors in Georgia are subject to the GRPC.  28 U.S.C. § 530B.  Pertinent here, Rule 4.2 of the GRPC prohibits a lawyer from— without consent—"communicat[ing] about the subject of the [lawyer's] representation with a person the lawyer knows to be represented by another lawyer in the matter."  Ga. R. Prof'l Conduct 4.2(a).  Even where an attorney violates this so-called "no-contact rule," however, "[s]uppression is not an available remedy."  *United States v. Evans Concrete, LLC*, 2023 WL 3019058, at *9 (S.D. Ga. Apr. 20, 2023) (citing *United States v. Lowery*, 166 F.3d 1119, 1124 (11th Cir. 1999) ("[A] state rule of professional conduct cannot provide an adequate basis for a federal court to suppress evidence that is otherwise admissible.")).  So, regardless of whether the FBI agents (who presumably are not lawyers) fall within the ambit of Rule 4.2 (something neither the parties nor the Magistrate Judge address) and whether they violated said Rule, any purported violation would not result in suppression.  *See United States v. Scrushy*, 366 F. Supp. 2d 1134, 1141 (N.D. Ala. 2005) (holding suppression was not warranted even if attorney for United States violated no-contact rule because "[e]ven if the contacts did constitute an

ethical breach, the Eleventh Circuit law is clear that an ethical breach cannot be the basis for exclusion of evidence").

Norkus acknowledges that violation of an ethical rule alone cannot serve as the basis for suppression. (Dkt. 162 at 22.) But, he says, "even assuming that there was nothing improper under Rule 4.2 about contacting [] Norkus, the problem is that—during that contact—the agents encroached on his attorney-client relationship with his civil lawyer." (Dkt. 162 at 21.) Norkus claims the agents "invit[ed] information from him about his conversations with his lawyer and about the goals of that representation, including seeking reimbursement from Sperber for payments that he had made." (*Id.*) He argues that by asking him about his legal representation, the agents encroached on his attorney-client relationship, rendering suppression an appropriate remedy. (Dkt. 162 at 22–23.)

In support of his argument, Norkus primarily relies on *United States v. Sander*, in which the Fifth Circuit explained that "[w]here there is an intrusion on the attorney-client relationship the remedy for such a violation is not dismissal but the suppression of any evidence so obtained." 615 F.2d 215, 219 (5th Cir. 1980). Like the Magistrate Judge

explained, however, *Sander* analyzed whether law enforcement violated a defendant's Sixth Amendment rights by reading the defendant's attorney's files. *Id.* The other cases Norkus cites for his encroachment theory similarly examine whether officers violate some constitutional right of a defendant by improperly obtaining privileged information. *See United States v. DeLuca*, 663 F. App'x 875, 878–79 (11th Cir. 2016) (determining whether agents' viewing privileged communications violated defendant's Fifth Amendment rights so as to warrant dismissal of indictment); *United States v. Ofshe*, 817 F.2d 1508, 1515 (11th Cir. 1987) (examining whether intrusion of attorney-client privilege warranted dismissal under Sixth Amendment); *United States v. Franklin*, 598 F.3d 954, 957 (5th Cir. 1979) (same).

This case is different for two reasons. First, the record makes clear that the agents did not intrude on Norkus's attorney-client relationship. As Norkus himself points out, the agents explicitly told him more than once that they did not want to hear anything he discussed with his attorney. (Dkt. 142 at 8, 12.) While Norkus cherry-picks certain quotes about what he discussed with the agents regarding his civil lawsuits, none demonstrate that the agents encouraged him to divulge privileged

information.  The agents did not, for example, question Norkus on what his civil attorney's legal strategy was, what advice that attorney provided him, or any discussions he had with that attorney.  Instead, as noted, the agents went so far as to instruct Norkus *not* to disclose any privileged material to them.  (Dkt. 139 at 24:23–25:5 (agent testifying that "every time [Norkus] mentioned something [about an attorney], we said we don't want to hear about anything that you may have spoken with your attorney")).

Second, even if the agents—through the questions Norkus voluntarily answered—obtained privileged information, they did not violate his constitutional rights in doing so.  The interview did not implicate Norkus's Sixth Amendment right to counsel because he gave his statement "well before the initiation of the prosecution against him." *DeLuca*, 663 F. App'x at 879; *see also McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) ("The Sixth Amendment right . . . does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.") (citation and internal quotation marks omitted).  The agents' conduct also fell "far

short" of the "outrageous" conduct necessary to establish a violation of Norkus's Fifth Amendment rights. *DeLuca*, 663 F. App'x at 879. The agents merely asked Norkus general questions about his civil lawsuits, cautioned him not to divulge any conversations he had with his attorney, and Norkus answered those questions without duress. Nothing about the agents' conduct warrants suppression on encroachment grounds.

Finally, Norkus complains that, at the evidentiary hearing on his motion to suppress, he was "prohibited from asking significant questions about the agents' knowledge of [] Norkus['s] represented status." (Dkt. 162 at 20 n.10.) The Magistrate Judge denied his request to reopen the evidence to get more information on this front because (1) suppression was not an available remedy for the agents' purported violation of Rule 4.2, and (2) counsel had an opportunity to ask limited questions about the representation at the hearing. (Dkt. 153 at 75–76 n.29.) Norkus says this was error because "suppression is an appropriate remedy" and his attempts to ask questions were too limited based on the United States's relevance objections at the hearing. (Dkt. 162 at 20 n.10.) The Court disagrees. No one disputes that the agents knew Norkus was represented by an attorney in related civil cases or that they continued

to question him despite this knowledge.  (Dkt. 139 at 24:2–4, 25:6–8.)
Indeed, the agent confirmed he did not stop the interview "[e]ven when
[Norkus] told [him] he had a meeting with his lawyer that afternoon."
(Dkt. 25 at 9–13.)   But that doesn't matter because: (1) as already
explained, even if the agents' continuing to talk to Norkus violated the
GRPC, suppression is not an appropriate remedy; and (2) the agents—
knowing Norkus was represented—took care to avoid learning privileged
information and did not violate any of his constitutional rights.  Norkus
does not say—and the Court cannot discern—how more information
about the agents' knowledge of the fact of his representation would result
in a different outcome.

### B.   Voluntariness

Norkus also says his March 2021 interview should be suppressed
as involuntary.  (Dkt. 142 at 22–24.)   Specifically, he claims his
statements were not freely given because the agents (1) "led him to
believe that they were investigating [] Sperber, not him," (2) asked him
"various questions that encroached on his attorney-client relationship,"
and (3) "told him that he needed to cooperate and needed to provide the
requested information—including 'owning up' to his actions."  (Dkt. 142

at 24.)  The Magistrate Judge concluded the agents' admonitions to tell the truth and attempts to downplay the significance of Norkus's involvement did not amount to coercion.  (Dkt. 153 at 80–88.)  Norkus objects, again raising the same arguments.  (Dkt. 162 at 22–24.)

To determine if a defendant's statement was voluntary, courts examine "whether the defendant was coerced by the government into making the statement: '[t]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)).  "Among the factors the Court should consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *United States v. Bhatt*, 160 F. Supp. 3d 1359, 1363 (N.D. Ga. 2016) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a [statement]."

*United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994).

Norkus "does not dispute that the circumstances of the interview were not coercive—the agents did not pull weapons or threaten him." (Dkt. 162 at 24.)  Nor could he.  The Magistrate Judge laid out in painstaking detail the circumstances surrounding the interview (Dkt. 153 at 60–67), which show that the agents acted cordially and professionally throughout the interview, that the interview was not overly long or exhaustive, and that Norkus could not reasonably have felt physically coerced or threatened by the agents' conduct.

Norkus takes issue, however, with several things the agents said that he claims essentially tricked him into giving his statement:

- 33 minutes into the interview, one of the agents told Norkus there was "a grand jury investigation going on right now up in Atlanta related to this whole case," to which Mr. Norkus asked, "To what case . . . with Brian [Sperber] and everything?"  The agent replied, "Right," and the other agent said, "Brian [Sperber] and everything," before the agents indicated Norkus needed to be truthful.

- Later on, the agents told Norkus they thought he could help them, positioning Sperber as the one "using [Norkus]" and putting him through "a lot of stuff" before telling Norkus that he did "have to own up to some of these things."

- The agents told Norkus, "We're looking for your

cooperation, so part of it is you owning up," before instructing him to tell them about his conversations with Sperber.

• The agents told Norkus they "were going to need [his] involvement to tell [them], which [emails] did [he] doctor up, and which ones did [Sperber] do?"

• One of the agents concluded the interview by telling Norkus that Sperber was "having Norkus do all this stuff," and that they "want[ed] to know what he is directing . . . so we need you to cooperate with us."

(Dkt. 142 at 22–24.)  Like the Magistrate Judge concluded, however, none of these statements—taken separately or together—were so coercive as to render Norkus's statement involuntary.  (Dkt. 153 at 81–86.)

First, regarding Norkus's complaint about the agents' saying cooperation was in his best interest, the Eleventh Circuit has explained that encouraging a defendant to cooperate is not coercive even if the agents know the defendant might face criminal charges for his involvement in what they are discussing.  *See United States v. Hipp*, 644 F. App'x 943, 945 (11th Cir. 2016) (holding agent's statement that cooperating with the government would be in defendant's best interest "amounted to 'no more than affording [defendant] the chance to make an informed decision with respect to [his] cooperation with the government'") (quoting *United States v. Ballard*, 586 F.2d 1060, 1063 (5th

Cir. 1978)).  Similarly, "[a] mere admonition to the accused to tell the truth does not render a statement involuntary," and "a general statement that cooperation may be beneficial to an accused, with no promise of leniency, does not amount to an illegal inducement."  *Hipp*, 644 F. App'x at 947.

Second, even if the agents' attempts to downplay the significance of Norkus's statement amounted to trickery or deception, "[i]t is clear, that the police's use of a trick alone will not render a confession involuntary." *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984).  Rather, "trickery or deceit is only prohibited to the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002) (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)); *see also United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (misrepresentations of fact are not enough to render confession involuntary).  Nothing about what the agents said to Norkus suggests they misled him about his legal rights. Instead, as Norkus concedes, they merely misled him "into believing that he was participating in an investigation into [] Sperber." (Dkt. 144 at 10

42

n.3.)  So, the agents' purported deception was not so coercive as to render Norkus's statement involuntary.  *See United States v. Farley*, 607 F.3d 1294, 1328 (11th Cir. 2010) ("Knowledge of what the agents really suspected [defendant] of doing would no doubt have been useful, possibly even decisive, to [defendant] in calculating the wisdom of answering their questions. But their deception on that point was not 'constitutionally significant[.]'") (citation omitted).

Finally, to the extent Norkus claims his statement was not voluntary because the agents "never gave him the information to contact his attorney or told him that he was not required to speak with them first" (Dkt. 162 at 24–25), Norkus has not even come close to demonstrating that he was (or could reasonably have thought he was) in custody.  *See United States v. Muhammad*, 554 F. Supp. 2d 1314, 1320 (M.D. Fla. 2008) ("*Miranda* warnings are necessary prior only to custodial interrogation.") (citing *Miranda v. Arizona*, 384 U.S. 436, 445–46 (1966)).  He did not even argue his statements' inadmissibility under *Miranda* to the Magistrate Judge.  *See Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) ("[A] district court has discretion to decline to consider a party's argument when that argument was not first

43

presented to the magistrate judge.").  So, this argument fails.

## VI.    Conclusion

The Court **OVERRULES** each of Defendants' Objections to the R&R (Dkts. 161; 162), **ADOPTS IN PART AND REJECTS AS MOOT IN PART** the R&R (Dkt. 153) as modified herein, and **DENIES** Norkus's Motion to Suppress Statement (Dkt. 97), Norkus's Motion for Bill of Particulars (Dkt. 98), Norkus's Motion to Dismiss Counts 7–10 (Dkt. 103), and Defendants' Corrected Joint Motion to Dismiss Multiplicitous Counts (Dkt. 105).  The Court **DENIES AS MOOT** Defendants' Motion to Dismiss Wire Fraud Counts (Dkt. 115).

**SO ORDERED** this 9th day of November, 2023.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE