## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | :: | |
| | :: | CRIMINAL CASE NO. |
| v. | :: | 1:21-cr-00328-MLB-RGV |
| | :: | |
| BRIAN SPERBER and | :: | |
| EDMOND NORKUS | :: | |

## <u>MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER</u>

Defendants Brian Sperber ("Sperber") and Edmond Norkus ("Norkus"), jointly referred to as "defendants," are charged in a ten-count superseding indictment with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1957, and 2. [Doc. 58].[1]  Defendants have filed a "Joint Motion to Dismiss Duplicitous Counts," [Doc. 175 (emphasis and all caps omitted)], seeking dismissal of the wire fraud charges in Counts 1 through 4 and the wire fraud conspiracy charge in Count 5 of the superseding indictment, [id. at 1].  The government opposes the motion to dismiss, [Doc. 179], and defendants

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

have filed a reply in support of their motion to dismiss the wire fraud counts, [Doc. 180].  Norkus also has filed a motion, [Doc. 178], requesting a ruling on the merits of the defendants' previously filed "Motion to Dismiss Wire Fraud Counts," [Doc. 115 (emphasis and all caps omitted)], that the Honorable Michael L. Brown, United States District Judge for the Northern District of Georgia, denied as moot, [Doc. 174 at 19], upon decertifying the case so that defendants could assert additional grounds for dismissal of the wire fraud charges.[2]  For the reasons that follow, it is **RECOMMENDED** that defendants' "Joint Motion to Dismiss Duplicitous Counts," [Doc. 175 (emphasis and all caps omitted)], be **DENIED**, and if the merits of the defendants' previously filed "Motion to Dismiss Wire Fraud Counts," [Doc. 115 (emphasis and all caps omitted)], are reached, as requested by Norkus, [Doc. 178], it is further **RECOMMENDED** that the motion be **DENIED** for the reasons stated in the Report, Recommendation, and Order issued on August 23, 2023, <u>see</u> [Doc. 153 at 38-44].

---

[2] Sperber also has filed a "Motion to Limit Codefendant's Statements," [Doc. 176 (emphasis and all caps omitted)], in which he seeks "to limit certain out-of-court statements by . . . Norkus, in the event [] Norkus elects to exercise his Fifth Amendment right not to testify at trial," [<u>id.</u> at 1], and that motion has been deferred to Judge Brown, <u>see</u> [Doc. 177].

# I.  INTRODUCTION

On August 25, 2021, a federal grand jury in the Northern District of Georgia returned an indictment against Sperber, [Doc. 1], and on September 20, 2022, a superseding indictment was returned against both defendants, charging them with four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); two counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2; and two counts of money laundering, in violation of 18 U.S.C. §§ 1957 and 2, [Doc. 58]. In particular, the superseding indictment alleges that "[b]eginning in or about 2020 and continuing until in or about March 2021," Sperber, who "owned a healthcare distributor located in Florida named Ark GBST [('Ark')] that distributed [personal protective equipment ('PPE')] on behalf of O&M Halyard[, Inc. ('O&M Halyard')]," a subsidiary corporation that maintained its principal place of business in Alpharetta, Georgia, and is a manufacturer and wholesale distributor of PPE, and Norkus, who "owned Champion Resources, a logistics company located in Florida that provided logistical services for Ark" and "also procured PPE for customers largely through its relationship with Sperber's various companies," engaged in a "scheme to defraud a PPE supplier as well as victims who sought to procure PPE for hospital and medical institutions" and that through

"a combination of falsified invoices, emails, and other documents," defendants "defrauded prospective PPE purchasers out of more than $12 million, much of which they used for [their] own personal benefit," including  the purchase of Sperber's waterfront mansion and Norkus' condominium.  [Id. ¶¶ 1, 3-4, 8-9 (all caps omitted)].

The superseding indictment charges that "[a]lmost as soon as [Sperber] became an authorized O&M Halyard distributor in September 2019, [he] failed to pay for previously shipped PPE," despite the fact O&M Halyard employees repeatedly told him that he "needed to pay down his outstanding balance in order to remain an authorized distributor."  [Id. ¶ 10.  It is alleged that despite owing a substantial amount of money to O&M Halyard, defendants "sent fabricated O&M Halyard emails and invoices to Victim A," a broker located in New York that "sought to procure PPE for [a] Chinese hospital and medical institutions," that "falsely claimed O&M Halyard had an ample supply of N95 masks that was ready to be shipped," enticing Victim A to wire $3,144,960 to Champion Resources for the PPE, with "an expected ship date of February 12, 2020."  [Id. ¶¶ 5, 11].  Norkus is alleged to have "used approximately $875,000 of those funds to purchase a condominium" in Florida, and to have wired $1,865,750 to Sperber, "who used those funds to pay down an outstanding balance of over $1 million on previous orders with O&M Halyard."  [Id. ¶ 11].  Defendants, however, "led Victim A to

4

believe that the funds were being used to purchase new PPE for Victim A," by, for example, Norkus sending a text message to Victim A on February 10, 2020, "with a fabricated banking statement that falsely claimed Champion Resources had wired nearly $3 million to O&M Halyard."  [Id.].  Because Victim A had not received any PPE by February 13, 2020, it asked Norkus for a status update, leading Norkus to email Sperber, "You need to call me bro I have it set up where we can talk while I'm [i]n front and your [sic] acting as [O&M Halyard.]  It's perfect to get us next level," and because Victim A still had not received any PPE by February 27, 2020, Norkus forwarded an email that Sperber "had purportedly received from O&M Halyard, stating, 'I want you to understand your order is confirmed[,]'" and Norkus then forwarded the email he sent to Victim A to Sperber and stated, "What I had to send yesterday FYI."  [Id. ¶ 12 (internal marks omitted)].

In addition, the superseding indictment alleges that in early 2020, Sperber negotiated the purchase of PPE by Victim B, a pharmaceutical and medical products wholesaler in Florida that "sought to procure PPE for an international healthcare company," and that defendants "led Victim B to believe that Sperber could acquire a substantial amount of PPE from O&M Halyard and Dukal," a medical supply and medical product manufacturer of PPE located in New York, even though Sperber had been notified by O&M Halyard "that an order of that

size was not possible," and Dukal "had never confirmed . . . that they could deliver the quantities of PPE that Victim B needed." [Id. ¶¶ 2, 6, 13 (all caps omitted)]. It is alleged that in order to "convince Victim B into believing they had access to additional quantities of PPE, Norkus displayed pallets of PPE in a warehouse" and that subsequently, Victim B "gave a $2.8 million cashier's check to an individual operating on behalf of Sperber," who then "delivered a portion of the glove order to Victim B and promised that the difference would be made up in subsequent orders." [Id. ¶ 14 (all caps omitted)]. On March 31, 2020, "Victim B sent an additional $8.25 million to Sperber for the purchase of N95 masks," and on May 1, 2020, "Victim B sent an additional $2.5 million to Sperber for the purchase of N95 masks." [Id. (all caps omitted)]. Thereafter, defendants "sent a series of false and misleading emails, invoices and messages falsely suggesting that the PPE from O&M Halyard was set to be delivered," and they "also sent fabricated Dukal documents and emails to Victim B purportedly showing that Dukal had an ample supply of N95 masks that was ready to ship." [Id. ¶¶ 15-16].[3]

---

[3] For example, the superseding indictment details that on April 30, 2020, Sperber emailed Victim B in response to its request for an update that he "expect[ed] this to move asap." [Doc. 58 ¶ 15 (internal marks omitted)]. On May 1, 2020, Norkus also forwarded an email to Victim B that "had purportedly been sent from O&M Halyard stating, 'as discussed yesterday these 4 orders are now shipping.'" [Id.]. It is alleged, however, that defendants "knew this email was fabricated and that O&M Halyard had not shipped Victim B's orders." [Id.]. Norkus is alleged to have also forwarded an email to Victim B on May 1, 2020, "that was purportedly sent by [a] Dukal employee" and then "pressed Victim B on making payments for

The superseding indictment also alleges that, at times, Sperber "used the victims' funds to pay down his outstanding balance with O&M Halyard that had been incurred prior to February 2020."  [Id. ¶ 17].[4]  It also alleges that defendants "used a substantial portion of the victims' funds for [their] own personal benefit," including that "[f]rom March 26 to May 4, 2020, Sperber used millions of dollars of Victim B's funds to purchase a waterfront mansion," as well as "for a variety of personal and business expenditures," such as "renting a private jet, purchasing jewelry, and purchasing food at restaurants," and that Norkus "used

---

N95 masks," prompting Victim B to "immediately wire[] $2.5 million to Sperber to pay for the Dukal N95 masks," even though defendants "knew that the forwarded Dukal email was fabricated."  [Id. ¶ 16 (all caps omitted)].  On May 25, 2020, "Victim B emailed Sperber and asked about the status of the Dukal N95 masks," and Sperber "responded by forwarding a fabricated Dukal spreadsheet that falsely listed N95 masks as being available," even though Sperber had confirmed to a Dukal representative on May 4, 2020, that he had been told about "the lack of inventory in existence."  [Id. (all caps and internal marks omitted)].

[4] For example, the superseding indictment details that on April 13, 2020, Sperber emailed an O&M Halyard employee that $50,000 had been wired as he knew "we had a small invoice coming due," and he was "also trying to expedite as much product as possible to our markets so we are trying to pay down the line so we can continue to work efficiently," but that he "failed to disclose that these funds had actually come from a prospective PPE purchaser who was expecting a shipment of PPE."  [Doc. 58 ¶ 17 (internal marks omitted)].  It also alleges that on June 10, 2020, Sperber emailed an O&M Halyard employee that a payment "was debited from our [account] late Monday and you should have seen it yesterday," but that he would "follow up [that day] at noon or so with [them] and if it [was] not in, [he would] head to the bank," even though Sperber knew he had not made the payment.  [Id. ¶ 18 (internal marks omitted)].

approximately $875,000 of Victim A's funds to purchase a condominium[.]"  [Id. ¶ 19 (all caps omitted)].

The superseding indictment specifically charges defendants in Counts One through Four with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, based on certain emails and text messages sent to O&M Halyard employees.  [Id. ¶ 24]. Count Five charges defendants with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, from about February 2020, and continuing until about March 2021.  [Id. ¶¶ 25-26].[5]  Defendants move to dismiss all the wire fraud charges in the superseding indictment, [Doc. 175], which the government opposes, [Doc. 179], and defendants have filed a joint reply, [Doc. 180], and the motion, having been fully briefed, is ripe for ruling.

## II.  DISCUSSION

Defendants move to dismiss the wire fraud counts in the superseding indictment as "duplicitous because they charge two schemes to defraud within each count while the wire fraud conspiracy count is duplicitous because it charges

---

[5] Count Six of the superseding indictment charges defendants with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and Counts Seven and Eight charge defendants with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, while Counts Nine and Ten charge defendants with money laundering, in violation of 18 U.S.C. §§ 1957 and 2, see [id. ¶¶ 30-37], but the money laundering charges are not at issue in the pending motion to dismiss duplicitous counts, see [Doc. 175].

two separate conspiracies within a single count." [Doc. 175 at 1]. Defendants contend that since the superseding indictment alleges that they defrauded two companies that were seeking to buy PPE, Victims A and B, and also alleges that defendants defrauded O&M Halyard, a PPE supplier, it is more accurate to view the superseding indictment as "two different schemes that have been combined into single counts," and because "there is one scheme to defraud PPE buyers and a separate and different scheme to defraud [O&M Halyard], a PPE distributor, Counts 1 to 4 are duplicitous." [Id. at 2-3]. Since "[t]he wire fraud conspiracy incorporates the same allegations made in the wire fraud counts," defendants argue that the superseding indictment charges two separate conspiracies in one count, "render[ing] the conspiracy count duplicitous as well." [Id. at 3].[6]

The government opposes defendants' motion to dismiss, arguing that the superseding indictment charges "a unitary, overarching scheme to defraud" a PPE supplier, O&M Halyard, "as well as victims who sought to procure PPE for hospital and medical institutions," Victims A and B. [Doc. 179 at 3 (citation and internal marks omitted)]. The government explains that "this case arose out of a

---

[6] In a footnote to their motion, defendants assert that "[i]n addition to being duplicitous, the counts should be dismissed because of misjoinder," because the charges "run afoul of Rule 8(a) of the Federal Rules of Criminal Procedure which states that an indictment 'may charge a defendant in separate counts with 2 or more offenses . . .'" [Doc. 175 at 3 n.1 (quoting Fed. R. Crim. P. 8(a))].

unique set of market conditions prevailing in the early phase of the COVID-19 pandemic," during which the demand and price for PPE spiked, and the "market for PPE became more chaotic and more opaque than before, with hospital systems and other buyers willing to pay extremely high prices for PPE and seeking it out from sources beyond their normal suppliers."   [Id. at 1-2].   As an authorized distributor for O&M Halyard, Sperber and his company, Ark, occupied a "middle man" position during this pivotal time, and Sperber, aided by Norkus, "sought to cash in on the crisis, hatching a scheme to defraud multiple other parties in his PPE transactions."   [Id. at 2].   The government cites several cases from other circuits rejecting arguments that wire and mail fraud charges were duplicitous where there were multiple victims of a single scheme under circumstances that the government contends are similar to the facts of this case.[7]

In their reply, defendants argue that "the [g]overnment appears to have changed its theory of prosecution and abandoned the lulling theory it used to defend against previous motions filed by the [d]efendants," and contend that their

---

[7] The government notes that in response to defendants' prior motion to dismiss the wire fraud counts as multiplicitous, it argued that emails that Sperber sent to O&M Halyard charged in "Counts 1-4 were 'lulling e-mails' under Eleventh Circuit precedent and thus part of the continuing scheme even though money had already been paid over," but even if those "communications weren't strictly within the definition of the lulling doctrine, they were in the nature of those types of communications, and were in furtherance of the scheme to defraud[.]"   [Doc. 179 at 4-5 (citation omitted)].

"motion to dismiss the duplicitous counts demonstrates that the emails could not possibly have lulled the victims of the first alleged scheme as they had no knowledge of the emails or their contents."  [Doc. 180 at 2].[8]  Defendants assert that the government "has proffered a new theory to connect the two different alleged schemes," but the problem with the "new theory is that there is no allegation in the indictment that the [d]efendants were still trying to get more money from Victims A and B as part of the same scheme to defraud" by sending the emails to O&M Halyard.  [Id. at 4].  Defendants further contend that the government's "hypothetical argument" about the significance of the emails sent to O&M Halyard on the scheme to defraud Victims A and B "does not match up with the realities of the situation."  [Id. at 5].  Defendants also argue that the cases cited by the government are distinguishable, [id. at 5-7], and "[s]ince there was nothing connecting the order from Victims A and B to product [ ] Sperber promised to pay for in emails, there is no tie between the two separate alleged schemes," [id. at 8], and therefore, the wire fraud counts and wire fraud conspiracy are duplicitous and should be dismissed.

---

[8] Defendants maintain that "[t]he importance of the lulling theory in this case is that it allows the [g]overnment to extend the fraud scheme to a point in which it would bring O&M Halyard [] into the case and get venue in the Northern District of Georgia," because "[w]ithout a scheme to defraud [O&M Halyard], no part of the scheme to defraud Victims A and B touches the Northern District of Georgia." [Doc. 180 at 2].

"A duplicitous indictment charges two or more separate and distinct crimes in a single count." United States v. Burton, 871 F.2d 1566, 1573 (11th Cir. 1989) (per curiam) (citation omitted).  "A single count that alleges commission by a defendant of a crime by several means is not duplicitous[.]" United States v. Barret, No. 10–cr–809 (S–3)(KAM), 2011 WL 6780901, at *2 (E.D.N.Y. Nov. 27, 2011) (citations omitted). "Duplicity, if uncorrected, can lead to the conviction of a defendant without unanimity among jurors respecting what offense has been committed, to prejudice against a defendant in a later double jeopardy defense, and to confusion respecting the admissibility of evidence." United States v. Campbell, No. 1:04–CR–0424–RWS, 2005 WL 6436621, at *7 (N.D. Ga. Oct. 24, 2005) (citation omitted).  However, duplicity is not usually fatal to an indictment, see United States v. Robinson, 651 F.2d 1188, 1194 (6th Cir. 1981); see also United States v. Abdi, Criminal Case No. 1:13–cr–484–JEC–RGV, 2014 WL 3828165, at *6 (N.D. Ga. Aug. 4, 2014) (citation omitted), and other courts have noted "that the rules regarding duplicity are pleading rules and, as such, the defendant's remedy is to move to require the prosecution to elect the charge within the count and that a duplicitous indictment is remediable by a jury instruction particularizing the offense charged in each count," United States v. James, 749 F. Supp. 2d 705, 711 (S.D. Ohio 2010) (citation omitted), aff'd, 496 F. App'x 541 (6th Cir. 2012) (unpublished); see also United States v. Williams, CRIMINAL INDICTMENT 3:16-

cr-00003-TCB-RGV, 2016 WL 10649420, at *8 (N.D. Ga. Oct. 19, 2016) (citation omitted), adopted by 2017 WL 1030804, at *6 (N.D. Ga. Mar. 16, 2017).  That is, generally, any confusion or risk of non-unanimity can be appropriately addressed and eliminated by special interrogatories and careful jury instructions.  See United States v. Deason, 965 F.3d 1252, 1269 (11th Cir. 2020); United States v. Davis, 306 F.3d 398, 416 (6th Cir. 2002); United States v. Marshall, 75 F.3d 1097, 1111-12 (7th Cir. 1996); United States v. Pungitore, 910 F.2d 1084, 1136 (3d Cir. 1990).

A conspiracy charge "presents 'unique issues' in duplicity analysis because 'a single agreement may encompass multiple illegal objects.'"  United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir. 1992) (quoting United States v. Murray, 618 F.2d 892, 896 (2d Cir.1980)); see also United States v. Rives, CRIMINAL CASE NO. 1:14-CR-00130-TWT-JFK-4, 2015 WL 7574759, at *17 (N.D. Ga. Sept. 15, 2015) (citation omitted), adopted by 2015 WL 7575933, at *1 (N.D. Ga. Nov. 25, 2015).  In Braverman v. United States, 317 U.S. 49 (1942), the Supreme Court ruled that "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for '[t]he conspiracy is the crime, and that is one, however diverse its objects.'"  Id. at 54 (citations omitted); see also United States v. Diaz, 690 F.2d 1352, 1356 (11th Cir. 1982) (footnote and citations omitted) (explaining that "[a]n indictment may charge a conspiracy with more than one distinct substantive offense").  Consequently, "an indictment is not duplicitous merely because it

13

alleges a conspiracy to commit multiple crimes." Berger, 22 F. Supp. 2d at 150-51 (citations omitted); see also United States v. Ramos, 666 F.2d 469, 473 (11th Cir. 1982) (citations omitted). Instead, "'acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.'" Berger, 22 F. Supp. 2d at 151 (quoting Aracri, 968 F.2d at 1518); see also United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989); United States v. Cotton, No. 8:14–cr–360–T–33TBM, 2014 WL 7068095, at *2 (M.D. Fla. Dec. 12, 2014). Thus, when evaluating defendants' claim that the conspiracy count is duplicitous, the Court is mindful that "[w]hether the government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or instead, has proven several independent conspiracies is a question of fact for a properly instructed jury." United States v. Johansen, 56 F.3d 347, 350 (2d Cir. 1995) (citations omitted); see also United States v. Evans Concrete, LLC, CR 420-081, 2023 WL 3019058, at *4 (S.D. Ga. Apr. 20, 2023) (citations and internal marks omitted) (explaining that the "jury determines whether evidence supports a single conspiracy or multiple conspiracies, and, on a motion to dismiss for duplicity, the Court is limited to consideration of the fact of the indictment and inferences reasonably drawn from those facts in support of the charges as pled"), adopted by 2023 WL 4704010, at *3 (S.D. Ga. July 24, 2023). "Moreover, an indictment will not be found to be

impermissibly duplicitous unless it implicates the underlying policy considerations of Rule 8(a) and threatens to expose the defendants to a risk of unfairness." Berger, 22 F. Supp. 2d at 150-51 (citations omitted).

When ruling on a motion to dismiss for duplicity, the Court considers only "the face of the indictment and inferences reasonably drawn from those facts in support of the charges as pled." United States v. Slawson, Criminal Case No. 1:14–CR–00186–RWS–JFK, 2014 WL 5804191, at *8 (N.D. Ga. Nov. 7, 2014) (citation omitted), adopted by 2014 WL 6990307 (N.D. Ga. Dec. 10, 2014); see also United States v. Calderon, 127 F.3d 1314, 1327 (11th Cir. 1997).  The superseding indictment in this case charges four counts of wire fraud based on certain emails and text messages Sperber sent to O&M Halyard in furtherance of "a scheme to defraud a PPE supplier as well as victims who sought to procure PPE for hospital and medical institutions." [Doc. 58 ¶¶ 9, 24].  The superseding indictment charges that "[t]hrough a combination of falsified invoices, emails, and other documents, [the defendants] defrauded prospective PPE purchasers out of more than $12 million, much of which they used for [their] own personal benefit," [id. ¶ 9], and that despite owing a substantial amount of money to O&M Halyard, defendants "sent fabricated O&M Halyard emails and invoices to Victim A" that "falsely claimed O&M Halyard had an ample supply of N95 masks that was ready to be shipped," enticing Victim A to wire $3,144,960 for the PPE, with "an expected ship

date of February 12, 2020," [id. ¶ 11].  Defendants allegedly "led Victim A to believe that the funds were being used to purchase new PPE for Victim A," by, for example, Norkus sending a text message to Victim A on February 10, 2020, "with a fabricated banking statement that falsely claimed Champion Resources had wired nearly $3 million to O&M Halyard."  [Id.].  Because Victim A had not received any PPE by February 13, 2020, it asked Norkus for a status update, leading Norkus to email Sperber, "You need to call me bro I have it set up where we can talk while I'm [i]n front and your [sic] acting as [O&M Halyard.]  It's perfect to get us next level," and because Victim A still had not received any PPE by February 27, 2020, Norkus forwarded an email that Sperber "had purportedly received from O&M Halyard, stating, 'I want you to understand your order is confirmed[,]'" and Norkus then forwarded the email he sent to Victim A to Sperber.  [Id. ¶ 12 (internal marks omitted)].

The superseding indictment also alleges that in early 2020, Sperber negotiated the purchase of PPE by Victim B, a pharmaceutical and medical products wholesaler in Florida that "sought to procure PPE for an international healthcare company," and that defendants "led Victim B to believe that Sperber could acquire a substantial amount of PPE from O&M Halyard and Dukal," a medical supply and medical product manufacturer of PPE located in New York, even though Sperber had been notified by O&M Halyard "that an order of that

16

size was not possible," and Dukal "had never confirmed . . . that they could deliver the quantities of PPE that Victim B needed."  [Id. ¶¶ 2, 6, 13 (all caps omitted)].  It is alleged that after Victim B sent a total of over $13 million to Sperber for the purchase of gloves and N95 masks, defendants "sent a series of false and misleading emails, invoices and messages falsely suggesting that the PPE from O&M Halyard was set to be delivered," and they "also sent fabricated Dukal documents and emails to Victim B purportedly showing that Dukal had an ample supply of N95 masks that was ready to ship."  [Id. ¶¶ 15-16].  The superseding indictment further charges that "[t]hroughout this timeframe, [Sperber] misappropriated Victim A and Victim B's funds," and at times, "used the victims' funds to pay down his outstanding balances with O&M Halyard that had been incurred prior to February 2020," and "failed to disclose that these funds had actually come from a prospective PPE purchaser who was expecting a shipment of PPE," while "[o]n other occasions, [Sperber] lied to O&M Halyard employees about payments that he had not actually made."  [Id. ¶¶ 17-18].

Defendants contend that the four wire fraud counts are duplicitous because they charge two schemes to defraud within each count, one directed at Victims A and B and a separate scheme directed at O&M Halyard, and "[a]side from [] Sperber being the alleged perpetrator in both schemes, there is no meaningful connection between the two alleged schemes."  [Doc. 175 at 1, 4].  Defendants

argue that once they "obtained the money from Victims A and B, that alleged scheme was over," and "[w]hat [] Sperber did with the money afterwards does not convert two schemes into one." [Id. at 5]. Defendants further assert that, to the extent the government relies on the contention that the wires sent to O&M Halyard charged in Counts One through Four somehow lulled Victims A and B, "there is no logical connection between [the] alleged lulling and the alleged scheme to defraud Victims A and B" because the lulling emails charged in those counts were sent to O&M Halyard, and "[t]here is no evidence or allegation that Victims A and B knew of the emails or their contents," so it was impossible that those wire communications lulled Victims A and B, and they could only be lulling as to the O&M Halyard scheme. [Id. at 5-6]. Finally, defendants contend that the "geographic separation between the schemes" indicates the schemes are not connected. [Id. at 6]. Specifically, defendants argue that they both resided and conducted business in Florida and Victims A and B are not based in Georgia, so any communications and business transactions between defendants and Victims A and B did not touch Georgia, whereas O&M Halyard is located in the Northern District of Georgia, so that scheme would have ties to this district. [Id.].

The superseding indictment charges a single "scheme to defraud a PPE supplier as well as victims who sought to procure PPE for hospital and medical institutions." [Doc. 58 ¶¶ 9, 24]. Contrary to defendants' contention, the fact that

18

defendants allegedly defrauded separate victims on opposite ends of transactions for the purchase and sale of PPE does not render the wire fraud counts duplicitous. The allegations of the superseding indictment provide a "sufficiently close nexus" between the two victims such that the wire fraud charges "are fairly characterized as one scheme." United States v. Zeidman, 540 F.2d 314, 317 (7th Cir. 1976).   As previously summarized, the superseding indictment alleges that defendants capitalized on the desperate circumstances of the COVID-19 pandemic to enrich themselves via a scheme in which they traded on Sperber's relationship with suppliers of PPE, including O&M Halyard, to secure funds from Victims A and B for the purchase of PPE, and perpetuated the scheme "[t]hrough a combination of falsified invoices, emails, and other documents," in which defendants made false representations at both ends of the transactions to conceal their fraudulent conduct and maintain their capacity to purportedly provide PPE as a "middle man" between the victims.  See [Doc. 58 ¶¶ 7-24].

The government persuasively argues that the circumstances here are analogous to those in Zeidman, 540 F.2d at 314, where a debt collection company and its principal were charged with defrauding their business counterparties on both sides of business deals and the defendants argued that certain mail fraud counts of the indictment were duplicitous because they alleged two separate and distinct classes of victims.  The Seventh Circuit Court of Appeals rejected this

argument, concluding that each challenged count "charge[d] only one mailing and therefore only one offense," and although it was "true that each of the frauds on the debtors and creditors could constitute a separate offense," that was "not determinative" because "the two acts originate[d] from one transaction, a debt assigned for collection," and "[t]he frauds were performed by the same parties and have a sufficiently close nexus with one another that they are fairly characterized as one scheme." Id. at 17 (citations omitted).  Similarly, here, the wire fraud charges in the superseding indictment may fairly be characterized as one scheme performed by the same parties to defraud different victims on both ends of transactions for the purchase and sale of PPE in which the defendants utilized false documents purportedly from the supplier to convince the buyers that the transactions were legitimate and some of the proceeds obtained from the buyers were used to maintain the relationship with the supplier by paying down past debt to keep the scheme from unravelling.  See United States v. Prieto, 812 F.3d 6, 12 (1st Cir. 2016) (citation omitted) ("The accomplishment of a scheme's fraudulent goal and the simultaneous evasion of detection by its victims or the authorities often necessitate multi-faceted patterns of criminal activity that may harm different groups of victims at different times."); United States v. Morse, 785 F.2d 771, 774 (9th Cir. 1986) (rejecting defendants' duplicitous challenge to the indictment alleging that four separate tax shelter ventures involving different

victims comprised a single scheme to defraud); <u>United States v. Weiss</u>, 588 F. Supp. 3d 622, 629-30 (E.D. Pa. 2022) (citations omitted) (rejecting defendant's duplicitous argument that the indictment charged two distinct schemes, or possibly even four separate schemes, because it alleged the "defrauding of four distinct clients or client groups," explaining that "federal courts have found that the fact that a count alleges multiple methods of carrying out a scheme, or multiple victims of a scheme, does not make that count duplicitous"); <u>United States v. Parlato</u>, 15-CR-149(FPG)(JJM), 2017 WL 9487081, at *10 (W.D.N.Y. Feb. 13, 2017) (footnote and citations omitted) (explaining that the fact that certain victims "may have been defrauded in a manner different from the other alleged victims does not render [the] counts duplicitous, since all of the alleged victims were the subject of defendants' scheme and artifice to defraud"), adopted by 2017 WL 2952832, at *4 (W.D.N.Y. July 10, 2017); <u>United States v. Zolp</u>, 659 F. Supp. 692, 725 (D.N.J. 1987) (citations omitted) (explaining that the "fact that the single scheme may have more than one victim . . . does not alter the fact that only one scheme is charged").

Defendants' argument that the wire fraud charges should be dismissed as duplicitous also fails because each of the challenged counts clearly charges a single execution of the wire fraud scheme as each count is based on a separate wire communication.  [Doc. 58 ¶ 24].  As the Seventh Circuit explained in <u>Zeidman</u>, each of the challenged mail fraud counts "charge[d] only one mailing and

therefore only one offense."  540 F.2d at 317.  Thus, even if defendants correctly contend that the indictment improperly combines two separate schemes, the wire fraud charges in Counts One through Four each pertain to only one execution of a scheme, and jury instructions may be used to ensure that the jury reaches unanimity on the nature of the scheme with respect to each of the challenged charges.  See Deason, 965 F.3d at 1269.  Indeed, courts have recognized that where duplicity is present in an indictment, "dismissal is not the sole remedy," because "ambiguity [can] be cured through jury instructions and/or special interrogatories."  Evans Concrete, LLC, 2023 WL 3019058, at *4 (alteration in original) (internal marks omitted) (quoting Campbell, 2005 WL 6436621, at *7).  That is, "any concern regarding jury unanimity may be addressed by curative instructions to the jury that its verdict must be unanimous on whatever specification the jurors find to be the predicate of a guilty verdict."  Id. (citation and internal marks omitted) (quoting United States v. Carter, No. CR 106-122, 2007 WL 230451, at *4 (S.D. Ga. Jan. 24, 2007)); see also Rives, 2015 WL 7574759, at *18 (explaining jury instructions on unanimity may cure duplicity concerns in conspiracy indictment).

Defendants' remaining arguments for dismissal of the wire fraud charges as duplicitous are more properly characterized as challenging whether the government can prove that the wire transmissions in Counts One through Four

were in furtherance of the scheme charged in the superseding indictment and

whether venue is proper in the Northern District of Georgia.  <u>See</u> [Doc. 175 at 4-6].

However, these arguments cannot be resolved on a motion to dismiss charges in

the superseding indictment and must await presentation of the evidence at trial.[9]

<u>See</u> <u>United States v. Snipes</u>, 611 F.3d 855, 866 (11th Cir. 2010) (venue determination

in a pretrial evidentiary hearing would be improper because a jury must decide

whether venue exists); <u>United States v. Salman</u>, 378 F.3d 1266, 1268 (11th Cir. 2004)

(per curiam) (explaining that "[t]here is no summary judgment procedure in

criminal cases," nor "do the rules provide for a pre-trial determination of

---

[9] Defendants' arguments about the lulling doctrine likewise are premature at this stage of the proceedings because they pertain to "factual questions as to which the government should be permitted to adduce evidence at trial."  <u>United States v. Louissaint</u>, 12-CR-6081W, 2016 WL 3145145, at *5 (W.D.N.Y. June 3, 2016) (footnote and citations omitted); <u>see also</u> <u>United States v. Weiss</u>, 469 F. Supp. 2d 941, 951-52 (D. Colo. 2007) (explaining that "at this stage of the proceeding, there is no evidence addressing whether receipt of the mailings lulled the lenders or concealed the truth from them," and "[i]t is sufficient, for purposes of a motion to dismiss, that these theories are legally cognizable and the [g]overnment may present evidence from which a reasonable jury might conclude that the mailings furthered the scheme in this manner"); <u>United States v. Best</u>, 660 F. Supp. 371, 374 (N.D. Ill. 1987) (denying motion to dismiss because mailings of deeds, mortgages and other documents to lender after loans were made and proceeds distributed could be seen as lulling mailings designed to conceal the fraud from examiners "by ensuring all normal documentation appeared in the loan files").  At this point, the "allegation[s are] sufficient to establish that the wire message[s were] in furtherance of the scheme for purposes of indicting [d]efendant[s]."  <u>United States v. Martin Wynn</u>, Cr. No. 8:10–cr–1026–GRA, 2011 WL 1748424, at *5 (D.S.C. May 2, 2011); <u>see also</u> [Doc. 58 ¶¶ 10, 17-18, 24, 29].

sufficiency of the evidence[]" as the "sufficiency of a criminal indictment is determined from its face.").[10]

Defendants' arguments for dismissal of the wire fraud conspiracy charge in Count Five fare no better. "An indictment is not duplicitous if, in one count, it charges a defendant with violating [a] statute in [multiple] ways." United States v. Burton, 871 F.2d 1566, 1574 (11th Cir. 1989) (per curiam) (footnote omitted); see also United States v. Thomas, Criminal Action File No. 1:12:CR–188–TWT/AJB, 2012 WL 6963671, at *3 (N.D. Ga. Dec. 31, 2012) (citation omitted) ("Where one broad conspiracy exists, charging multiple purposes is not improper."), adopted by 2013 WL 362860, at *1 (N.D. Ga. Jan. 30, 2013). "The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for [t]he conspiracy is

---

[10] In a footnote to their motion to dismiss, defendants assert that "[i]n addition to being duplicitous, the counts should be dismissed because of misjoinder," [Doc. 175 at 3 n.1], but defendants have not offered any further argument on this point, and the Court finds no merit in defendants' undeveloped argument since "[t]he Eleventh Circuit construes Rule 8(a) broadly in favor of initial joinder," United States v. Covington, CRIMINAL ACTION FILE NO. 1:16-CR-145-TWT-JKL-15, 2017 WL 10410076, at *11 (N.D. Ga. Oct. 5, 2017) (citing United States v. Smalley, 754 F.2d 944, 946 (11th Cir. 1985)), adopted by 2018 WL 5016499, at *1 (N.D. Ga. Oct. 16, 2018), "allowing joinder of offenses that are of the same or similar character, even if such offenses do not arise at the same time or out of the same series of acts or transactions," United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002) (citation and internal marks omitted), and the charges in the superseding indictment easily satisfy this standard.

the crime, and that is one, however diverse its objects."  Ramos, 666 F.2d at 473

(citations and internal marks omitted).

"In determining whether a single conspiracy is pled, courts consider: '(1)

whether a common goal existed; (2) the nature of the underlying scheme; and (3)

the overlap of participants.'" Evans Concrete, 2023 WL 3019058, at *3 (quoting

Calderon, 127 F.3d at 1327).  Considering only the allegations of the superseding

indictment, as the Court must on a motion to dismiss, Count Five adequately

alleges a single conspiracy committed by defendants to enrich themselves that

involved overlapping participants in a scheme to defraud "a PPE supplier as well

as victims who sought to procure PPE for hospital and medical institutions." [Doc.

58 ¶¶ 9, 24-26].  As previously discussed, the superseding indictment alleges that

defendants conspired to carry out a scheme to defraud different victims on both

ends of transactions for the purchase and sale of PPE in which the defendants

utilized false documents purportedly from the supplier to convince the buyers that

the transactions were legitimate and some of the proceeds obtained from the

buyers to maintain the relationship with the supplier by paying down past debt to

keep the scheme from unravelling.  "These allegations are sufficient to pass muster

at the motion to dismiss stage." Evans Concrete, 2023 WL 3019058, at *4 (citations

omitted).  If, at trial, the government "only proves the existence of multiple,

distinct conspiracies instead of the single conspiracy charged in the [superseding

i]ndictment, the Court can revisit [d]efendants' arguments after the close of the [g]overnment's case."  Id., at *5 (citation and internal marks omitted) (quoting United States v. Balotin, Case No. 3:19-cr-191-MMH-JBT, 2021 WL 2351738, at *3 (M.D. Fla. June 9, 2021)).

For the reasons discussed, defendants are not facing the risk of a conviction without unanimity among jurors respecting what offense has been committed or prejudice in a later double jeopardy defense that arise from a duplicitous indictment.  See United States v. Holland, CRIMINAL ACTION NO. 1:17-CR-00234-AT-CMS, 2018 WL 8838863, at *3 (N.D. Ga. Sept. 6, 2018) (citation omitted) (explaining that "a count alleging a conspiracy to commit several crimes [was] not duplicitous," but was "a multi-object conspiracy" and that it was "the single agreement that [was] the crime, and only the single penalty prescribed by the statute [could] be imposed"), adopted by 396 F. Supp. 3d at 1249.  Moreover, as previously noted, any concerns about duplicity in the conspiracy count likewise can be adequately addressed with an appropriate jury charge and verdict form. See Rives, 2015 WL 7574759, at *18 (citations and internal marks omitted) (explaining that even if the conspiracy count "was determined to be duplicitous, the remedy [was] not dismissal of that count of the indictment," but rather, "[a]ny danger flowing from the duplicity of charging more than one crime in a single count [could] be cured by a jury instruction explaining unanimous agreement

must be reached that the government proved, beyond a reasonable doubt, a single conspiracy").

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that defendants' "Joint Motion to Dismiss Duplicitous Counts," [Doc. 175 (emphasis and all caps omitted)], be **DENIED**, and if the merits of the defendants' previously filed "Motion to Dismiss Wire Fraud Counts," [Doc. 115 (emphasis and all caps omitted)], are reached, as Norkus has requested, [Doc. 178], it is further **RECOMMENDED** that the motion be **DENIED** for the reasons stated in the Report, Recommendation, and Order issued on August 23, 2023, see [Doc. 153 at 38-44].

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.  **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 14th day of February, 2024.

_Russell G. Vineyard_
RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE