# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

United States of America,

v.                                    Case No. 1:21-cr-328-MLB

Brian Sperber and Edmond
Norkus,

                   Defendants.

_____/

## ORDER

The United States obtained an indictment against Defendants Brian Sperber and Edmond Norkus, charging them with wire fraud, money laundering, and conspiracy. (Dkt. 58.) Magistrate Judge Russell G. Vineyard issued a Report, Recommendation, and Order (R&R) saying the Court should: (1) deny Defendants' joint motion to dismiss the wire fraud counts (Dkt. 175) and (2) deny Defendants' prior motion to dismiss based on the lulling exception that the Court previously denied as moot (Dkts. 115; 174; 178). Also pending is Sperber's motion to limit the admission at trial of statements Norkus gave FBI agents. (Dkt. 176.) Defendants together object to the Magistrate Judge's recommendation on

their joint motion to dismiss, and Norkus separately objects to the portions of the R&R recommending the Court deny Defendants' previous motion to dismiss.  (Dkts. 184; 185.)

## I.    Background

The United States obtained a superseding indictment against Sperber and Norkus, charging them with several wire fraud and money laundering counts (including conspiracy).  (Dkts. 58.)  The indictment alleges that during the "unique set of market conditions prevailing in the early phase of the COVID-19 pandemic," and "[b]eginning in or about 2020 and continuing until in or about March 2021," Defendants—distributors of personal protective equipment ("PPE")—engaged in a "scheme to defraud a PPE supplier as well as victims who sought to procure PPE for hospital and medical institutions."  (Dkt. 58 at 1 & ¶¶ 1, 3–4, 8–9.)  Defendants allegedly "defrauded prospective PPE purchasers out of more than $12 million, much of which they used for [their] own personal benefit."  (Dkt. 58 ¶¶ 1, 3–4, 8–9.)

Counts One through Four charge Defendants with wire fraud. (Dkt. 58 ¶¶ 7–24.)  Count Five charges Defendants with conspiracy to commit wire fraud and relies on the same allegations as the substantive

wire fraud counts.  (Dkt. 58 ¶¶ 25–26.)  Those allegations say Sperber was an authorized distributor for victim O&M Halyard—a "manufacturer and wholesale distributor of" PPE.  (Dkt. 58 ¶¶ 1, 10.) According to the indictment, "[a]lmost as soon as he became an authorized O&M Halyard distributor in September 2019," Sperber "failed to pay for previously shipped PPE." (Dkt. 58 ¶ 10.) O&M Halyard repeatedly told Sperber he needed to pay down his outstanding balance to remain an authorized distributor, and by February 2020, threatened to no longer distribute PPE through Sperber's company if he failed to make timely payments.  (*Id.*)

The indictment says Defendants' scheme began when they "sent fabricated O&M Halyard emails and invoices to" Victim A—a broker trying to buy PPE.  (Dkt. 58 ¶¶ 5, 11.)  These emails "falsely claimed O&M Halyard had an ample supply of N95 masks that was ready to be shipped to" Sperber.   (Dkt.  58 ¶ 11.)   "As a result of these misrepresentations, Victim A wired $3,144,960 to [Norkus's company] for the purchase of N95 masks with an expected ship date of February 12, 2020." (*Id.*)  Norkus allegedly used approximately $875,000 of those funds to buy a condo and wired the rest to Sperber, "who used those funds

to pay down an outstanding balance of over $1 million on previous orders with O&M Halyard." (*Id.*) On February 10, 2020, Norkus allegedly "sent a text message to Victim A with a fabricated banking statement that falsely claimed [his company] had wired nearly $3 million to O&M Halyard." (*Id.*)

Around the same time, "[i]n early 2020," Victim B—"a pharmaceutical and medical products wholesaler" also seeking to get PPE—"entered into negotiations with Sperber for the purchase of millions of dollars' worth of PPE, including N95 masks." (Dkt. 58 ¶¶ 6, 13.) Defendants allegedly led Victim B to believe Sperber could "acquire a substantial amount of PPE from O&M Halyard" and another company called Dukal, even though, by that point, Sperber had been told by O&M Halyard "that an order of that size was not possible" and he never confirmed he could receive that amount from Dukal. (Dkt. 58 ¶ 13.) To convince Victim B that Defendants had access to additional quantities of PPE, Norkus "displayed pallets of PPE in a warehouse," after which Victim B gave Sperber $2.8 million. (Dkt. 58 ¶ 14.) Victim B later sent two more payments to Sperber: $8.25 million on March 31, 2020, and $2.5 million on May 1, 2020—both for the purchase of N95 masks. (*Id.*) Over

4

the next several weeks, Defendants sent Victim B a series of false, misleading, and sometimes fabricated emails, invoices, and messages falsely suggesting the PPE from O&M Halyard was set to be delivered. (Dkt. 58 ¶¶ 15, 16.)  Norkus used $875,000 of the fraudulently obtained money to buy a condo, and Sperber used "millions of dollars of Victim B's funds to purchase a waterfront mansion in Boca Raton, Florida" and "for a variety of personal and business expenditures."  (Dkt. 58 ¶ 19.)

The indictment points to four emails Sperber allegedly sent O&M Halyard between May 26, 2020 and June 10, 2020 falsely claiming he was paying the outstanding invoices.  (Dkt. 58 ¶ 24.)  In Counts One through Four of the superseding indictment, the United States alleges Sperber and Norkus (aided and abetted by each other) sent those emails (by means of a wire communication in interstate commerce) as part of a "scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses," in violation of the wire fraud statute.  (*Id.*)

## II.   Legal Standard

28 U.S.C. § 636(b)(1) requires district courts to "make a de novo determination of those portions of [an R&R] to which objection is made."

Any such objection "must specifically identify the portions of the [R&R] to which objection is made and the specific basis for objection." *McCullars v. Comm'r, Soc. Sec. Admin.*, 825 F. App'x 685, 694 (11th Cir. 2020)[1]; *see United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009) ("[A] party that wishes to preserve its objection must clearly advise the district court and pinpoint the specific findings that the party disagrees with."). "Frivolous, conclusive, or general objections need not be considered by the district court." *Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988).

"It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a de novo or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). And, in most cases, "[a] party failing to object to [an R&R] waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *McGriff v. Comm'r, Soc. Sec. Admin.*, 654 F. App'x 469, 472

---

[1] The Court recognizes *McCullars* and other cases cited herein are unpublished and not binding. The Court cites them nevertheless as instructive. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

(11th Cir. 2016).  Ultimately, whether or not objections are filed, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

### III.   Joint Motion to Dismiss

Defendants move to dismiss the wire fraud counts (Counts One through Four) and wire fraud conspiracy count (Count Five) as duplicitous.  (Dkt. 175 at 1.)   Specifically, they contend that the indictment improperly treats two schemes (one to defraud Victims A and B, and another to defraud O&M Halyard) as one overarching scheme, thus charging multiple crimes in single counts.  (Dkt. 175 at 2–3.)  So, they say each substantive wire fraud count actually charges two schemes to defraud within a single charge and the conspiracy count combines two separate conspiracies into a single charge.  ((Dkt. 175 at 1.)   The Magistrate Judge concluded the indictment charges only one overarching scheme to defraud both Victims A and B and O&M Halyard, and the fact that Defendants "allegedly defrauded separate victims on opposite ends of transactions for the purchase and sale of PPE does not render the wire fraud counts duplicitous."  (Dkt. 182 at 18–19.)  Defendants object, saying the indictment fails to allege "that the goods for which Mr. Sperber owed

payment to Halyard had any relation to the goods Victims A and B intended to purchase from the Defendants." (Dkt. 184 at 2.) So, according to Defendants, the scheme to defraud Victims A and B is "distinct and unrelated" to the scheme to defraud O&M Halyard. (Dkt. 184 at 3.)

"A duplicitous indictment charges two or more separate and distinct crimes in a single count." *United States v. Burton*, 871 F.2d 1566, 1573 (1989). "A duplicitous count poses three dangers: '(1) a jury may convict a defendant without unanimously agreeing on the same offense; (2) a defendant may be prejudiced in a subsequent double jeopardy defense; and (3) a court may have difficulty determining the admissibility of evidence.'" *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997) (citation omitted). "[A]cts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992) (internal quotation marks and citation omitted). "In determining whether several acts constitute a single scheme, [the Court] ask[s] whether the transactions have a 'sufficiently close nexus with one another[.]'" *United States v. Lee*, 77

F.4th 565, 571 (7th Cir. 2023) (citation omitted); *see also United States v. Mastelotto*, 717 F.2d 1238, 1244 (9th Cir. 1983) ("In a mail or wire fraud case, where the defendants claim a charging of multiple schemes in each count, the question for review is simply whether the indictment may be read to allege a single unified scheme in each count.").

Conspiracy charges present "'unique issues' in the duplicity analysis because 'a single agreement may encompass multiple illegal objects.'" *Aracri*, 968 F.2d at 1518 (citation omitted). But "[a]n indictment may charge a conspiracy with more than one distinct substantive offense." *United States v. Diaz*, 690 F.2d 1352, 1356 (11th Cir. 1982). So, "an indictment is not duplicitous merely because it alleges a conspiracy to commit multiple crimes." *United States v. Berger*, 22 F. Supp. 2d 145, 150 (S.D.N.Y. 1998).

As to the substantive wire fraud counts, the indictment in this case alleges Defendants capitalized on the circumstances of the COVID-19 pandemic to enrich themselves by trading on Sperber's relationship with O&M Halyard—a PPE supplier—to secure payment from Victims A and B for the purchase of PPE. They allegedly perpetuated this scheme by falsifying documents and lying to both sets of victims to conceal their

fraudulent conduct and maintain their capacity as a purported middleman between their supplier and hopeful customers. In other words, in part one of the scheme, Defendants allegedly used fake documents from the supplier (O&M Halyard) to convince the buyers (Victim A and Victim B) that the transactions were legitimate while, in part two, Defendants allegedly used proceeds from the buyers (Victim A and Victim B) to pay down past debt, maintain their relationship with the supplier (O&M Halyard), and keep the scheme from unraveling. *See United States v. Prieto*, 812 F.3d 6, 12 (1st Cir. 2016) ("The accomplishment of a scheme's fraudulent goal and the simultaneous evasion of detection by its victims or the authorities often necessitate multi-faceted patterns of criminal activity that may harm different groups of victims at different times."). While alleging fraudulent conduct against two different types of entities (on the one hand a supplier and on the other hand customers), the United States still alleges a single scheme—specifically a scheme "to obtain money" by defrauding the customers into paying and the supplier into expecting its payment. And the United States alleges the individual emails identified in each substantive count furthered this scheme.

Defendants insist this is not a single scheme, but rather two schemes to defraud two different types of targets (one to defraud supplier-target O&M Halyard and one to defraud customer-targets Victims A and B). (Dkt. 184 at 3.) They claim "the only commonality" between the transactions with the different victims is Sperber, and that is not enough to constitute a "unitary scheme." (Dkt. 184 at 3–4.) More specifically, they contend it is not that there were two targets of the fraud that makes the counts duplicitous, but the fact that "the two different targets have no connection to each other." (Dkt. 184 at 4.) Plus, according to Defendants, the scheme against Victims A and B ended when those companies sent Defendants money, "long before" Defendants sent the emails (that constitute the substantive wire fraud charges) to O&M Halyard. (Dkt. 184 at 6.)

Contrary to Defendants' argument, Sperber's involvement is not the only "commonality" between the United States's fraud allegations. The indictment alleges Defendants played the two victims against each other to further their scheme. The United States alleges, for example, that when Victim A asked Norkus for a status update because Defendants had not delivered the PPE for which Victim A had paid

Defendants, Norkus emailed Sperber, saying "You need to call me bro I have it set up where we can talk while I'm [i]n front and your [sic] acting as [O&M Halyard.]  It's perfect to get us next level."  (Dkt. 58 ¶ 12.)  In other words, Norkus arranged for Sperber to act as one of their victims to deceive their other victim.  The United States alleges that, later the same day, Sperber sent Norkus a falsified email that made it appear O&M Halyard was confirming a delivery of PPE so Norkus could forward the email to Victim A.  (*Id.*)  Again, Defendants using the victim from one part of the scheme to mislead the victim in the other part of the scheme.  Far from showing a lack of commonality or two distinct schemes, these allegations show the intertwined nature of Defendants' actions against two separately situated victims to accomplish a single scheme to defraud.  And Defendants don't even mention these allegations.

Perhaps the United States could have crafted its indictment in the way Defendants say it should have—to allege separate schemes.  But Defendants do not get to tell the United States how to draft its indictments.  The United States decided to allege a single scheme that puts (what Defendants believe to be) separate parts together as one plan.  On its face, the indictment alleges a single scheme with related pieces.

The United States's decision to allege one scheme is not improper or duplicitous as a matter of law.  At bottom, regardless of whether O&M Halyard knew anything at all about Victims A and B, Defendants purportedly used the money from those victims to maintain their relationship with O&M Halyard and hide their fraudulent conduct.  The indictment clearly and properly alleges all this conduct as one scheme that Defendants could perpetrate during the COVID-19 pandemic.

To reiterate, as the Court already explained, a wire fraud count (involving a single wire communication) is not duplicitous merely because it charges a scheme that includes different acts against different entities so long as those acts have a sufficiently close nexus with one another.  In this case, Defendants' alleged acts against Victims A and B, and against O&M Halyard—all of which they undertook around the same time to obtain money—were sufficiently connected to constitute one scheme.  *See Lee*, 77 F.4th at 571 (wire fraud counts sufficiently charged one scheme, and so were not duplicitous, where they alleged defendant fraudulently obtained tickets from one victim and resold them using another, unrelated victim's online platform, noting in determining whether defendant's "scheme operated as a continuing course of conduct,

it is helpful to look at what he sought to gain from it"); *see also United States v. Parlato*, 2017 WL 9487081, at *10 (W.D.N.Y. Feb. 13, 2017) (fact that some victims "may have been defrauded in a manner different from the other alleged victims does not render [the] counts duplicitous, since all of the alleged victims were the subject of defendants' scheme and artifice to defraud"). The wire fraud counts are not duplicitous.[2]

And even if they were, dismissal would not be a proper remedy. In a wire fraud prosecution, "the relevant question at all times is whether

---

[2] Defendants also argue the R&R is wrong to the extent it suggests the two sets of transactions were connected because of the so-called "lulling exception." (Dkt. 184 at 6 n.1.) The Court addresses lulling in detail below, as it relates primarily to Defendants' prior motion to dismiss. (Dkt. 115.) As far as the wire fraud and conspiracy counts, all the Magistrate Judge decided was that Defendants' arguments about lulling "are premature at this stage of the proceedings because they pertain to 'factual questions as to which the [United States] should be permitted to adduce evidence at trial.'" (Dkt. 182 at 23 n.9 (citation omitted).) Defendants do not address the Magistrate Judge's conclusion on that point, instead arguing the merits of their challenge to the lulling theory. (Dkt. 184 at 6 n.1.) To the extent the Court even needs to review the R&R on this decision, it sees no plain error in the Magistrate Judge's conclusion. As the R&R correctly explains, "[a]t this stage of the proceeding, there is no evidence addressing whether receipt of the [wire communications] lulled the [victims] or concealed the truth from them," and "[i]t is sufficient, for purposes of [Defendants'] motion to dismiss, that these theories are legally cognizable and the [United States] may present evidence from which a reasonable jury might conclude the [communications] furthered the scheme in this manner." *United States v. Weiss*, 469 F. Supp. 2d 941, 951–52 (D. Colo. 2007).

the wire is part of the execution of the scheme" to defraud. *Schmuck v. United States*, 489 U.S. 705, 715 (1989). Here, each count is based on a separate wire communication. So, each count pertains to only one execution of a scheme (or two for argument's sake). To avoid any unanimity issues, the Court can provide the jury instructions "particularizing the offense charged in each count." *United States v. James*, 749 F. Supp. 2d 705, 711 (S.D. Ohio 2010); *see also United States v. Abdi*, 2014 WL 3828165, at *6 (N.D. Ga. Aug. 4, 2014) ("[G]enerally, any confusion or risk of non-unanimity can be appropriately addressed and eliminated by special interrogatories and careful jury instructions.").

As for the conspiracy count, the Court agrees with the Magistrate Judge that it properly charges a single conspiracy. (Dkt. 182 at 24.) "In determining whether a single conspiracy is pled, courts consider: '(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants.'" *United States v. Evans Concrete, LLC*, 2023 WL 3019058, at *3 (S.D. Ga. Apr. 20, 2023) (quoting *United States v. Calderon*, 127 F.3d 1314, 1327 (11th Cir. 1997)). As the Court already concluded, the indictment adequately alleges a single scheme with a common goal: defrauding a PPE supplier and potential PPE

customers for money.  And the conspiracy count alleges that Defendants (overlapping participants) conspired to engage in the conduct underlying that scheme.

Defendants do little in the way of objecting to this conclusion. Rather, they simply repeat that the United States "has mashed two unrelated schemes together in an attempt to create one wire fraud scheme." (Dkt. 184 at 9.)  That argument fails for the same reasons as before.  The indictment's allegations "are sufficient to pass muster at the motion to dismiss stage." *Evans Concrete*, 2023 WL 3019058, at *4.  If, at trial, the United States "only proves the existence of multiple, distinct conspiracies instead of the single conspiracy charged in the [indictment], the Court can revisit Defendants' arguments after the close of the [United States's] case." *Id.* (internal quotation marks and citation omitted).

## IV.   Prior Motion to Dismiss Based on Lulling Exception

Defendants previously moved to dismiss the wire fraud counts, saying they "fail to properly charge any conduct under the lulling exception." (Dkt. 115 at 1.)  Because of some procedural issues (and because it appeared Defendants raised a new argument for the first time in their objections to the Magistrate Judge's previous R&R), the Court

denied that motion as moot, but gave Defendants the chance to raise all their lulling arguments for initial consideration by the Magistrate Judge. (Dkt. 174 at 19–20.)   After the parties submitted their new motion to dismiss, Norkus moved for "a ruling on the merits" of the prior motion, saying the arguments it raised "are fully briefed and are separate and distinct from the arguments raised" in the new motion.   (Dkt. 178 at 2–3.)  The Magistrate Judge says that, should the Court reach the merits of the prior motion, it should deny the motion for the reasons he gave in the prior R&R.   (Dkt. 182 at 2.)   Norkus objects "for the same reasons previously submitted to the Court."  (Dkt. 185 at 3.)

In the prior motion, Defendants said that "[i]n the [United States's] response to [Defendants'] pre-trial motions, the [United States] asserted that the wire fraud counts were properly charged under the 'lulling exception.'"   (Dkt. 115 at 1.)   Defendants argued that the wire fraud counts "fail to properly charge any conduct under the lulling exception" because "there is no indication in the indictment that the people who had been defrauded—Victims A and B—had any knowledge of the emails sent to O&M Halyard, or that any communication with O&M Halyard would have any effect on whether Victims A and B discovered the fraudulent

17

scheme." (Dkt. 115 at 1–4.)

The Magistrate Judge found that the indictment properly describes an overarching scheme in which Defendants sought to defraud both sets of victims.   (Dkt. 153 at 41.)   The Magistrate Judge explained the indictment alleges that, after Defendants had wrongfully procured the money from Victims A and B and paid down some debt to O&M Halyard, Defendants:

> continued their deception by sending a series of emails to O&M Halyard employees regarding the transfer of funds in order to cause them to believe that the outstanding debt has been or would be paid so that they would remain authorized distributors for O&M Halyard and conceal their alleged fraudulent activities to reduce the likelihood of jeopardizing their scheme and in order to be in a position *to commit further fraudulent acts.*

(Dkt. 153 at 42 (emphasis added).)   Ultimately, the Magistrate Judge concluded these allegations sufficiently pled Defendants' post-payment emails to O&M Halyard furthered the whole scheme and lulled O&M Halyard into a false sense of security to evade detection of their fraudulent conduct.   (Dkt. 153 at 43.)   Defendants objected, saying the indictment alleges two separate schemes, and "the lulling exception does not apply to the first alleged scheme" against Victims A and B, because Defendants sent the alleged lulling emails only to O&M Halyard.   (Dkts.

161 at 3–4; 162 at 16–18.)  According to Defendants, because Victims A and B never would have seen the emails, there's no way they could have been intended to "prevent[] Victims A [and] B from discovering the scheme." (Dkt. 162 at 17.)

"Under the lulling exception, [wire communications] are sufficiently a part of the execution of a fraudulent scheme if they are used to lull the scheme's victims into a false sense of security that they are not being defrauded, thereby allowing the scheme to go undetected." *United States v. Hill*, 643 F.3d 807, 859 (11th Cir. 2011).  "And a lulling [wire communication] may be 'incident to an essential part of the scheme' even after the fraud has been successfully perpetrated if the [wire communication] is critical to conceal the scheme." *Id.*

Defendants' lulling argument fails for the same reasons discussed above—the indictment sufficiently alleges one overarching scheme, not two separate ones.  Without Defendants' fraudulent conduct on both sides of the separate transactions, the whole scheme would have fallen apart. In other words, Defendants' spending Victim A's and Victim B's money was necessary to convince O&M Halyard to remain Sperber's authorized distributor, and Sperber's relationship with O&M Halyard was necessary

to convince Victim A and Victim B to pay Defendants. The scheme did not end upon payment by Victims A and B because Defendants later used that money to continue the fraud against O&M Halyard. Indeed, "a lulling email sent" as part of the same scheme "after the money has been obtained can give rise to liability for wire fraud[.]" *United States v. Braeger*, 2023 WL 2136722, at *9 (E.D. Wis. Feb. 21, 2023). That Victims A and B did not see the later emails to O&M Halyard doesn't change the equation, as the alleged purpose of those emails was to keep the whole scheme from collapsing, which obviously would have tipped Victims A and B off to the fraud. "Defendants may argue at trial that the . . . email[s] [were] not sent in furtherance of the fraud and move for acquittal if the evidence is insufficient, but that argument does not warrant dismissal of the [indictment] at this stage." *United States v. Alfortish*, 2011 WL 2293136, at *4 (E.D. La. June 8, 2011).

## V. Sperber's Motion to Limit Admission at Trial of Norkus's Statements

Sperber moves to limit the admission at trial of an interview Norkus gave two federal agents, which includes "multiple comments, prompted and unprompted, implicating Mr. Sperber." (Dkt. 176 at 1.) Sperber asks the Court to "provide a clear and unambiguous limiting

instruction, at the time the [United States] first seeks to offer Mr. Norkus's out-of-court statements and again at the conclusion of that testimony, that the jury may not consider those statements as evidence relevant to the charges against Mr. Sperber." (Dkt. 176 at 2.) Sperber also requests that, should the United States offer this evidence, the Court "delete [Sperber's] name from any such statement and replace it with the term 'another person.'" (*Id.*) The United States did not respond.

A defendant "is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 20, 201–02 (1987) (citing *Bruton v. United States*, 391 U.S. 123 (1968)). Recently, the Supreme Court held that courts may avoid potential *Bruton* problems by meeting two conditions: (1) the court "modifies" the confession "to avoid directly identifying the nonconfessing codefendant," and (2) "the court offers a limiting instruction that jurors may consider the confession only with respect to the confessing codefendant." *Samia v. United States*, 599 U.S. 635, 640 (2023). The Supreme Court also explained that redacting the defendant's

name using a term like "other person" places the confession "'outside the narrow exception [*Bruton*] created,'" and is an appropriate redaction. *Id.* at 653 (citation omitted).

The Court will instruct the jury at trial that it must limit its consideration of Norkus's statement to the question of Norkus's guilt—not Sperber's. And it will order that the United States redact any mention in the interview of Sperber's name with the term "other person," "another person," or something like that. The parties must work with each other (and the Court) to dial in the exact instruction and approach for redaction/alteration consistent with this Order.

## VI. Conclusion

The Court **GRANTS** Sperber's Motion to Limit Codefendant's Statements (Dkt. 176) and Norkus's Motion for a Ruling on the Merits of Docket 115 (Dkt. 178), **OVERRULES** each of Defendants' Objections to the R&R (Dkts. 184; 185), **ADOPTS** the R&R (Dkt. 182), and **DENIES** Defendants' Motion to Dismiss Wire Fraud Counts (Dkt. 115) and Joint Motion to Dismiss Duplicitous Counts (Dkt. 175).

**SO ORDERED** this 28th day of March, 2024.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE